**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**PECOS DIVISION**

| | | |
|---|---|---|
| **MATTHEW JONES,**<br>**YSIDRO RENTERIA, and**<br>**WILLIAM L. JONES CARR,**<br><br>***Plaintiffs,***<br><br>**v.**<br><br>**AMBER M. KING,**<br>**CHRIS H. BUSSE, and**<br>**BRANDON W. JONES,**<br><br>***Defendants.*** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Civil Action No. 4:22-cv-30** |

**<u>SECOND AMENDED COMPLAINT</u>**

TO THE HONORABLE COURT:

Pursuant to the Court's April 24, 2023 Order (ECF No. 16), Plaintiffs Matthew Jones, Ysidro Renteria, and William L. Jones Carr (collectively, "**<u>Plaintiffs</u>**") file this Second Amended Complaint against Defendants Amber M. King, Chris H. Busse, and Brandon W. Jones (collectively, "**<u>Defendants</u>**"), and respectfully state the following:

## I. INTRODUCTION

1. As public officials in Loving County, Texas, Defendants took an oath to preserve, protect, and defend the Constitution and laws of the United States and of Texas. That oath includes an obligation to protect the constitutional rights of ***all*** citizens—even those with whom the officials disagree on political matters. Defendants violated their oaths, abused their authority, and carried out a premeditated and vindictive scheme to punish those who were unwilling to bend to their political, personal, and financial demands. This suit seeks to hold Defendants accountable to their oaths and for their misconduct.

2. Plaintiffs are lifelong residents and voters of Loving County. In May 2022, each Plaintiff received a jury summons to appear at the Justice of the Peace Court, over which Defendant Amber M. King presided. Each Plaintiff appeared. As deputies of Defendant Chris Busse (the Loving County Sheriff) and Defendant Brandon W. Jones (the Loving County Constable) watched, each Plaintiff truthfully swore that he was a resident of Loving County and thus eligible to serve as a juror. With no hearing, no evidence, and nothing resembling due process, King summarily ordered that each Plaintiff be immediately arrested. Deputy Sheriffs, acting at the direction of Defendants, then publicly arrested Plaintiffs, handcuffed them, and drove them to the jail in a nearby county, where they were held for several hours. Plaintiffs later learned that they had been charged with "contempt" for acts "disrespectful to the court."

3. The summons, arrest, and charges were a ruse. Defendants capitalized on the partisan fervor over supposed voter fraud—and ambiguous language in recently passed legislation known as Senate Bill 1111 ("**SB 1111**")—as a pretense to summon, arrest, jail, and intimidate their political rivals. Defendants did so with full knowledge that Plaintiffs ***are*** legal residents entitled to vote in Loving County, even after passage of SB 1111. Defendants shamelessly boasted to the media that they hoped to "thin out" the voter rolls in Loving County—all but announcing their apparent belief that the U.S. Constitution does not reach into the ranch lands of west Texas. King even admitted under oath that she could not identify any purpose for the arrests other than "voter intimidation."

4. One of the Defendants—Sheriff Busse—took these voter suppression efforts one step further. In his capacity as the Voter Registrar for Loving County, Busse sent a letter to ***every voter*** in Loving County—including Plaintiffs. That letter falsely stated that the Voter Registrar had "received information" that the voter's residence information was wrong and demanded that the voter prove their residency within thirty days. These false accusations further intimidated the

voters of Loving County, in the apparent hope that only Defendants' supporters would turn out to vote.

5. Like every other citizen of the United States, Plaintiffs enjoy the protections of the First, Fourth, and Fourteenth Amendments to the United States Constitution. These laws do not permit local officials to manipulate the levers of power to punish political opponents, settle personal scores, and intimidate rightful voters from exercising their lawful franchise. Plaintiffs now ask the Court to hold Defendants accountable for their abuse of power and brazen violation of Plaintiffs' rights.

## II. PARTIES

6. Plaintiff Matthew Jones ("**Matthew Jones**") is an individual residing in Loving County, Texas.

7. Plaintiff Ysidro Renteria ("**Renteria**") is an individual residing in Loving County, Texas.

8. Plaintiff William L. Jones Carr ("**Carr**" or "**William Carr**") is an individual residing in Loving County, Texas.

9. Defendant Amber M. King ("**King**" or "**Amber King**") is an individual residing in Loving County, Texas. During all times relevant to this Complaint, King served as Justice of the Peace for Loving County. She can be served through her attorney of record. King is being sued in her personal capacity.

10. Defendant Christopher H. Busse ("**Busse**") is an individual residing in Loving County, Texas. Busse currently serves as the Sheriff of Loving County. As Sheriff, he also serves as the Voter Registrar for Loving County. He can be served through his attorney of record. Busse is being sued in his personal capacity.

11. Defendant Brandon W. Jones ("**Brandon Jones**") is an individual residing in Loving County, Texas. Brandon Jones currently serves as the Constable for Loving County. He can be served through his attorney of record. Brandon Jones is being sued in his personal capacity.

## III. JURISDICTION

12. Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation of rights secured by the U.S. Constitution.

13. Plaintiffs also bring this suit under 52 U.S.C. § 10307(b) to redress the intimidation, coercion, threat, and attempted intimidation, coercion, and threat, to voting or attempting to vote.

14. The Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States and involve the assertion of deprivations, under color of state law, of rights under the United States Constitution.

15. The Court has personal jurisdiction over Defendants, who are sued in their personal capacities and are residents of Texas.

16. Venue is proper in this Court under 29 U.S.C. § 1391(b) because a substantial part of the events that give rise to Plaintiffs' claims occurred in this judicial district.

17. This Court has the authority to provide injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## IV. FACTUAL BACKGROUND

### A. Each Plaintiff is a resident of Loving County, Texas.

18. Loving County is located along the Texas-New Mexico border in west Texas. It is Texas' smallest county by population, with only 57 residents identified in the most recent census. The County has benefited substantially from the recent boom in oil and gas drilling. As oil revenues and property values have increased over the past twenty years, so have receipts from

Loving County property taxes. In 2008, the County commanded a budget of approximately $2 million. By 2020, that total had increased to approximately $27 million.

19. The Jones family has been firmly and proudly rooted in Loving County for generations. Plaintiff Matthew Jones is the grandson of long-time former Loving County Sheriff Elgin (Punk) Jones. Matthew's father, Skeet Jones, is currently the Loving County Judge. Matthew has been registered to vote in Loving County since he became eligible to vote as a teenager. He owns property in Loving County where he regularly stays overnight. Matthew Jones, his family, and their family-owned ranch corporation are model citizens—selflessly donating time, effort, and hundreds of thousands of dollars annually to charities and religious organizations in and around Loving County.

20. Like the Jones family, the Renteria family has been a fixture in Loving County for almost a century. Ysidro Renteria was born and raised in Loving County. He registered to vote in Loving County when he was 18 years old and has consistently voted in the County for over 40 years. Renteria owns property and conducts business in Loving County and neighboring counties. Renteria sleeps several nights a week on the property that he and his family own in Loving County. A dedicated public servant, Renteria currently serves as a County Commissioner for Loving County, a position he has held since 2011.

21. William Carr has been registered to vote in Loving County since he was 18. He warehouses and sells lubrication products out of a warehouse in Mentone and owns property in Loving County. His mother is Mozelle Carr, the current Loving County Clerk. His uncle is Skeet Jones, the County Judge, and Matthew Jones is his first cousin. William Carr regularly stays overnight in Loving County.

### B. <u>Plaintiffs and Defendants are personal and political adversaries.</u>

22. The Defendants' abusive conduct should be viewed within the framework of the

2022 elections. The Primary Election was conducted on March 1, 2022. The General Election was conducted on November 8, 2022.

23. Between those two election dates, and in the days leading up to May 25, 2022, each Plaintiff found himself in personal, financial, and political disputes with one or more of Defendants.

24. Defendant Brandon Jones is cousin to both Matthew Jones and William Carr. Matthew Jones' father—County Judge Skeet Jones—initially supported Brandon Jones' efforts to be Constable of Loving County. Brandon Jones' father, Richard Jones, is Judge Skeet Jones' brother and a co-owner of the Jones family ranch in Loving County.

25. Brandon Jones' wife (Holly Jones) worked for the Jones family ranch until January 2022, when she announced her intention to run for County Clerk against Mozelle Carr (her husband Brandon's aunt and William Carr's mother). Despite owing his very livelihood to Judge Skeet Jones and being the beneficiary of other generous gifts from Judge Jones' family, Brandon Jones has publicly maligned and shamelessly criticized Judge Jones in the media and has closely aligned himself with Amber King.

26. In approximately September 2021, Brandon Jones approached Renteria before a County Commissioners meeting. Brandon Jones asked Renteria to support a request to hire two additional deputies to work under Brandon Jones. Renteria pushed back, noting that Loving County (with a population of less than 60) already had several deputies and that Renteria did not see why it needed more. Brandon Jones responded that he wanted more deputies under his command. Renteria said that he would consider the request but, after hearing arguments at the Commissioners meeting regarding the justification for and expense of additional deputies, Renteria concluded that the extra deputies were not in the County's best interest and voted against the request. Brandon Jones has refused to speak to Renteria ever since. Instead, Brandon Jones

embarked with King and Busse on a coordinated and personal campaign of retaliation and intimidation against Renteria and his family.

27. Amber King had been the Loving County Justice of the Peace since 2020. Her husband, Raymond King, serves alongside Renteria as a Loving County Commissioner.[1] In December 2021, Renteria was asked to serve on the Loving County Appraisal Board, on which Amber King and Busse also served. At the March 2022 meeting of the Appraisal Board, both Amber King and Busse told Renteria that they believed that Renteria did not live on his property in Loving County and should resign from the Appraisal Board. As a basis for their position, King and Busse cited then-recently enacted SB 1111—2021 legislation that changed certain residency requirements for voter registrations. Both King and Busse voted for a resolution asking Renteria to resign. Renteria denied their allegations, voted against the resolution, and refused to resign.

28. Raymond King then made a similar motion seeking Renteria's resignation from the Loving County Commissioners Court. The motion did not receive a second and failed.

29. King and Busse then caused the Appraisal District to file suit against Renteria, alleging that he was not eligible to serve on the Appraisal District Board due to his supposed lack of residency in Loving County. The Loving County Commission later voted to deny funding for the suit and to recall King and Busse from their positions on the Appraisal Board.

30. Amber King has also repeatedly clashed with Judge Skeet Jones on political and personal issues and has filed multiple baseless grievances against Judge Jones with State authorities, including a baseless grievance claiming that Judge Jones raised his voice to King. None of the grievances have resulted in any disciplinary action being taken against Judge Jones.

31. In the November 8, 2022 general election, King received the same number of votes

[1] Neither Amber King nor her husband Raymond King is a native of Loving County. They moved there when Raymond took a job at one of several "man camps" for oil workers.

as her challenger. In the subsequent runoff election, King was defeated.

32. Holly Jones—Defendant Brandon Jones' wife—lost her campaign against Mozelle Carr for County Clerk.

33. Renteria's opponent also lost his campaign to unseat Renteria as a County Commissioner.

34. King, Holly Jones, and Renteria's opponent filed election contests against their opponents, which remain pending in Texas district court.

**C. Justices of the peace have limited jurisdiction under Texas law.**

35. Texas law does not give justices of the peace any jurisdiction to compile, modify, review, or alter the list of county residents eligible to serve on juries. That duty is proscribed by statute to other government officials.

36. Specifically, Texas law requires that the list of residents eligible to serve on juries be compiled from a combination of the county's registered voters and a list furnished by the Texas Department of Public Safety ("**DPS**") of all persons holding a valid Texas driver's license or identification card with an address in the county. The consolidated list is maintained by the clerk of court for each county. Justices of the peace have no authority or jurisdiction to determine whether any person is properly included on the list of registered voters, the DPS list, or the consolidated list of eligible jurors.

37. Loving County utilizes an electronic system to select jurors. For each jury trial, the clerk utilizes the electronic system to generate a list of prospective jurors that is drawn at random from the list of eligible jurors. The district clerk then provides that list of prospective jurors to court staff and others for issuances of summonses. Justices of the peace have no role, authority, or jurisdiction to choose the persons who are eligible to serve on juries or are chosen as prospective jurors for any particular trial.

38. On the day that jurors appear for jury service, the justice of the peace may oversee the process through which jurors are selected to serve on a jury panel. The justice of the peace may do so ***only*** after calling the case in open court, asking the parties to announce, and then identifying the jurors who have been summoned for that particular trial. Texas law does not give a justice of the peace the jurisdiction or authority to hold ***other*** proceedings—outside of the rule-prescribed jury selection process—to examine the list of eligible jurors, quiz summoned jurors about their qualifications, or determine whether any juror is a resident of the county.

39. Justices of the peace do not have jurisdiction to hear election challenges or other legal actions to determine whether a person is a resident of a county for purposes of voting or serving on a jury.

40. Justices of the peace also do not have jurisdiction to preside over prosecutions for perjury.

**D. <u>Defendants conspired to have Plaintiffs arrested under false pretenses.</u>**

41. Sometime prior to May 25, 2022, Defendants conceived of and agreed to execute a plan to abuse the power entrusted to them to punish Plaintiffs and Defendants' other political opponents.

42. In April 2022, King informed the Loving County clerk that she needed a jury for an upcoming trial. It was the first—and the only—time that King requested a jury. King informed the clerk that King wanted to hand-pick the jurors who would be called for jury service. The clerk provided King with the list of jurors randomly selected for service on the next jury. Plaintiffs were on the list of prospective jurors that the clerk provided to King. King told the clerk that she would proceed with the list and caused summonses to be issued.

43. Shortly thereafter, each Plaintiff received a summons to appear for jury selection in Justice of the Peace Court in Loving County. It was not unusual for Plaintiffs to receive jury

summonses for District Court. Given the small number of residents in Loving County, a large percentage of all eligible jurors received summonses each time a jury was called. But none of the Plaintiffs could recall ever receiving such a summons for Justice of the Peace Court.

44. In her deposition in the election contest, King testified that she was aware that Plaintiffs had been summoned for jury duty. She further testified that she intended to have the defendants arrested, at the least, by the day before the Plaintiffs were summoned to appear, based entirely on her personal, subjective belief that Plaintiffs were not eligible to serve on the jury panel:

> Q. Okay. In other words, what you had done the day before was determine that at least four citizens were not eligible to serve on the panel, right?
>
> A. Yes.

45. King also discussed her plan to arrest Plaintiffs with Brandon Jones, who told King that he wanted to arrest Plaintiffs for "aggravated perjury." King confirmed the conversation when she texted a friend—prior to the arrests of the Plaintiffs—that "the constable wants to charge them with aggravated perjury." King added: "It might get wild today."

46. Holly Jones further testified that Brandon Jones (her husband) told her, prior to the arrests, that King intended to arrest Plaintiffs, alleging that Plaintiffs had "perjured themselves."

47. On May 25, 2022, each Plaintiff appeared as summoned to a meeting room (not a courtroom) in the annex of the Loving County Courthouse, along with several other individuals. Richard Jones, the father of Brandon Jones, was also in the jury pool. Shortly after Carr arrived at the courthouse, Richard Jones approached Carr, put his face up close to Carr's face, and asked whether Carr thought he was "getting what he deserved." Upon information and belief, Defendants made Richard Jones aware of the premeditated plot to arrest his own nephews, William Carr and Matthew Jones.

48. As Brandon Jones and one of Busse's deputies watched, King initiated an informal, improvised, and unprecedented "juror qualification" proceeding. The proceeding did not take place in a courtroom, but rather in a meeting room in an annex building. King did not call a case that was set for trial. No defendant was present. No defense lawyer participated in the proceeding. No parties announced ready for trial. King did not announce the names of jurors summoned for service. There was no court reporter. King simply sat down and started talking.

49. King began by addressing the assembled group. She first stated that any of those summoned who were not "qualified jurors" could leave voluntarily. She then stated that any person who is found not to be a "qualified juror" would be "submitted to the district attorney for a [sic] aggravated perjury, a third-degree felony" and held in contempt of court. None of the "jurors" left.

50. A Sheriff's deputy, who was acting under the direction of Busse and the other Defendants, asked the summoned jurors to stand, raise their right hand, and swear to tell the truth in response to King's questions regarding their "service and qualifications as a juror." Each person affirmed.

51. King then proceeded to ask the assembled group a series of "yes" or "no" questions:

- "You are all 18 years of age or older?" The summoned jurors responded in unison, "yes."
- "You are all citizens of this country and residents of this county?" The summoned jurors responded in unison, "yes."
- You are all able to read and write?" The summoned jurors responded in unison, "yes."
- "You are currently eligible to become a qualified voter of this country under the Constitution and the laws of this state?" The summoned jurors

responded in unison, "yes."

- "You're not convicted of a misdemeanor theft or any felony?" The summoned jurors responded in unison, "no."
- "You're not under indictment for legal accusations for misdemeanor theft or felony?" The summoned jurors responded in unison, "no."

52. Immediately thereafter, King stated:

> "***So it's come to this Court's attention there are several jurors who are not residents of this county***. And you were given the opportunity to leave. Since you have not left you will be held in contempt of court, and you will be remanded to the Winkler County Jail for obstruction of the proper administration of justice as well as disrespect to the Court."

53. King then identified each Plaintiff by name and ordered them to be arrested. Brandon Jones and a Deputy Sheriff escorted Plaintiffs out of the room and into an enjoining hallway, where Plaintiffs were ordered to empty their pockets. Deputies then placed handcuffs on each Plaintiff and walked them to waiting vehicles. The deputies drove Plaintiffs to the Winkler County jail at high rates of speed, with lights and sirens blaring. Renteria objected to the speed, telling the deputy that he was needlessly putting all their lives in jeopardy. The deputy did not respond to Renteria.

54. At the Winkler County jail, Plaintiffs were fingerprinted, photographed, and jailed for approximately five hours before they were released.

55. In her deposition in the election contest, King testified that the purpose of the proceeding was to determine "eligibility for a jury panel." However, King had no jurisdiction or authority to hold a proceeding to "qualify jurors," or otherwise determine whether any juror summoned was a resident of Loving County, properly registered as a voter, or properly on the list of eligible voters. King instead—working with the other Defendants—concocted the sham

proceeding as a pretense for the unlawful arrest of Plaintiffs.

56. King did not hold any hearings, collect any evidence, or permit any Plaintiff the opportunity to obtain counsel, present evidence, or otherwise establish their residency in Loving County before ordering them to be arrested. King admitted as much in her deposition:

> Q. The four people that you ordered arrested, you never gave them an opportunity to have their own counsel advocate for them before they were handcuffed and taken away, correct?
>
> A. Correct.

57. As confirmed on video recorded of the jury selection, there was no exigency or emergency that preceded Plaintiffs' arrest. None of the Plaintiffs were being in any way disruptive or disobeying any of King's orders. None of the Plaintiffs interfered in the sham "juror qualification" proceeding in any manner. None spoke other than to take their oath and give "yes" or "no" answers to King's questions. The proceeding was merely a ruse to force Plaintiffs to appear for jury selection, ask them to swear to their residency, and provide a pretense for their unlawful arrest.

58. In July 2022, and only after Plaintiffs filed a Freedom of Information Act request, Plaintiffs learned that King had signed two separate orders for each Plaintiff. One order was titled "Order for Direct Contempt." The other order was titled "Modified Order for Direct Contempt." Each "Order for Direct Contempt" states: "You are hereby remanded to the Winker [sic] County Jail for 1 day (24 hrs.) as well as a fine of $100.00." Video of the proceeding makes clear that the contempt orders were prepared ahead of time, as completed orders were presented to King to sign immediately after she ordered Plaintiffs arrested.

59. Each "Modified Order for Direct Contempt" states: "You are hereby remanded to the Winker [sic] County Jail until 5:00 PM on May 25, 2022, as well as a fine of $100.00." On information and belief, Defendants modified the orders after learning that Winkler County had chosen to release Plaintiffs at 5:00pm on May 25, 2022.

60. All of the orders state that the "defendant" "refused to comply with this court's order" and "is hereby charged with Direct Contempt. [sic] Per Government Code Chapter 21.002(c)." The orders do not identify the court order with which Plaintiffs allegedly failed to comply or identify any actions of Plaintiffs that were the basis of the orders, as required by Texas law.

61. King and the other Defendants were well aware that Texas did not give King the authority or jurisdiction to conduct the "juror qualification" proceeding described herein. Defendants were aware that King had no authority to order Plaintiffs arrested for contempt without providing them with due process, including the opportunity to present evidence in their defense. Defendants were aware that King had no jurisdiction, authority, or right to determine whether Plaintiffs were residents of Loving County, eligible to vote, or eligible to serve on juries in Loving County. Defendants were aware that King's "proceeding" and orders to arrest Plaintiffs did not comply with state law, federal law, or basic principles of due process.

62. King and the other Defendants attempted to shield their illegal actions from judicial review by falsely characterizing King's orders as "direct contempt." The label was a fiction that did not accurately describe the nature of the orders, the proceeding that led to them, or their purpose. The proceeding in which King purported to hold Plaintiffs in contempt was an invention of Defendants, with no basis in law or practice. King did not comply with the requirements of federal and state law in ordering contempt, including the provision of due process to Plaintiffs.

Even the apparently hurried and typo-ridden orders that resulted from this kangaroo proceeding failed to comply with the requirements of Texas law.

63. The substance of what occurred is that King held a *sua sponte* and illegal prosecution for perjury—albeit in four minutes and with no notice, evidence, witnesses, defenses, or due process and with King acting as the prosecutor, judge, and jury and with the knowledge that Plaintiffs, in fact, ***accurately*** stated they were residents of Loving County. Again, King admitted as much in her deposition:

> Q. So you were acting as the prosecutor, the jury and the judge when you sentenced them to imprisonment up
>
> to 5:00 p.m.?
>
> MS. BALOVICH: Objection, form.
>
> Q. Correct?
>
> A. Yes.

Merely labeling these actions as "contempt" does not legitimize such flagrant violations of the United States Constitution.

64. The purpose of this sham proceeding was clear—to intimidate Defendants' political opponents from exercising their lawful right to vote. When confronted with her actions, King could not offer an explanation ***other than voter suppression***:

> Q. Sure. It's an opportunity for you to offer a single explanation other than voter intimidation, why you would order the arrests of people that show up for jury duty, as opposed to saying you can't serve on a jury. Do I have an answer?

A. (No audible answer)

Q. Ms. King, do you have an answer?

A. No.

65. Each Defendant knowingly conspired and coordinated with each other to concoct and carry out the "juror qualification" proceeding and arrest Plaintiffs. Each Defendant acted on this agreement, including by facilitating the mailing of jury summonses, being present for and participating in the arrest of Plaintiffs, directing subordinates to arrest Plaintiffs and drive them to the Winkler County jail, and by encouraging, approving, and supporting King's sham juror qualification proceeding.

66. As noted above, King testified that she and Brandon Jones discussed the plan to arrest Plaintiffs ahead of time and that Jones told King that he wanted Plaintiffs arrested for aggravated perjury. This fact was confirmed by King's contemporaneous text messages and the testimony of Holly Jones.

67. Busse denied being part of the plot to arrest Plaintiffs, but his key deputies were present and had advance notice of the arrests. The deputy that placed the handcuffs on Plaintiffs—Deputy Boyd—stated that either Busse or his principal deputy (he could not remember which) told Boyd ahead of time that Plaintiffs were going to be arrested. In his deposition, Busse ultimately conceded that King's unilateral decision to arrest Plaintiffs did not comply with due process. Busse also witnessed the arrests as they occurred and spoke to King while Plaintiffs were being escorted out of the conference room. As Sheriff, he could have intervened and directed his deputies not to carry out an arrest that he knew to be unlawful. He could have advised King that her actions were illegal. Yet he did nothing and knowingly permitted Plaintiffs to be escorted to jail in violation of their constitutional rights.

68. Video from Brandon Jones' body camera reveals a brief conversation between Busse, King, and Brandon Jones after Plaintiffs were arrested and escorted out of the conference room. The video shows Busse walk up to King and ask: "What did I miss this morning before I got here?" The video further shows King look up at Busse with a smile. The video then shows Brandon Jones indicate that his body camera is on, as Busse looks at Jones in a disapproving manner. Jones then covers up the body camera with his hand and obscures both video and audio recording. Busse's question, King's smile and body language, and the evident familiarity between the three Defendants indicates the close cooperation of a group of people working together toward a common goal. Brandon Jones' decision to cover his body camera and obscure its recording—as Busse glared at him—further indicates that Defendants knew what they were doing was improper and intended to minimize evidence of their cooperation.

69. In her deposition, King admitted to intentionally deleting evidence after losing her election, including all of the information on her work computer. She further admitted to destroying this evidence ***after*** being sued in this action and receiving a letter from Plaintiffs' counsel demanding that she preserve evidence and warning her of the potential consequences of spoliation. This deletion constitutes additional evidence that Defendants were aware that their actions were improper and took steps to eliminate evidence of those actions.

70. On October 14, 2022, Plaintiffs filed a Petition for Writ of Mandamus challenging the contempt orders. A state district court appointed the Lubbock County District Attorney to represent King. On January 30, 2023, after considering the Writ and accompanying evidence, the court grated the Writ, vacated the Contempt orders, and found that King had "clearly abused her discretion and failed to comply with due process."

### E. King illegally ordered Plaintiffs removed from the jury rolls and destroyed evidence.

71. On or about June 8, 2022, after she ordered Plaintiffs arrested, King directed the

Loving County clerk to remove Plaintiffs from the list of eligible jurors on the false grounds that they were residents of counties other than Loving County.

72. The intended result of King's direction to the clerk was that Plaintiffs would be no longer eligible to serve on juries in Loving County.

73. King gave this direction in an email. She did not provide any notice that she intended to remove Plaintiffs from the list of eligible jurors, conducted no hearings, considered no evidence, and gave Plaintiffs no opportunity to be heard regarding that direction. King had no jurisdiction to determine whether Plaintiffs were residents of Loving County and thus eligible to serve on juries.

### F. SB 1111 does not provide a valid basis for Defendants' actions.

74. In public statements before and after May 25, 2022, Defendants claimed that SB 1111 changed residency requirements for purposes of voting and made Plaintiffs ineligible to vote in Loving County. These statements were knowingly false.

75. By virtue of his position as Sheriff, Busse also served as the voter registrar in Loving County. Busse was therefore familiar with the laws and regulations concerning the establishment of residency for purposes of voting in Loving County, including the manner in which persons may be removed from the list of registered voters.

76. Shortly after SB 1111 was enacted, two non-profit organizations challenged the constitutionality of SB 1111 in a suit against the Attorney General of Texas and various state officials in the United States District Court for the Western District of Texas, Austin Division, captioned as *Texas State LULAC, et al. v. Elfant, et al.*, Cause No. 1:21-CV-546-LY (the "**Austin Litigation**").

77. In discovery in the Austin Litigation, the plaintiffs deposed Brian Keith Ingram, the Director of the Elections Division of the Texas Secretary of State's Office. Mr. Ingram testified

that he had spoken at length with Sheriff Busse regarding the impact of SB 1111 on voters in Loving County. Mr. Ingram testified that he told Busse that if a voter spent even a few days per year sleeping in a residence in Loving County, then that voter could be validly registered in Loving County:

> There are other persons who have a house or another sort of place to live in Loving County. And they do come visit, you know, a week or two a year.
>
> And I told the sheriff that those places were inhabited by those people who spent at least some time during the year at that location. So he could not successfully challenge those persons under impossible addresses.

78. In his deposition in the election contest, Busse admitted to speaking with Mr. Ingram and being told that a person who spends only one or two nights a year in Loving County could be considered a resident of Loving County. Busse also did not question Mr. Ingram's interpretation of the law:

> Q. But do you have any reason to -- to dispute, if it's coming out of Keith Ingram's mouth?
>
> A. No.
>
> Q. Okay. So -- so you have no reason to dispute the concept that even if someone spends just once or twice a year in Loving County, that they could still, depending upon other factors, claim Loving County as a residence for voting?
>
> A. Correct.

79. Prior to May 25, 2022, each Defendant was aware that each Plaintiff owned property, conducted business, and at times slept overnight in Loving County. Defendants were also aware that Mr. Ingram had told Busse that a person who spends a night or two each year in Loving County could legally vote in Loving County, ***even after passage of SB 1111***.

80. Defendants were thus well aware that SB 1111 did not render any Plaintiff ineligible to vote in Loving County. Yet Defendants used SB 1111—and the partisan fervor over alleged voter fraud—as a pretense to deprive Plaintiffs of their liberty and property rights, punish Plaintiffs for their votes and political positions, and attempt to intimidate Plaintiffs and other perceived political opponents from exercising their right to vote in Loving County.

### G. Busse continued voter suppression efforts after the arrests.

81. Even after the arrests of the Plaintiffs—and after receiving a preservation letter from Plaintiffs' counsel putting him on notice of Plaintiffs' claims—Busse persisted in his voter suppression efforts.

82. On or about August 22, 2022, acting in his capacity as voter registrar for Loving County, Busse signed and sent a letter to ***all voters*** in Loving County. Each of these letters includes the knowingly false claim that the Voting Registrar "has received information that your current residence is different from the residence on your information record." The letter then demanded that the voter provide information confirming their residence within thirty days of the date on the letter. If the voter did not respond in thirty days or otherwise act to prove their residency, the letter stated that "your registration will be canceled."

83. Texas law does not permit a voter registrar to send such letters unless the registrar has a bona fide reason to question a voter's residency. There was no legitimate basis for Busse to question the residency of every Loving County voter. In his deposition, Busse was forced to admit

that the letters include a "lie" that the Voter Registrar had received information challenging the voter's residency:

> Q. That statement cannot possibly be true for every single resident of Loving County, correct?
>
> A. Correct.
>
> Q. Okay. So when I asked you that this letter had a lie in it, that statement is a lie as it relates to every resident of Loving County, correct?
>
> MR. CHRISTIAN: Objection; form.
>
> A. Correct.

84. Busse further conceded that the letter was sent from an official Loving County address, bore the signature of the chief law enforcement and elections officer in the County, and was sent through the United States mail in the midst of an election. Busse admitted that such a letter could be "impactful" on potential voters:

> Q. And you understand that if you're a voter and you received this letter with the sheriff's signature on it that says they've received information that your current residence is different, that that could be impactful on voters, correct?
>
> A. Right.

85. The purpose of these letters is plain from their content and Busse's own testimony. The letters served to intimidate voters from exercising their rights to vote by falsely questioning their residency, forcing the voter to undergo legally unjustifiable burdens to prove their right to vote, and raising the prospect of negative consequences if the voter exercised his or her rights. When compounded with the arrests of Plaintiffs a few months before, the message from

Defendants to Loving County voters was clear: Defendants would use their power as county officials to punish any political opponent who dared to vote against them.

## V. CAUSES OF ACTION

86. Pursuant to Federal Rule of Civil Procedure 8(d), Plaintiffs assert the following claims individually, additionally, and/or alternatively as permitted by law.

### CAUSE OF ACTION ONE
**U.S. Const. Amendments IV, XIV; 42 U.S.C. § 1983**
**Undue Deprivation of Liberty**

87. Under Federal Rule of Civil Procedure 10(c), Plaintiffs incorporate by reference all the allegations set forth above.

88. The Civil Rights Act of 1871, now codified as 42 U.S.C. § 1983, provides that "[e]very person who, under color of any statute, ordinance, regulation, custom or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any laws, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

89. The Fourth Amendment to the United States Constitution, incorporated and applied to the states through the Fourteenth Amendment, includes a right to be free from unreasonable searches and seizures.

90. An arrest can be an unreasonable seizure when there is no legal basis for the arrest, including when the officials involved in the arrest disregard state law and when there is no probable cause for the arrest.

91. At all times relevant to this Complaint, each Defendant acted under the color of state law.

92. King and Brandon Jones knowingly and willfully caused and facilitated the issuance of jury summonses to Plaintiffs, participated in the planning and organization of the sham "juror qualification" proceeding on May 25, 2022, ordered Plaintiffs arrested, and then directed subordinates to arrest, search, and detain Plaintiffs. Busse directed or permitted his deputies to arrest and detain Plaintiffs despite knowing that King's orders were illegal. Defendants took these actions with knowledge that King had no jurisdiction, authority, or legal right to order such arrests.

93. Defendants were aware that King did not have jurisdiction or authority to conduct the "juror qualification" proceeding or determine whether any Plaintiff was a resident of Loving County. Defendants were also aware that King did not comply with the requirements of federal and state law in ordering the arrest of Plaintiffs, including the denial of due process to the Plaintiffs. Defendants were also aware there were no exigent circumstances that could justify an order of direct contempt, including because Plaintiffs were not disobeying any court orders, threatening the safety of Court personnel, or otherwise disrupting ongoing proceedings. Defendants knew that King's orders were not legal, valid, or the product of processes that complied with federal and state law. No reasonable law enforcement officer would have arrested Plaintiffs under these circumstances or permitted the arrests to proceed.

94. Defendants were further aware that each Plaintiff owned property in Loving County, at times stayed overnight in Loving County, and had been registered to vote in Loving County for a long period of time. Defendants were further aware that Mr. Ingram, the lead elections official for the State of Texas, had informed Busse that persons who stay overnight in Loving County at least "a week or two" a year could be eligible to vote in Loving County. No reasonable law enforcement officer would have found probable cause for Plaintiffs' arrests under these circumstances.

95. Through the actions described herein, Defendants violated Plaintiffs' right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution.

96. The actions of Defendants directly and proximately caused injury to Plaintiffs, including the unlawful arrest and detention of Plaintiffs, the unreasonable and unjustified search of Plaintiffs' belongings, damage to Plaintiffs' reputations, embarrassment and humiliation, and mental and emotional distress.

97. Defendants acted with malice and/or a reckless indifference to and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

98. Plaintiffs are therefore entitled to recovery of actual, compensatory, and punitive damages against all Defendants pursuant to 42 U.S.C. § 1983. Plaintiffs further seek payment of their attorneys' fees and costs from all Defendants pursuant to 42 U.S.C. § 1988.

## CAUSE OF ACTION TWO
**U.S. Const. Amendments I, XIV; 42 U.S.C. § 1983**
**Undue Burden on the Rights to Speech and Association**

99. Under Federal Rule of Civil Procedure 10(c), Plaintiffs incorporate by reference all the allegations set forth above.

100. The First Amendment to the United States Constitution, incorporated and applied to the states through the Fourteenth Amendment, prevents state officials from unduly burdening a citizen's right to speech and association.

101. Renteria is a County Commissioner for Loving County. In that capacity, Renteria has publicly expressed views in opposition to those expressed by Defendants on matters of public concern, including those relating to the expenditure of public funds.

102. Matthew Jones and William Carr have opposed the elections and political positions of Defendants, which were matters of public concern. Along with Renteria, Jones and Carr have

associated with the political opposition to Defendants, including through support, affiliation, and cooperation with the family members of Jones and Carr who are elected officials in Loving County.

103. At all times relevant to this Complaint, Defendants acted under the color of state law.

104. King and Brandon Jones knowingly and willfully caused and facilitated the issuance of jury summonses to Plaintiffs, participated in the planning and organization of the sham "juror qualification" proceeding on May 25, 2022, ordered Plaintiffs arrested, and then directed subordinates to arrest, search, and detain Plaintiffs. Busse directed or permitted his deputies to arrest and detain Plaintiffs despite knowing that King's orders were illegal. Defendants took these actions with knowledge that King had no jurisdiction, authority, or legal right to order such arrests.

105. Busse and King attempted to remove Renteria from the Loving County Appraisal Board despite knowing that Renteria met the legal requirements to be considered a resident of Loving County, even after the passage of SB 1111.

106. King caused Plaintiffs to be removed from the list of eligible jurors. This action prevents Plaintiffs from serving on juries in Loving County—a right, obligation, and privilege of citizenship to which Plaintiffs had a legitimate claim of entitlement (and reasonable expectation that such entitlement would continue) under Texas law. King took this action despite being aware that Plaintiffs met the requirements to be considered a resident of and eligible juror in Loving County, even after the passage of SB 1111.

107. With the knowledge, approval, and cooperation of the other Defendants, Busse sent letters to every voter in Loving County that included the knowingly false claim that the Voter Registrar had acquired information that that voter was not properly registered to vote in Loving County, demanded that the voter prove their residency within 30 days, and threatened to cancel the voter's registration if the voter did not do as the letter demanded. These letters were sent in

the middle of an election, through the United States mail, from an official Loving County address, and bore the signature of the Sheriff. They were intended to—and, in fact, did—intimidate Loving County voters, in an attempt by Defendants to dissuade Defendants' political opponents from exercising their rights to vote.

108. Defendants undertook the actions described herein, in part, to prevent, coerce, and/or intimidate Plaintiffs from exercising their right to speech regarding matters of public concern in Loving County, including opposition to the elections and political positions of Defendants.

109. Defendants further undertook the actions described herein, in part, to prevent, coerce, and/or intimidate Plaintiffs from exercising their right to association, including to associate with persons opposed to Defendants' elections and political positions.

110. The arrest and detention of Plaintiffs, the attempts to remove Renteria from the Loving County Appraisal Board, the removal of Plaintiffs from the list of eligible jurors, the false and intimidating letters from Busse to every Loving County voter, and the threat of future arrests, detentions, and other adverse actions imposed an undue burden on Plaintiffs' rights to speech and association.

111. Defendants had no governmental interest so compelling as to justify the denial or abridgement of Plaintiffs' rights to speech and association, as guaranteed by the United States Constitution. Even if such an interest existed, Defendants had less restrictive means by which any such interest could have been met.

112. Defendants therefore violated Plaintiffs' rights to speech and association under the First and Fourteenth Amendments to the United States Constitution.

113. The actions of Defendants directly and proximately caused injury to Plaintiffs, including the removal of Plaintiffs from the list of eligible jurors, the unlawful arrest and detention

of Plaintiffs, the unreasonable and unjustified search of Plaintiffs' belongings, damage to Plaintiffs' reputations, embarrassment and humiliation, and mental and emotional distress.

114. Defendants acted with malice and/or a reckless indifference and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

115. Plaintiffs are therefore entitled to recovery of actual, compensatory, and punitive damages against Defendants pursuant to 42 U.S.C. § 1983. Plaintiffs further seek payment of their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## CAUSE OF ACTION THREE
**U.S. Const. Amendments I, XIV; 42 U.S.C. § 1983**
**Violation of Due Process**

116. Under Federal Rule of Civil Procedure 10(c), Plaintiffs incorporate by reference all the allegations set forth above.

117. The Fourteenth Amendment to the United States Constitution, prevents state officials from depriving any person of life, liberty, or property without due process of law.

118. At all times relevant to this Complaint, Defendants acted under the color of state law.

119. King and Brandon Jones knowingly and willfully caused and facilitated the issuance of jury summonses to Plaintiffs, participated in the planning and organization of the sham "juror qualification" proceeding on May 25, 2022, ordered Plaintiffs arrested, and then directed subordinates to arrest, search, and detain Plaintiffs. Busse directed or permitted his subordinates to carry out King's order, despite knowing that it was illegal.

120. There were no exigent circumstances that could justify an order of direct contempt, including because Plaintiffs were not disobeying any court orders, threatening the safety of Court personnel, or otherwise disrupting ongoing proceedings. Before they could be arrested for contempt of court, due process required Plaintiffs be provided with notice of the allegations against

them, a reasonable opportunity to meet those allegations by way of defense or explanation, the opportunity to retain counsel, and the opportunity to testify, call witnesses, and present other evidence on their behalf. Plaintiffs were not provided with any of this pre-deprivation due process before they were arrested and deprived of their liberty.

121. Each Defendant was aware that King did not have jurisdiction or authority to conduct the "juror qualification" proceeding or determine whether any Plaintiff was a resident of Loving County. Defendants were each aware that there were no exigent circumstances that could justify an order of direct contempt. Defendants were each aware that Plaintiffs were arrested without the notice, opportunity to be heard, opportunity to present evidence, and other pre-deprivation rights required by due process. Each Defendant deliberately ignored these facts and/or acted in reckless disregard of them.

122. King caused Plaintiffs to be removed from the list of eligible jurors. This unauthorized action made Plaintiffs ineligible to serve on juries in Loving County, a right, obligation, and privilege of citizenship to which Plaintiffs had a legitimate claim of entitlement (and a reasonable expectation that such entitlement would continue) under Texas law. Defendants took this action without providing any notice to Plaintiffs, conducting any hearings, considering any evidence, and without providing Plaintiffs the opportunity to be heard regarding their eligibility to serve as jurors or any other adequate pre-deprivation process as required by the Fourteenth Amendment.

123. It was predictable that state officials such as Defendants would abuse their power and seek to illegally arrest political opponents, attempt to strip rights to vote and/or serve on juries, and take the other actions detailed herein. Pre-deprivation procedures—including notice, hearings, and other process provided by Texas law to consider residency of voters and/or jurors—could have avoided the harm caused by Defendants, but Defendants did not provide Plaintiffs with the

opportunity to avail themselves of such process.

124. Defendants therefore violated Plaintiffs' right to due process under the Fourteenth Amendment to the United States Constitution.

125. Defendants' actions directly and proximately caused injury to Plaintiffs, including the removal of Plaintiffs from the list of eligible jurors, the unlawful arrest and detention of Plaintiffs, the unreasonable and unjustified search of Plaintiffs' belongings, damage to Plaintiffs' reputations, embarrassment and humiliation, and mental and emotional distress.

126. Defendants acted with malice and/or a reckless indifference to and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

127. Plaintiffs are therefore entitled to recovery of actual, compensatory, and punitive damages against Defendants pursuant to 42 U.S.C. § 1983. Plaintiffs further seek payment of their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## CAUSE OF ACTION FOUR
**Conspiracy to Deprive Constitutional Rights**

128. Under Federal Rule of Civil Procedure 10(c), Plaintiffs incorporate by reference all the allegations set forth above.

129. All Defendants were part of a conspiracy that had as its objects the violation of Plaintiffs' constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

130. Each Defendant's relevant actions, as alleged herein, were undertaken under the color of law.

131. Each Defendant knew of each other's conduct as described herein. All Defendants knowingly, willingly, and enthusiastically participated in the improper arrests and other actions detailed herein.

132. Defendants undertook the actions described herein with malice and/or a reckless indifference to and callous disregard for, and deliberate indifference to, Plaintiffs' constitutional rights.

133. Defendants' actions in furtherance of the conspiracy were the actual and proximate cause of injury to Plaintiffs, including the removal of Plaintiffs from the list of eligible jurors, the unlawful arrest and detention of Plaintiffs, the unreasonable and unjustified search of Plaintiffs' belongings, damage to Plaintiffs' reputations, embarrassment and humiliation, and mental and emotional distress.

134. Plaintiffs are therefore entitled to recovery of actual, compensatory, and punitive damages against Defendants. Plaintiffs further seek payment of their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## CAUSE OF ACTION FIVE
**Section 11(b) of the Voting Rights Act; 52 U.S.C. § 10307(b)**
**Intimidation/Coercion Regarding Voting**

135. Under Federal Rule of Civil Procedure 10(c), Plaintiffs incorporate by reference all the allegations set forth above.

136. Section 11(b) of the Voting Rights Act, codified as 52 U.S.C. § 10307(b), provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." This statute extends to private conduct and establishes a private cause of action.

137. Each Plaintiff is registered to vote in Loving County. Each Plaintiff owns property in Loving County, conducts business in Loving County, regularly sleeps at their properties in Loving County, and intends to remain a resident of Loving County. Plaintiffs were therefore entitled to vote in Loving County.

138. Defendants were aware that each Plaintiff owned property in Loving County, at times stayed overnight in Loving County, and had been registered to vote in Loving County for a long period of time. Defendants were further aware that Mr. Ingram, the lead elections official for the State of Texas, had informed Busse that persons who stay overnight in Loving County "a week or two" a year could be eligible to vote in Loving County.

139. Each Plaintiff had publicly expressed opposition to the political positions of Defendants and associated with the political opponents of Defendants. Defendants knew that Plaintiffs opposed the reelection of Defendants and would vote against Defendants in upcoming elections. Given the small number of registered voters in Loving County, preventing, intimidating, or dissuading even a handful of registered voters from exercising their right to vote in Loving County could determine the outcome of elections. Defendants took the actions described herein to intimidate, threaten, and coerce Plaintiffs from voting in Loving County.

140. King and Defendant Jones knowingly and willfully caused and facilitated the issuance of jury summonses to Plaintiffs, participated in the planning and organization of the "juror qualification" proceeding on May 25, 2022, ordered Plaintiffs arrested, and then directed subordinates to arrest Plaintiffs, order Plaintiffs to empty their pockets, handcuff Plaintiffs, and transport Plaintiffs to jail in a neighboring county. Busse directed or permitted his subordinates to carry out King's orders despite knowing that the orders were illegal. Defendants took these actions with knowledge that King had no jurisdiction, authority, or legal right to order the arrests of Plaintiffs.

141. King caused Plaintiffs to be removed from the list of eligible jurors, preventing Plaintiffs from serving on juries in Loving County.

142. With the knowledge, approval, and cooperation of the other Defendants, Busse sent letters to every voter in Loving County that included the knowingly false claim that the Voter

Registrar had acquired information that the voter was not properly registered to vote in Loving County, demanded that the voter prove their residency within 30 days, and threatened to cancel the voter's registration if the voter did not do as the letter demanded. These letters were sent in the middle of an election, through the United States mail, from an official Loving County address, and bore the signature of the Sheriff. They were intended to—and, in fact, did—intimidate Loving County voters, in an attempt by Defendants to dissuade Defendants' political opponents from exercising their rights to vote.

143. Defendants' actions described herein threatened, coerced, and intimidated—and constituted an attempt to threaten, coerce, and intimidate—Plaintiffs from exercising their right to vote in Loving County, in violation of 52 U.S.C. § 10307(b).

144. If Defendants' misconduct is not addressed or remedied through this action, Plaintiffs anticipate that Defendants will continue to abuse their authorities to punish political enemies and to threaten, coerce, and intimidate their political opponents from exercising their rights to vote. Defendants would suffer no harm from the injunctive relief sought by Plaintiffs, including because there is no harm in preventing Defendants from taking such flagrantly illegal actions.

145. Plaintiffs are therefore entitled to permanent injunctive relief pursuant to 52 U.S.C. § 10307(b) and 28 U.S.C. §§ 2201, 2202, including to prohibit Defendants from repeating their illegal actions against Plaintiffs or others in the future and to withdraw improper instructions to remove Plaintiffs from the list of juror rolls. Plaintiffs further request their attorneys' fees and costs pursuant to 52 U.S.C. § 10310.

## VI. <u>JURY DEMAND</u>

146. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs request a trial by jury on all issues so triable and have tendered the appropriate fee.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request the following remedies individually and in the alternative where appropriate:

1. Actual and compensatory damages as described herein;
2. Exemplary and/or punitive damages;
3. Pre-judgment interest and post-judgment interest;
4. Injunctive relief, as described herein;
5. Attorneys' fees and expenses to the extent recoverable under law; and
6. All other and further relief in law or equity to which Plaintiffs may otherwise be entitled.

Dated: May 22, 2023

Respectfully submitted,

By: */s/ Jay Hulings*

Jason M. Davis
State Bar No. 00793592
Email: *jdavis@dslawpc.com*
Jay Hulings
State Bar No. 24104573
Email: *jhulings@dslawpc.com*
**DAVIS & SANTOS, PLLC**
719 S. Flores Street
San Antonio, Texas 78204
Tel.: (210) 853-5882
Fax: (210) 200-8395
***Counsel for Plaintiff Matthew Jones***

By: */s/ John T. Wolf with permission*

John T. Wolf
State Bar No. 24098629
Email: *john@wolfstallings.com*
**WOLF & STALLINGS PLLC**
310 W. Wall Street, Suite 816
Midland, Texas 79701
Tel.: (432) 848-3148
Fax: (432) 848-3149
***Counsel for Plaintiff William L. Jones Carr***

By: */s/ J. Stephen Hunnicutt with permission*

J. Stephen Hunnicutt
State Bar No. 10279510
Email: *steve@hunnicuttlaw.com*
**THE HUNNICUTT LAW GROUP**
17330 Preston Road, Suite 275-B
Dallas, Texas 75252
Tel.: (214) 361-6740
Fax: (214) 691-5099

Trent Graham
State Bar No. 24084307
Email: *trentgrahamlaw@gmail.com*
**LAW OFFICE OF TRENT GRAHAM, PLLC**
110 W. 5th Street
Pecos, Texas 79772
Tel: (432) 445-2127
***Counsel for Plaintiff Ysidro Renteria***

## CERTIFICATE OF SERVICE

I certify that on the 22 day of May, 2023, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system and all counsel of record will receive an electronic copy via the Court's CM/ECF system.

*/s/ Jay Hulings*
Jay Hulings