**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISION**

| | | |
|---|---|---|
| **MATTHEW JONES**, *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **No. PE:22-CV-00030-DC-DF** |
| | § | |
| **AMBER M. KING**, *et al.*, | § | |
| *Defendants*. | § | |

**TABLE OF CONTENTS**

**I. BACKGROUND** ............................................................................................................................2

**II. LEGAL STANDARD** ...................................................................................................................4

    A.  Federal Rule 12(b)(6) ..........................................................................................................4

    B.  Federal Rule 12(b)(1) ..........................................................................................................5

**III. ANALYSIS** ..................................................................................................................................5

    A.  Propriety of Considering Defendants' Exhibits ..................................................................6

    B.  Section 1983 Claims ...........................................................................................................7

        1.  Absolute Judicial Immunity: Judge King .......................................................................8

        2.  Quasi-Judicial Immunity: Sheriff Busse & Constable Jones ........................................31

        3.  Qualified Immunity .......................................................................................................36

    C.  Voting Rights Act Claim ...................................................................................................65

        1.  Standing ........................................................................................................................65

        2.  Mootness .......................................................................................................................73

**IV. RECOMMENDATION** .............................................................................................................75

**REPORT AND RECOMMENDATION OF THE U.S. MAGISTRATE JUDGE**

TO THE HONORABLE DAVID COUNTS, U.S. DISTRICT JUDGE:

       BEFORE THE COURT is Defendants Amber M. King ("King"), Brandon W. Jones

("Jones"), and Chris H. Busse's ("Busse") Motion to Dismiss Second Amended Complaint

(hereafter, "Motion to Dismiss"). (Doc. 19). This case is before the undersigned United States

Magistrate Judge through a standing order of referral pursuant to 28 U.S.C. § 636, and Appendix C

of the Local Court Rules for the Assignment of Duties to United States Magistrate Judges. After due consideration, the undersigned **RECOMMENDS** that the Motion to Dismiss be **GRANTED IN PART** and **DENIED IN PART**. (Doc. 19).

### I. BACKGROUND

In perhaps no § 1983 case has there been as convoluted a consanguinity mesh as this one. The Second Amended Complaint alleges as follows.

Loving County, Texas, has 57 residents. Plaintiff Matthew Jones ("Jones")[1] is the son of incumbent Loving County Judge Skeet Jones. Plaintiff Ysidro Renteria ("Renteria") has been a Loving County Commissioner. Plaintiff William L. Jones Carr's ("Carr") mother is Mozelle Carr, the current Loving County Clerk. Judge Skeet Jones is Plaintiff Carr's uncle. All Plaintiffs were registered to vote in Loving County before the events described in this suit, as they regularly stay overnight in the county.

Defendant Jones is the Constable for Loving County. He is the cousin of Plaintiffs Jones and Carr. His father, Richard Jones, is Judge Skeet Jones' brother. His wife, Holly Jones, announced her intent to run for Loving County Clerk against Mozelle Carr, Plaintiff Carr's mother. Defendant Jones at some point approached Renteria and requested his support for the employment of two additional deputies, which Renteria denied. Defendant Busse is the Loving County Sheriff. Defendant King is the Loving County Justice of the Peace. Her husband, Raymond King, is another Loving County Commissioner alongside Renteria. Defendant King "has filed multiple baseless grievances" against Judge Skeet Jones.

After Defendant Jones' deputy request was denied, Renteria was asked to serve on the Loving County Appraisal Board ("Appraisal Board") with Defendants Busse and King. Defendants King and Busse then told Renteria that they believed he did not live on his Loving County property and should resign from the board. They then voted for a resolution seeking his resignation.

---

1. To avoid confusion, Defendant Jones will be referred to as "Defendant Jones" where appropriate.

Defendants Busse and King caused the Appraisal Board to file suit against Renteria on these same grounds. Around this time, Defendant King's husband unsuccessfully moved for Renteria's resignation in the Loving County Commissioners Court.

Enter the flashpoint of the courthouse. In April 2022, Defendant King convened a group of "prospective jurors" which included Plaintiffs. Plaintiffs appeared in a group in the annex of the Loving County Courthouse on May 25, 2022. In the annex, King initiated a "juror qualification" proceeding. She stated that any of the group's members who were not "qualified jurors" could leave, and that any unqualified jurors remaining would be charged with perjury and held in contempt of court. Plaintiffs remained. A Sheriff's deputy requested each individual to swear to tell Defendant King the truth about their qualifications as a juror. King then asked the group inter alia whether they were residents of Loving County, to which Plaintiffs responded affirmatively. "Immediately thereafter," King stated that "there are several jurors who are not residents of [Loving County]." King identified each Plaintiff by name and ordered them arrested, jailing them in the Winkler County jail for approximately five hours. King later released written orders citing "direct contempt" as the basis for their arrest.[2]

In June 2022, King directed the Loving County Clerk via email to remove Plaintiffs "from the list of eligible jurors," citing their non-Loving County residency status. Plaintiffs claim they are no longer eligible to serve on juries in the county, and that Defendants used Texas Senate Bill 1111 ("SB 1111") to justify their actions.[3]

Plaintiffs thereafter filed a petition for writ of mandamus challenging the contempt orders in state court. A Texas state district court granted the writ and vacated the contempt orders, finding that King had "clearly abused her discretion and failed to comply with due process."[4]

---

2. (Doc. 18 at 12).
3. (Doc. 18 at 18).
4. (Doc. 18 at 17).

Plaintiffs filed the live pleading on May 22, 2023.[5] Plaintiffs argue Defendants' actions unduly deprived them of liberty and burdened their freedoms of speech and association in violation of Amendments One, Four, and Fourteen of the United States Constitution; violated 42 U.S.C. §§ 1983 and 1988; conspired to violate their constitutional rights; and contravened the Voting Rights Act, codified at 52 U.S.C. § 10307(b). On December 2, 2022, Defendants filed their Motion to Dismiss, asserting in large part the defenses of judicial and qualified immunity as to the § 1983 claims, as well as standing and mootness challenges. Plaintiffs have timely filed a Response, and Defendants a Reply. Accordingly, this matter is now ripe for disposition.

## II. Legal Standard

### A.        Federal Rule 12(b)(6)

When a defendant files a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the trial court must assess whether a complaint states a plausible claim for relief.[6] The court must accept "all well-pleaded facts in the complaint as true and viewed in the light most favorable to the plaintiff."[7] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[8]

On the other hand, if the complaint only offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," dismissal is appropriate.[9] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[10] The court should dismiss a complaint if the court can only infer the mere possibility of misconduct, or if the

---

5. The instant Second Amended Complaint was filed following the Court's sua sponte allowance of leave to Plaintiffs to address certain factual deficiencies outlined in Defendants' earlier motion to dismiss. (Docs. 9, 12, 16).
6. *See Raj v. La. State Univ.*, 714 F.3d 322, 329–30 (5th Cir. 2012).
7. *See id.*
8. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
9. *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).
10. *Shaw v. Villanueva*, 918 F.3d 414, 415 (5th Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678).

plaintiff has only alleged that he is entitled to relief rather than stating a claim that is "plausible on its face."[11]

## B.        Federal Rule 12(b)(1)

Federal courts are courts of limited jurisdiction.[12] The courts possess only the powers authorized by the Constitution and statutes of the United States.[13] Motions filed under Federal Rule 12(b)(1) allow a party to challenge the subject matter jurisdiction of the district court to hear a case.[14]

Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.[15] "[A]ll uncontroverted allegations in the complaint must be accepted as true."[16] "Thus, unlike a motion to dismiss under [Federal] Rule 12(b)(6), when examining a motion to dismiss for lack of subject matter jurisdiction under [Federal] Rule 12(b)(1), the district court is entitled to consider disputed facts as well as undisputed facts in the record."[17]

The burden of proof for a Federal Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction.[18] In fact, "there is a presumption against subject matter jurisdiction that must be rebutted by the party bringing an action to federal court."[19]

## III. ANALYSIS

This case only ostensibly turns on the issue of whether Plaintiffs are eligible to vote in Loving County by virtue of their citizenship.[20] In fact, however, regardless of their voting eligibility,

---

11. *Iqbal*, 556 U.S. at 678–79 (quoting *Twombly*, 550 U.S. at 570).
12. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).
13. *Id.* (citations omitted).
14. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).
15. *Id.* (citing *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)).
16. *Taylor v. Dam*, 244 F. Supp. 2d 747, 752 (S.D. Tex. 2003) (citations omitted).
17. *Id.* (citations omitted).
18. *Ramming*, 281 F.3d at 161 (citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995)); *Taylor*, 244 F. Supp. 2d at 752.
19. *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996).
20. (Docs. 18 at 10–15, 18).

the true primary consideration is whether Defendants' actions as alleged were improper. Defendants challenge Plaintiffs' claims on three general grounds: immunity, standing, and mootness. The undersigned will consider the issues of judicial and qualified immunity prior to engaging in the standing and mootness analyses.

**A.        Propriety of Considering Defendants' Exhibits**

As a preliminary matter, the parties dispute whether certain "orders" and letters—affixed to Defendants' Motion to Dismiss—are properly considered in evaluating the motion at this stage.[21] The Court's consideration at this stage is "limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."[22] If documents are accordingly central and referenced, a defendant may attach the documents to a motion to dismiss to "assist[] the plaintiff in establishing the basis of the suit."[23]

The undersigned finds that the proffered exhibits should be considered in evaluating the Motion to Dismiss. In this instance, Plaintiffs do not dispute that the proffered exhibits are Judge King's "contempt orders" issued in relation to the courthouse contempt findings, or that the orders reference statutes on which Judge King apparently based her decision. Plaintiffs reference the "contempt orders" several times in the Second Amended Complaint, having themselves obtained copies of them "only" after filing Freedom of Information Act requests.[24] The written orders are additionally central to Plaintiffs' claims—Plaintiffs argue that Judge King's findings of contempt were unjustified and violated their civil rights. Certainly, the specific statutory authority Judge King supposedly relied on in issuing the arrest and contempt orders would be informative as to whether Judge King's actions extended beyond the scope of her authority and therefore impinged upon

---

21. (Docs. 20 at 3 n.1; 19 at 3 n.1).
22. *Lopez v. Kendall*, No. 2-50411, 2023 WL 2423473, at *1 (5th Cir. Mar. 9, 2023) (unpublished) (citation and quotation marks omitted).
23. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (quotation marks omitted).
24. (*See* Doc. 18 at 13).

Plaintiffs' constitutional rights. It is not obvious that the orders should inherently be excluded from consideration due to having been allegedly released "after-the-fact" of the courthouse proceedings.[25] Therefore, the written contempt orders are central and referenced in the live Complaint and will be considered.

A similar analysis applies to the voter registrar letters. Plaintiffs again do not dispute that the attached exhibit is an example of one of the letters sent by Busse as Loving County Voter Registrar. They reference the letters in the Second Amended Complaint.[26] The letters are central to their claim that Busse "continued voter suppression efforts after their arrests," thereby constituting a violation of the Voting Rights Act.[27] Plaintiffs' contention that Busse and the other Defendants conspired to intimidate them and suppress their vote is indubitably supported by the existence of allegedly intimidating, vote-suppressing letters.[28] Plaintiffs, beyond merely lodging an "objection" to the consideration of Busse's letter, do not provide any reason as to why or how such letters are not central to their claims.[29]

**B.        Section 1983 Claims**

Plaintiffs' primary substantive claims are alleged under 42 U.S.C. §§ 1983 and 1988.

Section 1983 allows for recovery against "[e]very person who . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."[30] Generally, to state a claim under § 1983, a plaintiff must "(1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was

---

25. (Doc. 20 at 1).
26. (Doc. 18 at 2–3, 20–22).
27. (Doc. 18 at 31–32).
28. (Doc. 18 at 32 ("[The letters] were intended to—and, in fact, did—intimidate Loving County voters, in an attempt by Defendants to dissuade Defendants' political opponents from exercising their rights to vote.")).
29. (*See* Doc. 20 at 3 n.1).
30. 42 U.S.C. § 1983.

committed by a person acting under color of state law."[31] In doing so, a plaintiff "must enunciate a set of facts that illustrate the defendants' participation in the wrong alleged."[32]

The bulk of Plaintiffs' claims concern Defendants' activities at the Loving County courthouse. Defendants' alleged conduct can be categorized as (1) courthouse activities (i.e., the qualification proceeding and contempt orders) and (2) all other activities. Defendants contend that the doctrine of judicial immunity and, in the alternative, the doctrine of qualified immunity, shield their actions. Thus, Defendants move for dismissal under both Federal Rules 12(b)(1) and 12(b)(6). Although judicial immunity is traditionally addressed under Federal Rule 12(b)(6),[33] because there is some disagreement as to whether such immunity is most appropriately raised under Federal Rule 12(b)(1),[34] this purported immunity will be addressed first.

### 1.  Absolute Judicial Immunity: Judge King

Defendants argue that Plaintiffs' § 1983 courthouse activities claims are barred by absolute judicial immunity. Generally, the doctrine of judicial immunity shields a judge from actions for damages.[35] As a nation with a "well-ordered system of jurisprudence,"[36] judicial immunity continues to flourish. The Supreme Court of the United States has long described the objectives and purposes of the doctrine:

> For it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer to every one who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of this freedom, and would destroy that independence without which no judiciary can be either respectable or useful.[37]

---

31. *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994).
32. *Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986).
33. *See Morrison v. Walker*, 704 F. App'x 369, 372 n.5 (5th Cir. 2017) (unpublished).
34. 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 (3d ed. 2022).
35. *Mireles v. Waco*, 502 U.S. 9, 9–10 (1991).
36. *Bradley v. Fisher*, 80 U.S. 335, 347 (1871).
37. *Id.*

Judicial immunity extends "even when the judge is accused of acting maliciously and corruptly."[38] This is because the protection "is not for the . . . benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence, and without fear of consequences."[39] The immunity thus also applies where the judge's action "was in error . . . or was in excess of his authority."[40]

"Two narrow exceptions exist to this immunity: (1) if the actions are not taken in the judge's judicial capacity, and (2) if judicial action is 'taken in the complete absence of all jurisdiction.'"[41] Defendants argue that neither exception applies in this case.

### i.   Judicial Acts

Sheriff Busse and Constable Jones' quasi-judicial immunity depends on whether Judge King herself receives it. Thus, Judge King's immunity will be discussed first.

To determine whether a judge's conduct involved judicial acts, four factors are considered:

> (1) whether the precise act complained of is a normal judicial function; (2) whether the acts occurred in the courtroom or appropriate adjunct spaces such as the judge's chambers; (3) whether the controversy centered around a case pending before the court; and (4) whether the acts arose directly out of a visit to the judge in his official capacity.[42]

The factors are to be "broadly construed in favor of immunity." Understanding the policies set forth above, "immunity should not be denied where the denial carries the potential of raising more than a frivolous concern in a judge's mind that to take proper action might expose him to personal liability." Thus, immunity is sometimes afforded notwithstanding the fact that one or more of the factors does not favor the judge.[43]

---

38. *Pierson v. Ray*, 386 U.S. 547, 554 (1967).
39. *Bradley*, 80 U.S. at 349 n.16 (citing *Scott v. Stansfield*, L.R. 3 Ex. 220, 223 (1868)).
40. *Stump v. Sparkman*, 435 U.S. 349, 356 (1978).
41. *Kastner v. Lawrence*, 390 F. App'x 311, 314 (5th Cir. 2010) (quoting *Mireles*, 502 U.S. at 11) (unpublished).
42. *Id.*; *see also Malina v. Gonzales*, 994 F.2d 1121, 1124 (5th Cir. 1993).
43. *Malina*, 994 F.2d at 1124.

Plaintiffs contend that the jury qualification proceedings and the issuance of the contempt orders both were non-judicial acts. Because the latter three factors produce the same result for each set of conduct, these factors will be addressed first.

Starting off with the second factor, the undersigned finds that it favors Defendants. Plaintiffs assert that they were summonsed to a meeting room in the annex of the Loving County courthouse. However, as Defendants point out, Texas law provides that counties with low populations such as Loving County "may hold court in the county courthouse or another facility provided under [§] 292.002(a) [of the] Local Government Code."[44] Plaintiffs do not dispute that this is the case. An annex of the courthouse reasonably would also be considered part of the courthouse itself, or at least an "appropriate adjunct space." That this non-trial proceeding took place in a meeting room of the annex of the courthouse itself does not alone transform the events into something extrajudicial. This factor favors Defendants.

The third factor benefits Plaintiffs. Plaintiffs maintain that King did not call any case set for trial. Nor was there defense counsel present. Plaintiffs therefore believe there was no pending case over which a "jury" would have presided. Defendants have not controverted this statement. Thus, construing all undisputed facts in Plaintiffs' favor, the third factor weighs in favor of Plaintiffs.

The fourth factor somewhat favors Defendants. Plaintiffs allege they were summonsed to the courthouse on King's orders for a purported appearance as potential jurors. It was at this time that the alleged events occurred. Thus, as alleged by Plaintiffs, the acts at the courthouse directly arose from Plaintiffs' visit to King's courthouse in her official capacity as justice of the peace.

As to the first factor, a more holistic approach is needed. To determine whether the relevant conduct constitutes a "normal judicial function," a court should examine the "'nature and function' of the act, not the act itself."[45] Thus, a court is to consider "the particular act's relation to a general

---

44. Tex. Gov't Code § 27.051(f).
45. *Malina*, 994 F.2d at 1124 (quoting *Mireles*, 502 U.S. at 13).

function normally performed by a judge."[46] The "touchstone" of the doctrine is the "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights."[47] An important line, however fine, is to be drawn "between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform."[48]

Here, beginning with the qualification proceeding, the parties agree that the preparation of a "jury list" is indeed a non-judicial act, and that selecting a petit jury is indeed a judicial function.[49] But Defendants distinguish the former action from the act of "determining whether the persons who appear in response to a jury summons meet the statutory qualifications to serve on a jury."[50] Whether King's qualification proceedings were judicial therefore depends on the character of the "jury qualification proceedings." Classifying these proceedings correctly is accordingly of utmost importance.

### a.   General Assembly/Venire versus Voir Dire

The proceedings, at base, allegedly entailed King asking the summoned "juror" pool if they were qualified for jury service. No specific case was at hand, and no petit "jury panel" was being selected. Instead, as Plaintiffs note, King was ruling on whether Plaintiffs were "eligible to serve on a venire."[51]

The Fifth Circuit has recognized a "vast difference in function and purpose between selection for a venire and selection for a jury."[52] A "venire" is a "panel of persons selected for jury duty and from among whom the jurors are to be chosen."[53] The selection of a venire involves the

---

46. *Id.*
47. *Antoine v. Byers & Anderson*, 508 U.S. 429, 435–36 (1993) (quotation marks omitted).
48. *Davis v. Tarrant County*, 565 F.3d 214, 221 (5th Cir. 2009) (quotation marks omitted).
49. (Docs. 20 at 5, 6, 9; 21 at 10).
50. (Doc. 21 at 10).
51. (Doc. 20 at 6).
52. *United States v. Leslie*, 783 F.2d 541, 554 (5th Cir. 1986), *overruled on other grounds*, *Leslie v. United States*, 479 U.S. 1074 (1987).
53. *Venire*, *Black's Law Dictionary* (11th ed. 2019).

determination of the fitness of individuals to "try *any* case," as opposed to a particular case.[54] In Texas, where a "venire" is sometimes referred to as a "general assembly," the judge "presiding over the general assembly is assigned for that purpose only at that time and has no given case in mind."[55] As Texas courts have put it,

> [m]embers of the general assembly are qualified on their ability to serve and exemptions and excuses are heard and ruled on by the judge presiding over the general assembly. Prospective jurors who are not disqualified, exempt, or excused are divided into trial panels and sent to the individual courts trying the cases. At that point, attorney voir dire will result in the jury that will ultimately hear the case.[56]

Thus, "voir dire examination" instead refers not to the general summonsing and qualification for jury service, but instead to the "examination of prospective jurors *after* they have been assigned to a particular court and case from the general assembly."[57] If the presiding judge has announced the type of case for which the jurors were summonsed, the panel will most likely be rightfully considered a voir dire panel as opposed to a general assembly.[58]

In this case, there was allegedly no case before King's court, no defendant or other parties present, and no specific jury panel to be selected. It is alleged that King has testified in state court that her purpose in summonsing Plaintiffs was to determine their "eligibility" to serve on a jury.[59] Defendants' motion also appears to concede that King summonsed a general assembly.[60] They do not otherwise controvert the conclusion that King's proceedings were a general assembly selection. It must therefore be concluded that the proceedings most closely resembled venire selection as opposed to a voir dire jury panel.

---

54. *Leslie*, 783 F.2d at 554 (emphasis in original).
55. *Chambers v. Texas*, 903 S.W.2d 21, 31 (Tex. Crim. App. 1995).
56. *Jasper v. Texas*, 61 S.W.3d 413, 423 (Tex. Crim. App. 2001) (citing George E. Dix & Robert O. Dawson, 43 *Texas Practice* § 35.13 (2001)); *see also* Jay M. Zitter, J.D., Annotation, *Validity of Jury Selection as Affected by Accused's Absence from Conducting of Procedures for Selection and Impaneling of Final Jury Panel for Specific Case*, 33 A.L.R. 4th 429, 3b (2015).
57. *Chambers*, 903 S.W.2d at 31.
58. *See, e.g.*, *Jasper*, 61 S.W.3d at 423 (finding a judge to "have functioned as a general assembly judge over prospective jurors already assigned to [the defendant's] specific case" because he told prospective jurors pre-qualification "that they had been summon[s]ed for a capital murder case") (emphasis omitted).
59. (Doc. 18 at 10–12; Doc. 21 at 5).
60. (Doc. 19 at 5, 7 ("Texas law authorizes a justice of the peace to summon a venire.")).

### b. General Assembly/Venire as a Judicial Act

At this time, the undersigned must answer the question of whether conducting juror qualifications at a general assembly is a judicial act. The undersigned finds that, in this scenario and under these particular facts, King's "jury qualification proceedings"—i.e., her general assembly— were non-judicial acts.

The undersigned has located no prior Texas or Fifth Circuit precedent discussing the judicial quality of qualifying and determining the eligibility of potential jurors summonsed for a general assembly, and the parties have not pointed to any specific case or statute on the point.[61] The issue is novel and will be considered against the backdrop of the standard "judicial acts" framework.

The substantive "distinction between ministerial, and judicial . . . acts, [is] that where the law prescribes and defines the duty to be performed, with such precision and certainty as to leave nothing to the exercise of discretion, or judgment, the act is ministerial." But "where the act to be done involves the exercise of discretion or judgment in determining whether the duty exists, it is not . . . merely ministerial."[62] Such "discretion" can be broadly defined as

> the option which a judge may exercise either to do or not to do that which is proposed to him that he shall do; choosing between the doing and not doing of a thing, the doing of which cannot be demanded as an absolute right of the party asking it to be done; the exercise of the right legally to determine between two or more courses of action.[63]

Thus, "discretion" can also be distinct from *de facto* mandatory actions. Alternatively, the Texas Supreme Court has observed another indicator of judicial nature, which is where the Texas

---

61. Defendants cite to a provision of the Texas Code of Criminal Procedure which purports to stand for the proposition that "[q]ualifying a jury is a . . . judicial function." (Doc. 19 at 5). While the provision seemingly relegates exclusively to the state court the duty of deciding a juror's qualifications, Defendants' briefings are devoid of any cases applying the statute in the general assembly, as opposed to voir dire, context. The undersigned's research reveals that the cases addressing the application of article 35.21 involved named defendants and an active criminal prosecution. *See, e.g.*, *Chambers*, 903 S.W.2d at 27–30; *Goodwin v. Texas*, 799 S.W.2d 719, 737 (Tex. Crim. App. 1990). As noted above, no defendant, case, or subject matter was called during King's proceedings. These cases are therefore inapposite.
62. *Boynton v. Brown*, 164 S.W. 893, 895 (Tex. Civ. App.—San Antonio 1914).
63. *Koll v. Texas*, 157 S.W.2d 377, 380 (Tex. Crim. App. 1941) (citing 27 Corpus Juris Secundum 135).

13

Constitution vests all judicial power exclusively in judicial officers.[64] It follows that if a law allocates to a non-judicial officer some authority or responsibility, the power is non-judicial.[65]

The undersigned concludes that King's courthouse actions were ministerial and therefore nonjudicial. The undersigned addresses this issue of first impression with an eye towards pragmatism. As noted above, the parties do not materially dispute that, if King had empaneled the summonsed jurors at a voir dire petit jury selection, she would be shielded by judicial immunity. And she would. [66] But at the general assembly or venire stage, in Texas, the undersigned concludes that King's alleged actions were instead ministerial, involving the summonsing of Plaintiffs and others for a general assembly.

In making this determination, the undersigned begins by observing that the relevant Texas statute expressly "disqualifies" non-residents from serving.[67] Each potential juror must be a Texas resident, and in this case, also a resident of Loving County.[68] Indeed, the statute states that "[a] person *is* disqualified to serve as a petit juror unless the person . . . is a resident of [Texas] and of the county in which the person is to serve as a juror."[69] By the statute's plain language, there is no room for a judge's discretion. For example, the statute does not say that a person "may" or "can" be disqualified if he does not satisfy the residency requirement.[70] This is distinct from a related Texas statute which provides additional guidelines for judges presiding over voir dire selections.[71]

---

64. *San Antonio & Aransas Pass Ry. Co. v. Blair*, 196 S.W. 1153, 1162–63, 1178 (Tex. 1917) ("The Legislature has no power to authorize a [] judge to place his judicial robe upon the shoulders of any man.") (citations omitted).
65. *Id.*; *Duron v. Texas*, No. 13-96-585-CR, 1998 WL 34201930, at *9 (Tex. App.—Corpus Christi-Edinburg July 23, 1998) (mem. op).
66. *See, e.g.*, *Libertarian Party*, 970 F.3d at 124 ("[E]mpaneling a jury in a particular . . . trial is a quintessentially judicial act[.]").
67. Tex. Gov't Code § 62.102.
68. *Id.*
69. *Id.* This is contrasted with a similar Texas statute pertaining to disqualification for a particular jury. *See* Tex. Gov't Code § 62.105. The latter statute concerns interests, bias, or preconceived notions that a juror may have depending on the facts of the instant case.
70. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 112–13 (2012).
71. *See* Tex. Gov't Code § 62.105 (section titled "Disqualification for Particular Jury").

14

Contrasting general assembly proceedings with voir dire, the latter takes place after the general assembly is settled and the prospective panels are sent off for different cases. At this stage, there is little disagreement that this qualification involving specific cases and parties is judicial.[72] In particular, attorneys lodge their challenges based on personality, beliefs, and general understanding of jury service, not commonly for unmet statutory requirements.[73] The presiding judge then *decides* whether a given juror should be struck for cause or upon motion.[74] Put differently, a judge presiding over a voir dire panel selection has *discretion* to remove a juror based on excuses and the parties' challenges.[75] But at the general assembly stage, the judge simply verifies whether a prospective juror is, among other things, a resident of the relevant county. Such determinations at the general assembly stage prevent the individuals from serving on *any* venire pool in the jurisdiction, or on *any* voir dire panel.[76] Yet no expertise or legal knowledge is needed to determine one's county residency,[77] and certainly no discretion is required to determine which county a prospective juror resides in. Considering all four factors, the determination must be made that a general assembly qualification proceeding screening for statutory compliance is a nonjudicial act.[78]

---

72. *See, e.g.*, *People ex rel. Riordan v. Hersey*, 69 Colo. 492, 498–99 (1921) (Denison, J., dissenting).
73. Erika L. Oliver, Note & Comment, *Researching Jurors on the Internet: The Ills of Putting Jurors on Trial and the Need to Shift the Focus Back to the Defendant*, 34 U. La Verne L. Rev. 251, 265 n.120 (2013) (citation omitted).
74. *See* Tex. Code Crim. Proc. art. 35.21.
75. *See Koll*, 157 S.W.2d at 380.
76. *See United States v. Leslie*, 783 F.2d 541, 554 (5th Cir. 1986), *overruled on other grounds*, *Leslie v. United States*, 479 U.S. 1074 (1987) (contradistinguishing venire-pool discrimination from peremptory challenge exclusion). Defendants assert that *Leslie* is an inapplicable case. (Doc. 21 at 2 n.1). Specifically, Defendants exclaim that the Supreme Court of the United States, in *Batson v, Kentucky*, allegedly "reject[ed] the significance of the supposed 'vast difference' between selection for a venire and selection for a jury." *Id.* (citing *Batson*, 476 U.S. 79 (1986)). But the footnote in the majority opinion to which Defendants cites merely summarizes *Leslie*. *Batson*, 476 U.S. at 82 n.1. Additionally, it is true that the Supreme Court eventually vacated *Leslie* in light of *Griffith v. Kentucky*, 479 U.S. 314 (1987). *See Leslie v. United States*, 479 U.S. 1074 (1987). However, none of the cases cited by Defendants, whether it be *Griffith*, *Batson*, or otherwise, pertaining to their attempt at devaluing *Leslie*, involved claims of judicial immunity or judicial acts at the Supreme Court, and instead involved the use of peremptory strikes against minority jurors in violation of equal protection. While *Leslie* may no longer be binding authority, there is no reason to completely and wholly disregard its reasoning as to judicial immunity on these grounds.
77. *Benard v. Humble*, 990 S.W.2d 929, 931 (Tex. App.—Beaumont 1999) (pet. denied) (citing Tex. Elec. Code § 1.015).
78. *See Hersey*, 69 Colo. at 496–99 (Denison, J., dissenting).

The arbiter in this scenario is therefore not the presiding judge, court clerk, or otherwise. Instead, it is, as statutory guidance, the Texas Legislature. There is no conceivable discretion in eliminating individuals from the general assembly who do not fit the minimum statutory requirements for jury service.[79] Nothing in the statute leaves the disqualification of jurors who do not meet the statutory requirements to the "option of the judge."[80] Thus, it is the *nature* of the act of removing ineligible jurors from possible *consideration* for any voir dire panel that is non-judicial. This determination "might as well have been committed to a private person";[81] here, in fact, it was. This is true regardless of the title or identity of the individual performing the act.[82] In other words, whether a justice of the peace or instead a 1950s milkman is personally evaluating each potential juror's eligibility, ineligible individuals must be removed from the general assembly. The lack of discretion in this scenario signifies that the general assembly eligibility evaluations are a ministerial task.[83]

---

79. Defendants observe this statutory phenomenon. (*See* Doc. 21 at 3 (noting "the list of questions . . . tracks the statutory qualifications for a juror, including residency in the county")).

80. *See Koll*, 157 S.W.2d at 380 (finding judicial discretion where state transfer statute did not "ma[k]e it incumbent" upon the judge "to transfer this or any other case"). *See also Taylor v. Texas*, 195 S.W. 1147, 1149–50 (Tex. Crim. App. 1917) (finding summonsing of jury pool to be discretionary act).

81. *Virginia*, 100 U.S. at 348.

82. Absolute immunity protects judges "of whatever status in the judicial hierarchy, from Justices of the Supreme Court to Justices of the Peace." *Almaguer v. Chacon*, No. DR-04-CV-023-AML/VRG, 2006 WL 8433819, at *6 (W.D. Tex. Sept. 5, 2006); *see also* 47 Am. Jur. 2d *Justices of the Peace* § 62, Westlaw (database updated Feb. 2023). Acts "that simply happen to have been done by judges" are not judicial. *Forrester v. White*, 484 U.S. 219, 227 (1988). Such acts are distinguished from "function[s] normally performed by a judge." *Twilligear v. Carrell*, 148 S.W.3d 502, 504–05 (Tex. App.—Houston [14th Dist.] 2004) (mem. op.) (pet. denied). Thus, it is the nature of the challenged acts themselves, and not the actor performing them, that demands focus.

83. The parties dispute the applicability of Plaintiffs' seminal case, *Ex parte Virginia*. There, a county judge was indicted for racial discrimination in the selection of a jury venire for the county's courts. He argued that he was immune to prosecution because excluding certain people from the jury lists based on race was a "judicial act." The Supreme Court found that it was not so, and that it was "merely a ministerial act" not entitled to immunity. *Ex parte Virginia*, 100 U.S. 339, 340, 348–49 (1879). Plaintiffs argue that King's general assembly qualification in this case resembles the fact of *Virginia*, characterizing it as "the same action" of determining that certain people were "not eligible to serve on a jury." (Doc. 20 at 5). Defendants contend that Plaintiffs "confuse the compilation of the list of persons eligible to be called for jury service with the judge's role in qualifying the persons who appear for jury duty in response to a summons." (Doc. 21 at 1).

      The undersigned finds that the facts of *Virginia* indeed are too dissimilar from those before the Court in this case. Defendants concede that compiling potential jurors in a list outside of the courthouse would be nonjudicial. This case, however, involves not a list of jurors, but rather the qualification of potential jurors summonsed as a general assembly. Although the undersigned concludes that this case nevertheless involves a non-judicial act, it should be noted that *Virginia* is best reserved as an explication of the doctrine of judicial immunity instead of a

This conclusion is buttressed by other provisions of the Texas Government Code.[84] The initial duty of qualifying individuals for jury service via a general assembly in non-justice courts are often times assigned to clerks and other non-judicial personnel. Specifically, county clerks and the sheriff are to draw names of prospective jurors from a jury wheel.[85] This jury wheel is composed of individuals named on the county's voter registration list as well as on a Texas Department of Public Safety ("DPS") list. Individuals who are disqualified from jury service for minority and non-American citizenship are to be excluded from the DPS list.[86] The DPS as well as the Texas Secretary of State furnish a list providing this information, including the individual's county of residence. It is from this list in part that the jury wheel is constituted. Various state employees, including the clerk of the court, maintain a list containing names of the jurors disqualified due to nonresidency.[87]

Texas statutes have historically provided for the selection of juries in the courts of justices of the peace—also known as justice courts—to be done via the "pick-up" jury method. This involves the justice of the peace issuing a writ commanding the sheriff or constable to summon a venire "from which qualified persons are to be selected to serve as jurors."[88] Jury panels may be selected either by the pick-up method or instead the jury wheel method.[89] Both instances involve a pool of potential eligible jurors from which panels are to be selected and against which jurors can be disqualified. Nevertheless, the precise method used in justice courts has less to do with whether King's general assembly proceedings were a judicial act than the nature of the act itself.

---

factually identical framework. *See, e.g.*, *Guercio v. Brody*, 814 F.2d 1115, 1116–18 (6th Cir. 1987) (analogizing *Virginia* in the context of termination of judicial employees), *decision vacated and later reinstated*, 859 F.2d 1232 (6th Cir. 1988).

84. The undersigned is less convinced by Plaintiffs' argument that the alleged "informality" of King's proceeding somehow makes it non-judicial. (Doc. 20 at 6). As addressed above, it is not the fashion in which a judge's act is conducted that indicates its judicial quality, but rather the nature of the act itself. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993). Further, as Defendants admit, a defendant does not have to be "present" during these proceedings; court reporters are not required in justice court; and court business such as the challenged general assembly hearing can be conducted in other parts of the courthouse than the courtroom. (Doc. 19 at 5–6).

85. Tex. Gov't Code § 62.004.

86. Tex. Gov't Code § 62.001.

87. Tex. Gov't Code § 62.114.

88. 24 Tex. Jur. 3d Criminal Procedure: Trial § 128.

89. *Id.*

By Defendants' own admission, it would be difficult to consider any of these activities to be anything other than non-judicial.[90] Many of the qualifications to be placed on the jury wheel are derived directly from the same statute that requires all jurors to be residents of the relevant county. Yet before the summons are released, several indisputably non-judicial actors filter out potential jurors for lack of qualification. This statutory selection scheme bodes in favor of holding that the determination of individuals' county residency is non-judicial.[91] That the determination took place in this case post-summons at a general assembly does not swaddle the proceedings in a judicial cloak. Likewise, that justices of the peace may be tasked for selecting voir dire jury panels does not recast non-judicial general assembly selection into something judicial.[92] While this function may be viewed as a judicial act in some cases, in this situation, King's general assembly was administrative and ministerial.[93]

Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **DENIED** as to King's general assembly proceedings for being a non-judicial act.[94]

### c.  Contempt Orders

Defendants also assert judicial immunity for King's contempt orders.

Plaintiffs assert that, at the qualification meeting, King forewarned all summonsed jurors that any unqualified jurors who were dishonest in giving their responses would be "held in contempt of

---

90. (Doc. 21 at 1).

91. *Fluker v. Worpell*, No. 1:22-cv-12045, 2022 WL 19731086, at *6 (E.D. Mich. Sept. 21, 2022) (finding act not judicial because "[m]ayors, county clerks, and religious ministers are all authorized by statute" to perform it).

92. *See Buckley*, 509 U.S. at 269 (observing the focus is on the nature of the function performed, not the identity of the performing actor).

93. *See Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 124 (2d Cir. 2020), *overruled on other grounds*, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ("[S]ome functions may be viewed as judicial acts when performed in the context of a particular case but as administrative when performed for the purpose of overall management in anticipation of future cases.").

94. Plaintiffs additionally contend that Defendant King's actions in the courtroom were illegal and beyond her authority. Yet judicial immunity can still attach even if a particular judge was without authority to act. *Mireles*, 112 S. Ct. at 12–13 (citation omitted). Likewise, if the judge's action was illegal, immunity will still apply if the challenged conduct was judicial in nature. *Harris v. City of Austin*, No. A-15-CA-956-SS, 2016 WL 1070863, at *6 (W.D. Tex. Mar. 16, 2016). As will be explained below, King's actions in the courtroom fell beyond the scope of the authority ascribed to her as a justice of the peace. Nevertheless, for the judicial act exception, this is immaterial and is insufficient to defeat immunity.

court." Each juror swore to tell the truth as to their qualifications. After all members answered the qualification questions, King announced that she believed several jurors were not Loving County residents and stated that they would "be held in contempt of court" and remanded to the local jail.[95]

It was not until July 2022 that Plaintiffs received copies of the written orders. According to the orders issued by Judge King on May 25, 2022, the day of the general assembly qualification, each Plaintiff was found to have "refused to comply with th[e] court's order." Ostensibly pursuant to Texas Government Code § 21.002(c), King charged each Plaintiff with "direct contempt" and remanded them to the local jail for 24 hours with a $100.00 fine.[96] King later modified the orders to note a release of 5:00 P.M. on May 25, 2022.[97] Whether King is entitled to judicial immunity for the contempt orders firstly requires an analysis of the four-factor judicial acts test.

Turning to the four-factor test, three of the factors have already been addressed and are the same as those for the general assembly qualification proceedings above. Therefore, only the judicial nature of citing for contempt remains to be considered.

It is generally well established that citing someone for contempt is an act normally performed by a judge.[98] Judges normally and traditionally issue contempt citations in the same vein as they do arraignments, convictions, and sentences.[99] So too do they order law enforcement to arrest and jail offenders in the courthouse setting.[100]

Furthermore, judges such as justices of the peace are equipped with plentiful discretion to cite individuals for contempt.[101] Plaintiffs do not assert that some provision or principle of law makes

---

95. (Doc. 18 at 12).
96. (Doc. 19-1).
97. (*Id.*).
98. *Adams v. McIlhany*, 764 F.2d 294, 298 (5th Cir. 1985).
99. *Malina v. Gonzales*, 994 F.2d 1121, 1124 (5th Cir. 1993).
100. *See Ballard v. Wall*, 413 F.3d 510, 516 (5th Cir. 2005).
101. Tex. Gov't Code § 21.002(a).

it incumbent upon justices of the peace to issue contempt orders for suspected perjury.[102] Citations for contempt are typically "normal judicial functions."[103]

Additionally, the Texas Government Code expressly allocates to justices of the peace the ability to sentence an individual for contempt.[104] King's contempt orders in this case cite to the relevant provision.[105] With all of these considerations, King's act of ordering Plaintiffs be arrested for contempt of court may appear judicial.[106]

But a predicament is present. The parties here dispute whether the Fifth Circuit case of *Harper v. Merckle* is applicable.[107] In *Harper*, the Fifth Circuit encountered a plaintiff who visited a state judge's chambers to deliver a child support payment check to his former wife, a court employee. The judge met with the plaintiff, and after a brief conversation about where the plaintiff lived, asked from behind his secretary's desk for the plaintiff to raise his right hand to be sworn in. The plaintiff left the office, and the judge instructed a deputy to apprehend the plaintiff. The plaintiff, after leaving the courthouse on foot, was soon apprehended by bailiffs. The judge then initiated a "'contempt proceeding' of sorts" against the plaintiff.[108]

The court found that a judge's finding of contempt of an individual in a courthouse was not a "judicial act," even though it was a "normal judicial function." The Fifth Circuit carved out a narrow exception to the judicial act exception, holding that, "when it is *beyond reasonable dispute* that a judge has *acted out of personal motivation* and has *used his judicial office as an offensive weapon* to

---

102. *See Koll v. Texas*, 157 S.W.2d 377, 380 (Tex. Crim. App. 1941).
103. *Hennessey v. Blalack*, 1995 WL 71182, at *1–2 (5th Cir. Jan. 26, 1995) (unpublished) (citing *Malina*, 994 F.2d at 1121); *Nalls v. LaSalle*, 568 F. App'x 303, 306 (5th Cir. 2014) (unpublished) (observing that there was "no question" that a finding of contempt in the courtroom and arising out of a visit to the judge in her official capacity was a judicial act).
104. *See* Tex. Gov't Code § 21.002(c).
105. (*See generally* Doc. 19-1).
106. The parties appear to dispute whether King as justice of the peace was legally authorized to order arrests based on contempt. (Docs. 19 at 7; 20 at 7–8). For the reasons described below, the undersigned holds that she was. To the extent that King as justice of the peace was acting *ultra vires* when ordering Plaintiffs' arrest for contempt, the undersigned finds that her action would still be a judicial act for the aforementioned reasons.
107. 638 F.2d 848 (5th Cir. 1981).
108. *Id.* at 850–51.

vindicate personal objectives, and it further appears certain that *no party has invoked the judicial machinery* for any purpose at all, then the judge's actions do not amount to 'judicial acts.'"[109]

Plaintiffs' contentions of conspiracy and malice appear to echo the holding in *Harper*, and Plaintiffs here beg the Court to find the instant case analogous to *Harper*.[110] As Defendants note, the Fifth Circuit expressly cabined its holding, cautioning that it is "exceedingly narrow and . . . tailored to . . . the rarest of factual settings."[111] Additionally, Defendants cry that the instant case can be distinguished by the fact that the *Harper* plaintiff did not have the "expectation that judicial matters were at hand when he entered [the judge's] office on nonjudicial business."[112] In this case, Plaintiffs were summonsed to King's courthouse for the purported purpose of jury service. This may indicate to a reasonable person that they would encounter a judge in a judicial setting over a courthouse matter, even if the matter was involved a non-judicial act.[113] Given *Harper*'s self-admonition against strict reliance upon it and the fact that it has since been afforded very little controlling weight, the undersigned finds it difficult to circumvent judicial immunity on this case alone.

Another case, however, could be considered *Harper*'s progenitor. In *Zarcone v. Perry*, a traffic court judge told a sheriff's deputy to purchase coffee from a coffee vendor. The deputy and judge tasted the coffee, concluding that it was "putrid." The judge ordered the vendor to be handcuffed and brought to his court. At the following proceeding, the judge threatened to file criminal charges against the vendor for selling the "putrid" coffee. The judge furthermore subjected the vendor to twenty minutes of him "screaming at him, threatening him and his livelihood . . . and thoroughly scaring him." The vendor was then brought in later for a similar encounter before the judge. On these facts, but without analysis, the United States Court of Appeals for the Second Circuit

---

109. *Id.* at 859 (emphasis added).
110. (Doc. 20 at 7–8).
111. *Harper*, 638 F.2d at 859.
112. *Id.*
113. *See Sleeman v. Brazoria County*, 1996 WL 60605, at *4 (5th Cir. 1996) (unpublished) (distinguishing *Harper* because the current plaintiff entered the courtroom as a "subpoenaed witness in a case pending before the judge" and was fully aware of the judicial nature of his visit); (*see also* Doc. 21 at 4).

affirmed the denial of the judicial immunity defense and upheld a punitive damage jury award for his actions.[114]

Most recently, the United States Court of Appeals for the Eighth Circuit declined to grant immunity to a judge for his actions. In *Rockett v. Eighmy*, the Eighth Circuit encountered a divorced couple who initially shared custody of their two children. One of the parents filed a case for sole custody in Missouri, before the judge-defendant. The children were instructed to live with the filing parent for a month before living with the other parent. The children were displeased with this situation and voiced their concerns within earshot of the judge-defendant. The judge-defendant tried to intervene, but after the children refused, he took them to a conference room and he scolded them. With the children continuing to protest, the judge-defendant personally escorted them to jail. The other parent sued the judge-defendant in relevant part for placing his children in jail. The judge-defendant claimed judicial immunity.[115]

Relying on *Harper* and *Zarcone*, the Eighth Circuit became perhaps the third instance of a court finding a judge to be liable for "what would otherwise [have] be[en] a judicial act." The court acknowledged a judge's general ability to order law enforcement to escort unruly litigants to jail and pull parties into a conference room. But the Eighth Circuit found the judge to have "crossed the line" when he "personally escorted the kids to jail, stood there while they removed their clothes and belongings, and personally came back an hour later to release them." Even if the judge "could have ordered *someone else* to take the kids to jail, he could not put them there *himself*." The judge's jailing of the children seemed all the more non-judicial because the children "were never parties," "never

---

114. *Zarcone v. Perry*, 572 F.2d 52, 53–57 (2d Cir. 1978); *see* Richard Labunski, *A First Amendment Exception to the "Collateral Bar" Rule: Protecting Freedom of Expression and the Legitimacy of Courts*, 22 Pepp. L. Rev. 405, 426 n.102, 446 (1995); *Sleeman v. Brazoria County*, 1996 WL 60605, at *3 n.4 (5th Cir. 1996) (noting *Zarcone* as the "only [] other case" within the scope of *Harper*) (unpublished).
115. *Rockett*, 71 F.4th at 667–68.

stepped foot in the courtroom," and the judge-defendant "personally locked them up himself." The court could not locate a case to have extended judicial immunity "so far."[116]

Many a court have distinguished *Harper* and *Zarcone*, and few cases have found judicial immunity to be defeated on these grounds.[117] This may appear to indicate that, as Defendants contend, the *Harper-Zarcone* doctrine is forever contained to only the three above cases. To the contrary, they are not. Most, if not all, of the cases distinguishing *Harper* and *Zarcone* do so expressly on the basis of the accused violator having encountered the aggrieved party on a legitimate, uncontrived premise. These cases place heavy emphasis on the judge's intent and motives.[118] In effect, these cases explicitly recognize that *Harper* and *Zarcone*, while limited and narrow holdings, prescribe liability for those who would otherwise be immune where the alleged constitutional violations occurred as the result of a contrived set of circumstances not motivated by any legitimate objective, but rather by personal or political animus.

In this case, as the undersigned has concluded, Defendants are accused of just that— conjuring false pretenses for Plaintiffs' summons, all for the exclusive extra-judicial and illegitimate purpose of arresting them for aggravated perjury and to suppress their political freedoms. King in particular is alleged to have admitted to organizing the general assembly proceeding for the sole purpose of voter suppression.[119] These facts detail such a unique and pernicious environment only in which illegitimate political attacks and the abuse of the judiciary and its offices could occur. With just the slightest legitimacy to Defendants' proceedings could they fall outside of the *Harper-*

---

116. *Id.* at 671, 672 (emphasis in original).
117. *See Sleeman*, 1996 WL 60605, at *3 n.4 (discussing *Zarcone* as the only other case within *Harper*'s scope). Defendants contend that *Sleeman* distinguished *Harper* on the simple fact that the plaintiff there was aware that judicial matters were at hand. (Doc. 21 at 3–4 (citing 1996 WL 60605)). This is wrong for two reasons. First, the undersigned concludes that a general assembly proceeding is not a judicial act; therefore, "judicial matters" were not evidently at hand. Second, the plaintiff in *Sleeman* was subpoenaed in a pending case before the judge, in which he would expect to appear. *Sleeman*, 1996 WL 60605, at *4. It can hardly be said that being summoned to testify before a judge in an open case produces the same expectation as one appearing in a courtroom to be questioned on one's eligibility to serve on any jury in an unnamed case. Only the former action cannot be done without the judge present; as the undersigned has concluded above, only the latter can be accomplished by non-judge members of a court.
118. *See, e.g.*, *Delbridge v. Schaeffer*, 569 A.2d 872, 878–79 (N.J. Super. Ct. Law Div. 1989).
119. (Doc. 18 at 15–16).

*Zarcone* exception. Here, however, Defendants do not even attempt to counter that the proceeding was legitimate, motivated by a genuine need to select a venire, or otherwise. To be sure, *Harper* was unique. But the Fifth Circuit has apparently not dealt with a case rising to the level of *Harper* since *Harper* itself. This alone is not a reason to permanently cabin the doctrine in light of its spread to other circuits.

Essentially, *Harper* and *Zarcone* established an unwritten exception to the general judicial acts exception: if an otherwise protected judicial act is so wrought with personal animus, and the judge exclusively uses his judicial office offensively for no other legitimate reason, the act is not judicial. As it has been alleged, Plaintiffs were brought to court for a sting operation from which they had no chance of escaping. The supposedly "direct contempt" orders were pre-drafted[120] and Defendants summonsed Plaintiffs with the plan of arresting them for perjury before they even had the chance to perjure themselves. Most cases will be unlike this one: the claimant will have expected to be part of a legitimate judicial matter, the judge will have merely made a mistake, and/or the contempt finding will be ad hoc. Defendants' only argument to the contrary is, essentially, King had the authority to do it, and law enforcement had to follow her orders, so it cannot be questioned. But *Harper* and *Zarcone* exist for the purpose of encompassing those individuals who attempt to use their official offices as shields for their wholly wrongful conduct. In a different case on different facts, Defendants may very well be entitled to immunity for Plaintiffs' claims. In this one, however, they are not. King went "too far"[121] and is not judicially immune for her non-judicial act.

King's general assembly qualification was a non-judicial act. And although ordering Plaintiffs' arrest for contempt might ordinarily be judicial, the extreme and unique nature of King's conduct brings it outside the realm of immunizing judicial acts. Neither King nor any other judge can weaponize the Texas judiciary to vindicate her personal political objectives by dressing all the

---

120. (Doc. 18 at 13).
121. *Eighmy*, 71 F.4th at 671.

proceedings in a robe of immunity.[122] Therefore, King is not entitled to judicial immunity for either the qualification proceedings or the contempt orders. Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **DENIED** as to judicial immunity for the general assembly proceedings and contempt orders.

### ii.      Complete Absence of All Jurisdiction

Should the Court conclude that King's courthouse activities were judicial, Plaintiffs' only recourse in the face of judicial immunity would be that the actions were taken without jurisdiction. A judge can only lose his immunity if an act that was otherwise judicial "occurred in the complete absence of all jurisdiction."[123] Thus, if King, as justice of the peace, "in the case of [qualifying a general assembly or] contempt . . . , had jurisdiction, [her] judgment cannot be impeached or inquired into [even if] the judge may have been influenced by wrong motives in rendering it."[124] The Court accordingly must determine whether King had "some subject-matter jurisdiction"[125] to (1) hold the qualification proceedings and (2) issue the contempt orders.

"Where a court has some subject-matter jurisdiction, there is sufficient jurisdiction for immunity purposes."[126] The proper inquiry "is not whether the judge actually had jurisdiction, or even whether the court exceeded its jurisdictional authority, but whether the challenged actions were *obviously* taken outside the scope of the judge's power."[127] Thus, whether a judge has or does not have judicial immunity for actions taken in the complete absence of jurisdiction is a separate inquiry from whether a judge's actions should be reversed or vacated for want of subject matter

---

122. Judicial immunity should only be denied at this stage because Plaintiffs' factual allegations are taken as true. If it is later demonstrated that it is not "beyond reasonable dispute" that King utilized the judicial machinery exclusively to pursue her personal objectives, King may later receive the benefits of judicial immunity. *See Harper*, 638 F.2d at 859.
123. *Malina v. Gonzales*, 994 F.2d 1121, 1125 (5th Cir. 1993).
124. *Taylor v. Goodrich*, 40 S.W. 515, 519 (Tex. Civ. App.—Waco 1897).
125. *Malina*, 994 F.2d at 1125.
126. *Id.*
127. *Davis v. Bayless, Bayless & Stokes*, 70 F.3d 367, 373 (5th Cir. 1995) (emphasis added).

jurisdiction.[128] For immunity purposes, the scope of jurisdiction is to be "broadly construed to effectuate the policies of guaranteeing a disinterested and independent judicial decision-making process."[129] There is a distinction between "acts 'in excess of jurisdiction,' for which immunity from civil liability applies[,] and acts taken in 'the clear absence of all jurisdiction,' for which there is no legal protection."[130] An example of an act done in the "clear absence" of jurisdiction is a "probate judge who tries a criminal case," while a "judge presiding over a criminal court" who "convict[s] a defendant of a non-existent crime" merely acts "in excess of his jurisdiction."[131] In any event, "[i]t is the [j]udge's actions alone, not intent, that . . . must [be] consider[ed]."[132]

### a.   General Assembly/Venire

Plaintiffs argue that King lacked jurisdiction to conduct the general assembly proceedings. "The focus is not on whether a judge's specific act was proper or improper, but on whether the judge has the jurisdiction to perform an act of the kind performed."[133] Thus, the jurisdictional question with regards to qualification relates to King's authority or lack thereof in holding the general assembly proceeding and determining who is eligible for jury service.

The undersigned holds that King had some authority to hold the qualification proceeding or call a general assembly of potential jurors. The Texas Government Code empowers justices of the peace to qualify jurors to serve on jury panels.[134] Thus, there is authority on the books for judges such as King to hold jury qualification proceedings.

---

128. *See Harry v. Lauderdale County*, 212 F. App'x 344, 347 (5th Cir. 2007) (unpublished) (finding state appellate decision that judge "acted without subject matter jurisdiction is not coterminous with the conclusion that she acted in 'complete absence of all subject matter jurisdiction'" for judicial immunity purposes).

129. *Holloway v. Walker*, 765 F.2d 517, 523 (5th Cir. 1985).

130. *Hudnall v. Smith*, No. EP-21-CV-00106-FM, 2021 WL 3744580, at *3 (W.D. Tex. Aug. 10, 2021) (quoting *Bradley v. Fisher*, 80 U.S. 335, 351–52 (1871)) (analogizing arbitral immunity and judicial immunity).

131. *Hudnall*, 2021 WL 3744580, at *3.

132. *Malina*, 994 F.2d at 1125.

133. *Almaguer v. Chacon*, No. DR-04-CV-023-AML/VRG, 2006 WL 8433819, at *5 (W.D. Tex. Sept. 5, 2006).

134. Tex. Gov't Code § 62.015; Tex. Code. Crim. Proc. Art. 45.027(a).

Further, § 62.015(a) of the Texas Government Code, cited by Defendants, provides that the judge shall select those names "if jury trials have been set."[135] While Plaintiffs imply in only a single instance that King's failure to "call a case that was set for trial" constituted error, Plaintiffs also note that King informed the Loving County Clerk "that she needed a jury for an upcoming trial."[136] These are seemingly contradictory allegations and need not be accepted in Plaintiffs' favor.[137] Plaintiffs' pleadings offer no alternative factual allegations which may support their conclusion that King's general assembly qualification proceeding was clearly not statutorily authorized.

In any event, King's action in holding the proceeding was not "obviously taken outside the scope" of her power.[138] She was allocated statutory authority to qualify potential jurors. To the extent that she was unable to qualify general assembly jurors, this modification would be but an excess of her authority to already qualify and determine the eligibility of jurors for jury service. She is undisputedly authorized to qualify a voir dire panel; while the judicial quality of that act may differ from that of a general assembly qualification, any difference in authorization is not so distinct as to make one conclude she has no authority to do the latter. The proceedings here, as Plaintiffs note, were "unprecedented," so it is difficult to discern how this first-instance scenario suggests a *clear* or *obvious* absence of power. This is further amplified considering that the only meaningful difference between this circumstance and one which would likely be within King's authority is whether a jury trial had been set. If King was slightly in excess of her authority, as it would appear she was, the broad confines of judicial immunity would still encompass the general assembly actions.[139]

---

135. *Id.*
136. (Doc. 18 at 9).
137. *See Cicalese v. Univ. of Tex. Med. Branch*, 456 F. Supp. 3d 859, 872 n.8 (S.D. Tex. 2020) ("Where [a] plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss.") (quotation marks and citation omitted).
138. Plaintiffs appear to also characterize the proceeding as an "election challenge." (Docs. 18 at 9; 20 at 9). Plaintiffs' allegations do not indicate they are presenting an election challenge or provide any facts suggesting that King was "determin[ing] whether a particular voter is a resident and thus eligible to vote in a county." (*Id.* (citing Tex. Elec. Code § 221.002)).
139. *Hudnall*, 2021 WL 3744580, at *3.

Therefore, Plaintiffs have not demonstrated that the extra-jurisdictional exception to judicial immunity applies to the general assembly proceedings. Accordingly, the exception does not apply to the general assembly conduct.

Plaintiffs' other minor argument must be rejected. They maintain that King's qualification hearing was an "election challenge."[140] It is not obvious to which argument in the Motion to Dismiss this refers. It is also unclear how King, who supposedly was running a conspiracy hellbent on punishing and imprisoning her political opponents, could have been "hearing an election challenge" by having Plaintiffs arrested for allegedly lying about their residency status in court. Further, this contention conflicts with Plaintiffs' other allegation that King refused to hear any argument from Plaintiffs before having them arrested for contempt, for she could not have been hearing and also refusing to hear argument at the same time.[141] While Texas law does allocate only to district courts, and not justice courts, the initial authority to review election challenges,[142] Plaintiffs allege no facts indicating that King was actually hearing an election challenge. Thus, Plaintiffs have not demonstrated that King lacked all subject matter jurisdiction in qualifying the general assembly or allegedly hearing an election challenge.

### b.  Contempt Orders

The second action Plaintiffs challenge as extra-jurisdictional is King's contempt orders. This conduct is most clearly within King's authority. Section 21.002 of the Texas Government Code permits justice courts to issue punishments for contempt. This punishment is "a fine of not more than $100 or confinement in the county or city jail for not more than three days, or both."[143] In this case, King purportedly remanded Plaintiffs to the county jail for one day at most, eventually instead

---

140. (Doc. 20 at 9).
141. (Docs. 18 at 18; 20 at 9).
142. Tex. Elec. Code § 221.002.
143. Tex. Gov't Code § 21.002(a)–(c).

releasing them that evening, and fined them $100.00 each.[144] Under Texas law, King possesses the "power to hold a contempt hearing, find a person in contempt, and issue a sentence of confinement for contempt."[145] She allegedly did just that here. Whether it was all a ruse for other nefarious purposes is not part of this exception's inquiry. These allegations do not clear the ever-higher threshold of being in the complete absence of all jurisdiction.[146]

Plaintiffs assert that the contempt orders were instead "prosecutions for perjury" during which King "act[ed] as the prosecutor, judge, and jury." As impressive a statement as this is, Plaintiffs' contention can be reduced to one stating that King held them in contempt without due process. Specifically, Plaintiffs believe that the "perjury" prosecution "cannot provide a basis for contempt without due process."[147] Construing Plaintiffs' characterization of the contempt orders as "prosecutions for perjury," the undersigned still finds that King had some subject matter jurisdiction to order Plaintiffs' arrests for contempt.

Defendants do not provide any statutory authority granting a justice of the peace jurisdiction to prosecute perjury charges. But Plaintiffs' argument is misplaced. Even if it is true that perjury cannot constitute contempt absent due process,[148] the Fifth Circuit has held that insufficient due process is on its own not enough to uproot all jurisdiction in a given proceeding.[149]

---

144. (Docs. 18 at 13; 19-1).
145. *See Almaguer*, 2006 WL 8433819, at *7.
146. *Hudnall*, 2021 WL 3744580, at *3; *see also Pierson v. Ray*, 386 U.S. 547, 554 (1967) (judicial immunity applies "even when the judge is accused of acting maliciously and corruptly"). To the extent Plaintiffs are seeking to collaterally attack King's contempt orders, they still must overcome judicial immunity in order to do so. *See also Hicks v. Bexar County*, 973 F. Supp. 653, 667 (W.D. Tex. 1997) ("The federal civil rights laws do not provide a vehicle to attack state court judgments nor to sanction the conduct of state court judges for actions taken within the scope of their judicial authority.) (citation omitted).
147. (Doc. 20 at 10).
148. *See In re Reece*, 341 S.W.3d 360, 367 (Tex. 2011) (finding that *federal law* prohibits perjury from being the sole basis for contempt absent obstruction of the court's duties).
149. In *Adams v. McIlhany*, the Fifth Circuit encountered a woman who had been punished for out-of-court contempt when she sent a state district judge an accusatory letter complaining of his allegedly biased treatment of her sons. She was summarily punished without due process rights. In finding that "some subject-matter jurisdiction" existed, the court observed that courts are to "construe a court's jurisdiction broadly when immunity is the issue." The court found that the district judge's court "was a court of general jurisdiction empowered to cite for contempt" and held that judicial immunity was applicable. 764 F.2d 294, 296, 298–99 (5th Cir. 1985).

In this case, Plaintiffs argue that due process was not given before they were cited for contempt or prosecuted for perjury.[150] The undersigned has found above that justice courts are empowered to cite for contempt up to heretofore un-surpassed limits. Justice courts furthermore have express jurisdiction to issue contempt orders.[151] To the extent some ambiguities exist, the Fifth Circuit's guidance sways the undersigned toward a broad interpretation of the justice court contempt power. Judicial immunity is not circumvented merely because King failed to observe procedural or statutory requirements in engaging in certain conduct. That any statutory authority grants King some tangible jurisdiction is all that is sufficient to invoke the protections of judicial immunity. Thus, King, in ordering Plaintiffs' arrest for contempt, even allegedly without due process, was acting within some feasible sense of her jurisdiction.

Therefore, Plaintiffs have not met their burden of showing that King was without authority to issue the contempt orders. Accordingly, the exception does not apply to this conduct.

Plaintiffs however have not met their burden of demonstrating that the qualification proceedings or contempt orders were conducted or made in the complete absence of all jurisdiction. As the *Harper* judicial act exception applies, however, King is still not entitled to absolute judicial immunity. Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **DENIED** as to judicial immunity concerning the general assembly proceedings and contempt orders.

### iii.    Malice/Corruption Exception

In the event the Court concludes that King's courthouse activities were judicial acts, Plaintiffs appear to pose an end-run to their alleged exceptions to judicial immunity. Specifically, Plaintiffs litter their live Complaint with allegations of malice and conspiracy, suggesting that King's

---

150. Plaintiffs also contend that "malice" or "personal motivation" can overcome judicial immunity for jurisdictional purposes. They cite *Harper v. Merckle* for this proposition. (Doc. 20 at 7–10). The Fifth Circuit, however, has recognized that, post-*Harper*, the Supreme Court "stated that 'allegations of bad faith or malice' cannot overcome judicial immunity." *Morrison v. Walker*, 704 F. App'x 369, 373 (5th Cir. 2017) (unpublished) (quoting *Mireles v. Waco*, 502 U.S. 9, 11 (1991)); *see also Ballard v. Wall*, 413 F.3d 510, 517 (5th Cir. 2005).
151. *See Tedford v. McWhorter*, 373 S.W.2d 832, 834 (Tex. App.—Eastland 1963) (reh'g denied Jan. 10, 1964).

attempts to upend their political rights will overpower King's assertion of judicial immunity. This argument is unpersuasive.

As Defendants observe, "[a]llegations of bad faith, malice, or corruption do not overcome judicial immunity."[152] Nor do allegations of a far-flung conspiracy involving the judge.[153] The only two possible pathways to circumvent the protections of judicial immunity are the aforementioned judicial act and clear absence of jurisdiction analyses. Furthermore, as Plaintiffs contend, King's contempt orders may have indeed been vacated on appeal. But this does not overcome the absolute judicial immunity afforded to judges for actions that are judicial and done with some tangible jurisdiction.[154] Put simply, allegations of malice, corruption, or conspiracy are insufficient to remove a judge to a place outside the scope of the jurisdiction he otherwise enjoys.

In sum, Plaintiffs have met their burden of demonstrating that King's actions in qualifying a general assembly and issuing contempt orders were non-judicial. Therefore, the claims against King are not precluded by judicial immunity to the extent that they relate specifically to this conduct. Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **DENIED** as to judicial immunity concerning the general assembly proceedings and contempt orders.

### 2.   Quasi-Judicial Immunity: Sheriff Busse & Constable Jones

Defendants Busse and Jones also assert the defense of quasi-judicial immunity for the contempt orders and subsequent arrests.

Where a judge is absolutely immune from suit for judicial actions taken pursuant to their jurisdiction, quasi-judicial immunity "protects government officials who perform functions that

---

152. *Swaringen v. Bell*, No. 7:18-cv-00073-O-BP, 2019 WL 2870951, at *4 (N.D. Tex. June 13, 2019) (citing *Mireles*, 502 U.S. at 11).
153. *Mitchell v. McBryde*, 944 F.2d 229, 230 (5th Cir. 1991).
154. *Sparks v. Duval Cnty. Ranch Co.*, 588 F.2d 124, 126 (5th Cir. 1979) ("His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption.") (citing *Pierson*, 386 U.S. at 554).

require them to act in accordance with a judge's direct orders."[155] Quasi-judicial immunity thus

protects the "quasi-judicial acts of government servants—official acts involving policy discretion but

not . . . adjudication."[156] To deny this protection to government officials executing their orders

"would render the officials lightning rods for harassing litigation aimed at judicial orders."[157] Further,

government officials "should not be required to make the Hobson's choice between disobeying the

court order or being haled into court to answer for damages."[158] "Enforcing a court order . . . is

intrinsically associated with a judicial proceeding."[159] If the court's will could be challenged by

threats of litigation against its officers, "the officers might neglect the execution of their sworn

duties."[160] Where an official "charged with enforcing a facially valid" judicial order, such as police

officers, sheriffs, and other court officers, executes it, judicial liability extends to him.[161] Thus, courts

routinely find that sheriffs and constables acting within their authority and enforcing facially valid

orders are entitled to quasi-judicial immunity.[162]

    In this case, the undersigned finds that neither Busse nor Jones are entitled to quasi-judicial

immunity. Because the undersigned concludes above that King's contempt orders were not judicial

acts, Judge King is not entitled to judicial immunity. Since quasi-judicial immunity is a derivative

immunity, Busse and Jones cannot enjoy any such immunity if King herself does not.[163] The order

that an officer executes "must be one for which the judge [herself] is absolutely immune from

suit."[164] Accordingly, Busse and Jones as a matter of law are not entitled to judicial immunity.

---

155. *Burgess v. Cox*, No. 4:14-CV-466-ALM-CAN, 2015 WL 5578009, at *4 (E.D. Tex. July 27, 2015).
156. *Wearry v. Foster*, 33 F.4th 260, 280 (5th Cir. 2022) (internal quotation marks omitted).
157. *Mays v. Sudderth*, 97 F.3d 107, 113 (5th Cir. 1996) (quotation marks omitted).
158. *Id.* (quotation marks omitted).
159. *Martin v. Bd. of Cnty. Comm'rs*, 909 F.2d 402, 404 (10th Cir. 1990) (citation omitted).
160. *Id.* (citation omitted).
161. *In re Foust*, 310 F.3d 849, 855 (5th Cir. 2002); *Modelist v. Miller*, No. H-12-1677, 2012 WL 4962190, at *3 n.3 (S.D. Tex. Oct. 16, 2012).
162. *See Burgess*, 2015 WL 5578009, at *4.
163. *Mays v. Sudderth*, 97 F.3d 107, 114 (5th Cir. 1996).
164. *Id.*

If the Court concludes that Judge King is entitled to judicial immunity for the contempt orders, further analysis is required. Plaintiffs allege that, at the qualification proceeding, a Sheriff's deputy acting "under the direction of Busse and the other Defendants" swore each prospective juror in. Following King's oral contempt and arrest orders minutes later, Defendant Jones and a Sheriff's deputy escorted Plaintiffs out of the room and ordered them to empty their pockets. Deputy Boyd[165] then handcuffed Plaintiffs and drove them to the Winkler County jail.[166] Defendants' primary assertion of quasi-judicial immunity therefore pertains to Busse's deputy and Jones, having personally arrested and searched Plaintiffs.[167]

Busse and Jones are alleged to only have followed King's orders to arrest Plaintiffs for contempt. Certainly, transportation to the local jail would be part of these orders. Further, each of the contempt orders are facially valid—they cite the correct Texas Government Code contempt section, 21.002(c); remand each Plaintiff for less than the maximum of three days; and assign a fine of the statutory maximum of $100.00.[168] This order calling for the arrest of individuals for contempt of and "disrespect" to the court, may appear to be a facially valid order for contempt. Therefore, if King herself is entitled to judicial immunity for the facially valid contempt orders, Busse and Jones would appear to be likewise entitled to quasi-judicial immunity for their actions in enforcing them.

However, the parties dispute whether the present allegations of conspiracy, or otherwise knowledge of the order's invalidity, alter the analysis. Plaintiffs claim that Busse and Jones' participation in the conspiracy, even if King herself is judicially immune, removes their own derivative immunity.[169] Defendants, on the other hand, contend that sheriffs still have derivative

---

165. As a preliminary matter, although Sheriff Busse is not alleged to have personally participated in the courthouse proceedings, under Texas law, the actions of sheriff deputies acting on behalf of the sheriff and in the course of their employment are imputed to the sheriff. *Rich v. Graybar Elec. Co.*, 84 S.W.2d 708, 709 (Tex. 1935). Defendants do not dispute that Deputy Boyd was acting in the course of his employment. Thus, even though Busse did not personally arrest Plaintiffs, the actions of Deputy Boyd can be imputed to him.
166. (Docs. 18 at 2, 16).
167. (Doc. 19 at 8–9).
168. (Doc. 19-1).
169. (Doc. 20 at 11–12).

judicial immunity for executing orders even though they might know "there was no legal cause for the writ of attachment."[170] Plaintiffs in turn allege that Busse and Jones "knew that King's order to arrest Plaintiffs was *not* valid."[171] Defendants claim the Fifth Circuit has rejected this approach.[172]

The undersigned finds that, even if the Court believes that King is entitled to judicial immunity for her contempt and arrest orders, Defendants Busse and Jones are not entitled to quasi-judicial immunity for their role in the alleged conspiracy. To begin, Defendants are correct in their assertion that the cases Plaintiffs cite in support of their proposition that co-conspirators with a judge are not entitled to the same immunity the judge enjoys involve only private parties, not government officials.[173]

However, Defendants' contention that the Fifth Circuit, in *Mays v. Sudderth*, forecloses Plaintiffs' argument is misplaced. Plaintiffs argue that, essentially, an order by a judge is not facially valid where its enforcers are aware that the order itself is invalid or are conspiring in its genesis. In *Mays*, the Fifth Circuit observed that the plaintiff *failed to cite* cases denying quasi-judicial immunity to "government officials complying with *facially valid* court orders."[174] The Fifth Circuit also found that the plaintiff made "no claim that [the sheriff] was in possession of any information that was not known by the judge" and that would have made the order appear facially invalid.[175] *Mays* did not address directly whether knowledge or awareness of the legal baselessness of a judicial order would make it invalid. The *Mays* court instead opted to focus on the plaintiff's failure to provide authority for her position, and therefore the case does not support Defendants' position.

The undersigned has not located, and the parties have not provided, any binding authority explaining the confines of "facially valid" orders. A review of the case law from around the country

---

170. (Doc. 19 at 9) (citing *Mays*, 97 F.3d at 113)).
171. (Docs. 18 at 23; 20 at 11) (emphasis in original); *see also Mays*, 97 F.3d at 113.
172. (Doc. 21 at 5).
173. *See Dennis v. Sparks*, 449 U.S. 24, 29 (1980); *Alexander v. Reese*, 702 F. App'x 223, 228 (5th Cir. 2017) (unpublished).
174. *Mays*, 97 F.3d at 113.
175. *Id.* at 113–14.

reveals that most courts to touch on the issue might consider an enforcer's knowledge or awareness that a judicial order is without legal validity to make the legal document facially invalid.[176] The undersigned has no reason, even considering *Mays*, to diverge from these other courts' implications.

Using this as a benchmark, the undersigned concludes that Plaintiffs' allegations make Defendants Busse and Jones unable to claim quasi-judicial immunity, even if Judge King herself enjoys the protection. Plaintiffs state multiple times throughout their Second Amended Complaint that Busse and Jones were aware of King's lack of jurisdiction or authority to not only conduct the general assembly proceedings, but also to issue the contempt and arrest orders. In particular, Plaintiffs allege that Busse and Jones were aware that the ground on which King was finding them in contempt—perjury for non-Loving County residency—was entirely fabricated and falsified.[177] Moreover, Plaintiffs' assertion that Busse and Jones conspired with King pre-summons to arrest them for "aggravated perjury," essentially regardless of the veracity of Plaintiffs' response, speaks to their knowledge that the contempt orders were a mere ruse.[178] These allegations illustrate a picture of a hijacking of the judicial process for solely personal motives. It cannot be said at this stage that Busse and Jones were "just following orders" or were merely enforcing what otherwise reasonably appeared to be facially valid orders when Busse and Jones are alleged to have known that they were invalid.[179]

---

176. *See, e.g.*, *Grove v. McGill*, No. 12-cv-01539-REB-CBS, 2013 WL 5183898, at *7 (D. Colo. Sept. 16, 2013) (finding insufficient allegations that do not indicate a defendant "exceeded the writ or actually knew that the writ was invalid"); *Cain v. City of New Orleans*, No. 15-4479, 2017 WL 467685, at *13 (E.D. La. Feb. 3, 2017) (finding failure to state claim where plaintiffs did not allege sheriff was aware of infirmity of warrants at time of execution); *Welch v. Saunders*, 720 F. App'x 476, 481 (10th Cir. 2017) (opining that if deputies knew that enforced protection order had been superseded, it would present "a more challenging issue to resolve") (unpublished); *Udeh v. Messerman*, No. 95-2536, 1995 WL 596160, at *1 (E.D. Pa. Oct. 5, 1995) (holding defendant "plainly entitled to an immunity defense, absent some allegation or proof that he exceeded the writ, or actually knew that the writ was invalid"); *Krohn v. United States*, 742 F.2d 24, 26–27 (1st Cir. 1984); *Rafferty v. Falkenstein*, No. 84-548-Z, 1985 U.S. Dist. LEXIS 16740, at *7–8 (D. Mass. Aug. 16, 1985) (opining that liability may be available if enforcers "should have known" that facially valid order was invalid).
177. (Docs. 18 at 20, 25; 20 at 1).
178. (Doc. 18 at 10, 11, 16).
179. *Turner v. Watson*, No. 6:19-CV-06016, 2020 WL 3158266, at *1, *3–4 (W.D. Ark. Feb. 12, 2020) (finding officers entitled to quasi-judicial immunity for "just following orders" where orders were facially valid).

Plaintiffs have alleged sufficient facts either obviating King's own judicial immunity, or else divesting Busse and Jones of their own derivative immunity. Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **DENIED** as to quasi-judicial immunity for Busse and Jones' arrests of Plaintiffs for contempt.

### 3. Qualified Immunity

In the alternative to judicial immunity, Defendants assert variously the defense of qualified immunity. Qualified immunity "shields government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[180] "Qualified immunity balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[181] The doctrine applies to "all but the plainly incompetent or those who knowingly violate the law."[182] "Qualified immunity represents the norm," so "courts should deny a defendant immunity only in rare circumstances."[183] Accordingly, the defense mostly protects "officials performing discretionary functions."[184]

In determining whether qualified immunity applies at the motion to dismiss stage, courts generally follow a two-step process, inquiring (1) "whether the facts that a plaintiff has alleged or shown make out a constitutional violation"; and (2) "whether the violation was objectively unreasonable in light of law that was clearly established at the time of the alleged misconduct."[185] "To defeat qualified immunity, a plaintiff must demonstrate that it would be clear to a reasonable

---

180. *Serrano v. U.S. Customs & Border Patrol*, 975 F.3d 488, 503 (5th Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).
181. *Pearson*, 555 U.S. at 231.
182. *Ziglar v. Abbasi*, 137 S. Ct. 1843 at 1867.
183. *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018) (internal quotation marks and citations omitted).
184. *Gunaca v. Texas*, 65 F.3d 467, 473 (5th Cir. 1995).
185. *Cabello v. Torres*, No. DR-11-CV-0078-AM-CW, 2014 WL 12986196, at *7 (W.D. Tex. Jan. 3, 2014); *Blakely v. Andrade*, 360 F. Supp. 3d 453, 479 (N.D. Tex. 2018).

officer that his conduct was unlawful in the situation he confronted."[186] To be "clearly established," there must exist "controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity."[187]

The plaintiff ultimately has the burden to negate the assertion of qualified immunity.[188]

### i.   Contempt Orders & Arrests

Defendants Busse and Jones assert qualified immunity for the arrests for contempt. In particular, they dispute only the second prong of qualified immunity concerning whether Plaintiffs have alleged a violation of a clearly established right.

"[L]aw enforcement officers have absolute immunity for enforcing the terms of a [facially valid] court order, but only qualified immunity of the manner in which they choose to enforce it."[189] Thus, "whether particular actions of government officials fit within a common-law tradition of absolute immunity, or only the more general standard of qualified immunity, [courts] have applied a functional approach, . . . which looks to the nature of the function performed, not the identity of the actor who performed it."[190] The undersigned believes Busse and Jones are not entitled to quasi-judicial immunity for King's conduct; therefore, this derivative immunity does not proscribe their liability for their method of enforcing the orders. Additionally, because the undersigned concludes that the contempt orders, being ancillary to Defendants' allegedly admitted conspiracy and plot against Plaintiffs, were facially invalid, on this reason alone, qualified immunity should not apply for the contempt arrests. The undersigned, however, will proceed with the analysis as though they are not facially invalid for this reason alone.

Plaintiffs bring three separate constitutional claims under the First, Fourth, and Fourteenth Amendments against Busse and Jones: (1) unreasonable search and seizure; (2) undue burden on the

---

186. *Shumpert v. City of Tupelo*, 905 F.3d 310, 321 (5th Cir. 2018).
187. *Espinal v. City of Houston*, No. H-22-1149, 2023 WL 424831, at *2 (S.D. Tex. Jan. 26, 2023).
188. *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020).
189. *In re Foust*, 310 F.3d 849, 855 (5th Cir. 2002); *Turner v. Raynes*, 611 F.2d 92, 93 (5th Cir. 1980).
190. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (quotation marks omitted).

freedom of speech and association; and (3) violation of due process. To plead a § 1983 claim, Plaintiffs must allege facts showing that both Defendants violated the United States Constitution or federal law, and that Defendants were acting under color of state law while doing so.[191] For these three constitutional claims, the parties agree that Busse and Jones were acting under color of their state law-provided authority as law enforcement officers. Thus, the qualified immunity defense turns on whether Plaintiffs allege facts demonstrating that they violated Plaintiffs' clearly established federal rights.

### a.   Fourth Amendment: Search and Seizure

Plaintiffs' search and seizure claim mentions in many places that they were arrested and searched without probable cause. These allegations appear therefore to assert a false or wrongful arrest claim.[192] The Fourth Amendment, applied to the States through the Fourteenth Amendment, guarantees "the right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . and [that] no [w]arrants shall issue, but upon probable cause."[193] For Plaintiffs to prevail on a Fourth Amendment unreasonable search-and-seizure or a false arrest claim, they must demonstrate that Defendants lacked an arguable probable cause for their arrest.[194] "The Supreme Court has defined probable cause as the 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'"[195] Qualified immunity will shield law enforcement from suit for wrongful arrest if "a reasonable officer could have believed the arrest at issue to be lawful, in light of clearly established law and the information the arresting officers possessed. Even law enforcement officials who

---

191. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).
192. *See Hartman v. Walker*, No. 1:13-CV-355, 2015 WL 5470261, at *23 (E.D. Tex. Sept. 16, 2015).
193. U.S. Const. amend. IV.
194. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009).
195. *Piazza v. Mayne*, 217 F.3d 239, 245–46 (5th Cir. 2000) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

reasonably but mistakenly conclude that probable cause is present are entitled to immunity." Thus, "[i]f officers of reasonable competence could disagree" on whether probable cause was present, "immunity should be recognized."[196] This is because law enforcement is inherently expected to abide by orders of the presiding judge, for to do otherwise would be to act as a "pseudo-appellate court."[197]

Here, viewing the factual allegations in the light most favorable to Plaintiffs, the undersigned finds that Busse and Jones are not entitled to qualified immunity for the Fourth Amendment claim. Plaintiffs assert that, after King ordered their arrests for contempt, Jones and a Sheriff's deputy escorted them out of the meeting room and into a hallway, searched them, detained them, and transported them to jail. Assuming the warrant was otherwise facially valid, there is no case in the Fifth Circuit case directly addressing whether law enforcement's compliance with an arrest order by a presiding judge indicates probable cause. The undersigned therefore turns to other courts for guidance.

Probable cause can exist when law enforcement officers follow a judicial officer's order to arrest.[198] Indeed, an oral order to arrest a present individual for contempt of court "is analogous to a court issued arrest warrant and raises a presumption of probable cause." So too is the finding of contempt, as it is "the equivalent of an indictment."[199] In this scenario, where the contempt orders are presumed facially valid, only if the Plaintiffs demonstrate that the orders were "improperly procured by the arresting officer" can the probable cause presumption be rebutted.[200]

In this case, the undersigned concludes that Plaintiffs meet their burden of demonstrating that the arrest was in contravention of their clearly established rights. Conducting an arrest without

---

196. *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000) (quotations and alterations omitted).
197. *Mays*, 97 F.3d at 113 (citation omitted).
198. *See Peairs v. Jackson County*, No. 1:13cv402-HSO-RHW, 2015 WL 5666906, at *14 (S.D. Miss. Sept. 25, 2015).
199. *Levine*, 2007 WL 9723282, at *6; *Hall v. Texas*, 450 S.W.2d 90, 91–92 (Tex. Crim. App. 1969); *Aplon v. City of Jasper*, No. 1:22-CV-18, 2022 WL 17815172, at *13 (E.D. Tex. Nov. 14, 2022) (grand jury indictment "establishes probable cause as a matter of law").
200. *Levine*, 2007 WL 9723282, at *6.

probable cause certainly presents a potential constitutional violation.[201] Yet as Defendants focus the majority of their arguments on the "clearly established" prong of qualified immunity, Defendants' arguments appear to myopically examine the requirement.[202] Satisfaction of this prong is not to be pleaded so narrowly that every issue would present a new case or so broadly that every conceivable case would have precedential support.[203] Rather, the right is to be defined at instead a higher level so that precedent can still be established.[204]

Thus, Plaintiffs possess the burden of pointing to some case law or other authority indicating that defines the contours of their alleged right with a high degree of particularity. That right is best framed here as the right of a summonsed individual to be free from arrest for contempt of court by law enforcement without probable cause even if the presiding judge orders said arrest.

In this case, Plaintiffs have alleged sufficient facts demonstrating that Busse and Jones violated clearly established law. It is clearly established that arrests for contempt must be made with probable cause, as noted above. If Plaintiffs had only alleged that Busse and Jones followed King's order to arrest them, perhaps the requisite probable cause would exist and Plaintiffs would fail at this stage. Indeed, several courts have concluded or implied that a bailiff or other judicial officer following a presiding judge's order to remove or arrest individuals based on contempt does not pose a constitutional threat.[205]

---

201. *Voss v. Goode*, 954 F.3d 234, 238 (5th Cir. 2020).

202. (*See, e.g.*, Doc. 19 at 12 ("It is not 'clearly established' that an officer violates a constitutional right by taking a person in a courtroom into custody when the presiding judge orders them to do so.")).

203. *Hobson v. Wilson*, 737 F.2d 1, 26 (D.C. Cir. 1984) ("[T]he right at issue can be defined neither so broadly as to parrot the language in the Bill of Rights, nor so narrowly as to require that there be no distinguishing facts between the instant case and existing precedent.").

204. *Id.*

205. *See, e.g.*, *Morrison v. Walker*, 704 F. App'x 369, 371–75 (5th Cir. 2017); *Wollin v. Gondert*, 192 F.3d 616, 624 (7th Cir. 1999) (order for arrest based on contempt of court); *Peairs*, 2015 WL 5666906, at *14 (bench warrant for contempt); *Droz v. McCadden*, 580 F.3d 106, 107–08 (2d Cir. 2009) (oral direction for contempt); *Enoch v. Hamilton Cnty. Sheriff's Off.*, No. 1:16-cv-661, 2021 WL 2223894, at *11–12 (S.D. Ohio June 2, 2021) (suggesting that judge's contempt order would constitute probable cause for arrest); *Levine v. Janosek*, No. CV-03-1694 (BMC) (ETB), 2007 WL 9723282, at *6 (E.D.N.Y. Apr. 12, 2007) (judge's oral order to arrest plaintiff for contempt).

But there is more to this case. Jones and the Sheriff's deputy allegedly "witnessed" King admonished all the summonsed jurors from being dishonest about their residency status in Loving County. They also reportedly witnessed King ask them the residency questions, the answers to which King found incorrect and thereafter ordered Plaintiffs arrested for contempt. Even though Texas law permits perjury as a basis of contempt of court,[206] the Constitution still requires probable cause.

Plaintiffs also assert, however, that Busse was personally aware that "persons who stay overnight in Loving County at least 'a week or two' a year could be eligible to vote in Loving County."[207] If these allegations presumed true, the analysis changes significantly. Taken together with Plaintiffs' allegations that they "regularly stay" in Loving County every night, it can be inferred that Busse should have been aware that there was no probable cause to arrest Plaintiffs for "perjury" based on their residency status in Loving County. Busse and his deputy, Deputy Boyd, were in the courtroom at the time of the arrests, and Busse's deputies apparently had "advance notice of the arrests." Additionally, King's contempt orders were presented to her for immediate signature after King ordered their arrests.[208] These allegations together indicate that Busse should have known that Plaintiffs did not perjure themselves by affirmatively answering King's residency question. Yet, Busse allowed the baseless arrests to occur. Busse's conduct in allowing arrests knowingly devoid of probable cause to occur violated Plaintiffs' Fourth Amendment clearly established rights to be free from such arrests.

Jones is also without qualified immunity. Jones in this case is alleged to have discussed a plan with King to arrest Plaintiffs ahead of time for "aggravated perjury." Some conspiracy in this plot is buttressed by Jones' father who, at the meeting room just before the arrests, asked Plaintiff Carr if he thought he was "getting what he deserved." Following the arrests, Jones allegedly

---

206. *See, e.g.*, *JP Morgan Chase Bank v. Park*, No. 09-07199, 2010 Tex. Dist. LEXIS 850, at *2–3 (193rd Dist. Ct., Dallas County, Tex. Mar. 18, 2010).
207. (Doc. 18 at 23).
208. (Doc. 18 at 13, 16).

conferred with King and Busse. During this conversation, Jones allegedly covered up his body camera and "obscure[ed] both video and audio recording."[209] These allegations illustrate a pre-meditated plot to arrest Plaintiffs, one of which Jones was aware possessed little legal basis. It appears that Jones knew that any violation of Plaintiffs' Fourth Amendment or other rights would be illegal and unsubstantiated.[210] Because the undersigned concludes elsewhere that Plaintiffs have alleged a violation of their Fourth Amendment rights, it can also be said that Jones' alleged participation in the arrests precludes his own qualified immunity.

As a last resort, Defendants also assert that Sheriff Busse cannot be held liable in his individual capacity for these alleged violations since he was not alleged to have been personally present. It is true that Plaintiffs only contend that Sheriff Busse's deputies participated in their arrests, not Busse himself. "An official cannot be held liable in his individual capacity merely because a subordinate committed some constitutional violation; [§] 1983 does not impose vicarious or respondeat-superior liability." If the supervisor was not involved in his subordinate's actions, he cannot be personally liable. Thus, a defendant must either be "personally involved in the constitutional violation" by affirmatively participating in it or commit "acts that are causally connected to the constitutional violation alleged."[211] In the law enforcement context, a plaintiff can alternatively make this showing by alleging that the officer implemented policies that caused the alleged constitutional injury.[212]

In this case, Plaintiffs' arrest-related allegations against Sheriff Busse fail. In their briefings, Plaintiffs do note that Busse stood by and watched "his deputies . . . carry out an arrest that he knew

---

209. (Doc. 18 at 10, 17).
210. Defendants suggest that the "specific manner" in which Plaintiffs were taken into custody, including handcuffing and transporting them to the local jail, does not allege a violation of a clearly established right. (Doc. 19 at 13). As Plaintiffs confirm, Plaintiffs' claim is based on their being arrested, which they contend was the unlawful act, and not the method by which it was effectuated. (Doc. 20 at 16 n.6).
211. *Magnolia Island Plantation, L.L.C. v. Whittington*, 29 F.4th 246, 251 (5th Cir. 2022) (quotation marks and one alteration omitted).
212. *See Calhoun v. City of Hous. Police Dep't*, 855 F. App'x 917, 922 (5th Cir. 2021).

to be unlawful."[213] However, the live complaint and the Response are devoid of factual allegations indicating that Busse himself was present for the qualification proceedings. This single-line diktat is insufficient to demonstrate Busse participated in Plaintiffs' arrest. Therefore, there are insufficient factual allegations to impute liability to Busse for personally participating in the arresting conduct of his deputies.[214]

On a different note, Busse, as the undersigned concludes elsewhere, is alleged to have committed multiple acts that are causally connected to the alleged constitutional violation. For example, Busse allegedly conspired with King and Jones to arrest Plaintiffs, was aware that the contempt orders lacked probable cause and were unconstitutional, and could have but refused to prevent their arrests. If Busse and his deputies had not conspired, even if Busse had still appeared at the general assembly proceeding, he could have prevented Plaintiffs' arrests from occurring without probable cause. Therefore, Busse is sufficiently alleged to have participated in the unconstitutional conduct at the general assembly proceeding.

Simply put, it is clearly established that law enforcement cannot arrest individuals in a courthouse for contempt without probable cause. Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **DENIED** as to the arrest-related Fourth Amendment claims against Jones and Busse on the basis of qualified immunity.

### b.  Fourteenth Amendment: Due Process

Plaintiffs complain that the contempt arrests by Defendants violated their due process rights under the Fourteenth Amendment. Plaintiffs contend that due process required notice and reasonable opportunities to defend against or explain the allegations, retain counsel, testify, call witnesses, and present evidence. Plaintiffs assert that they were deprived of their liberty without due process when they were arrested for contempt during the jury qualification proceedings. Defendants do not

---

213. (Doc. 18 at 16)
214. *See Delmast v. Collin County*, No. 4:21-cv-398-ALM-KPJ, 2022 WL 4362457, at *8 (E.D. Tex. Aug. 23, 2022).

expressly dispute the existence of a due process violation as to the arrests. But to determine whether Defendants violated Plaintiffs' clearly established rights, an inquiry into the due process required for contempt is necessary.

In the qualified immunity analysis, the undersigned first must determine whether Plaintiffs have alleged a violation of a clearly established constitutional right. The Fourteenth Amendment prevents states from depriving individuals of "life, liberty, or property, without due process of law."[215] In answering procedural due process questions, courts make two determinations. First, the court determines "whether there exists a liberty or property interest which has been interfered with by the State." Second, if so, the court considers "whether the procedures attendant upon that deprivation were constitutionally sufficient."[216]

"Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." These rules are "shaped by the risk of error inherent in the truth-finding process." The fundamental test of whether the process provided was constitutionally sufficient is the "opportunity to be heard at a meaningful time and in a meaningful manner." "A meaningful time" typically means "prior to the deprivation of the liberty or property right at issue."[217]

At the first step, the undersigned concludes that Plaintiffs sufficiently allege an interference with their liberty interests. Plaintiffs imply a liberty interest in being free from an unjustified arrest for contempt.[218]

---

215. U.S. Const. amend. XIV.
216. *Ky. Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989).
217. *Wooten v. Roach*, 431 F. Supp. 3d 875, 899, 900 (E.D. Tex. 2019) (quotation marks and citations omitted).
218. (Doc. 18 at 20, 22–24). This sounds eerily similar to their Fourth Amendment claim for false arrest. It is well-established that there is no Fourteenth Amendment "liberty interest" to be free from criminal prosecution unsupported by probable cause. *C.H. v. Rankin Cnty. Sch. Dist.*, 415 F. App'x 541, 546 (5th Cir. 2011) (unpublished). Undue deprivation of this liberty interest is best analyzed under the Fourth Amendment, as the "Framers [of the Constitution] considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it." *Albright v. Oliver*, 510 U.S. 266, 274 (1994). Thus, the "liberty interest" is merely a freedom from false arrest and falls in line with the Fourth Amendment claim above. Plaintiffs accordingly cannot

In Texas, "[c]ontempt proceedings are quasi-criminal in nature, and the contemnor is entitled to procedural due process throughout the proceedings."[219] Depending on the form of contempt charged, certain particular procedural safeguards may be required.[220] Although Texas judges are given all authority needed to exercise their jurisdiction and enforce their lawful orders, "that power does not include the power to violate a party's due process rights."[221] Alleged violations of procedural due process guarantees—even in contempt proceedings—can be asserted under the Fourteenth Amendment.[222] Therefore, Plaintiffs' qualms about due process in the face of a contempt hearing prior to their citation present a liberty interest protected under the Fourteenth Amendment.

As to the second step, the undersigned concludes that Plaintiffs have sufficiently alleged they were indeed deprived of procedural due process when their liberty interests were interfered with. If the Court recognizes a liberty interest in the contempt order and subsequent arrest, the below analysis applies, for the alleged justification for finding Plaintiffs in contempt is their supposed non-residency. The primary question at this stage, with a liberty interest sufficiently implicated, is what and how much procedural due process was required before Plaintiffs were arrested.

The undersigned begins with the contempt orders.[223] In Texas, contempts of court are labeled as either "direct or constructive." Direct contempt involves "words spoken or acts done in the presence of the court or in open court," whereas constructive contempt involves acts occurring outside the court. The contemnor's rights and the process due are "substantially different" under the

---

seek relief under the Fourteenth Amendment for any false arrest. The undersigned's analysis proceeds in the event the Court concludes that Plaintiffs can proceed under the Fourteenth Amendment.

219. *In re Rowe*, 113 S.W.3d 749, 752 (Tex. App.—Austin 2003) (mem. op.).

220. *See, e.g., Ex parte Daniels*, 722 S.W.2d 707, 709 (Tex. Crim. App. 1987).

221. *Rowe*, 113 S.W.3d at 752–53.

222. *Toplez v. Skinner*, 7 F.4th 284, 294 (5th Cir. 2021).

223. The undersigned's review is somewhat limited. *See Jackson v. Bachman*, No. 1:19-cv-422, 2021 WL 2223904, at *4 (S.D. Ohio June 2, 2021); *see also Spriggs*, 2021 WL 2905564, at *4 ("This Court's review is limited to determining if the contempt order was beyond the state trial court's power to enter or if the judgment deprived the petitioner of liberty without due process.").

two doctrines: direct contempt typically does not require immediate procedural safeguards prior to addressing the contempt.[224]

Direct contempt oftentimes warrants summary contempt findings.[225] Thus, fewer procedural safeguards are afforded when one is charged with direct contempt.[226] Those charged with criminal constructive contempt, however, "are entitled to full criminal process," including the right to counsel, adequate notice, public trial, and several other constitutional guarantees such as the burden of proving guilt beyond a reasonable doubt.[227] Indeed, the Supreme Court has outlined these protections:

> Except for a narrowly limited category of contempts, due process of law . . . requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation.[228]

Texas judges are not required to give accused direct contemnors "counsel and a hearing" prior to committing them for direct contempt.[229] Nor are they required to demonstrate by affidavit, notice, or rule to show cause.[230] What an alleged direct contemnor has no right to, therefore, is counsel.[231]

Direct contemnors are to receive neither notice nor a hearing because "there is no factual dispute arising from contemptuous behavior that occurs in the court's presence."[232] The key term here, and the basis for much of this lawsuit, is "no factual dispute." Plaintiffs argue that there was a dispute as to the factual foundation for the direct contempt adjudication. They furthermore maintain

---

224. *Adams v. McIlhany*, 593 F. Supp. 1025, 1028, 1029 (N.D. Tex. 1984).
225. *United States v. Wilson*, 421 U.S. 309, 316–17 (1975).
226. *Orr v. Bowles*, No. 3:99-CV-2274-BF, 2002 WL 1033092, at *7 (N.D. Tex. May 20, 2022) ("Additional safeguards are afforded a defendant charged with constructive rather than direct contempt.").
227. *Spriggs v. Thomas*, No. 2:18-CV-120-Z-BR, 2021 WL 2905564, at *4 (N.D. Tex. June 22, 2021) (collecting cases); *In re Iupe*, No. 01-15-00019-CV, 2015 WL 1967581, at *3–4 (Tex. App.—Houston [1st Dist.] Apr. 30, 2015).
228. *In re Oliver*, 333 U.S. 257, 275 (1948).
229. *Ex parte Flournoy*, 312 S.W.2d 488, 492 (Tex. 1958).
230. *Cooke v. United States*, 267 U.S. 517, 537–38 (1925).
231. *Daniels*, 722 S.W.2d at 709.
232. *Ex parte Gordon*, 584 S.W.2d 686, 688 (Tex. 1979).

that the "direct contempt" finding is just a ruse for any actual contempt, implying that it is but a mere method to circumvent the due process requirements of constructive contempt. If there was a factual dispute, it may be possible that traditional direct contempt requirements would not apply. In this case, judging by the written contempt orders, Plaintiffs were seemingly charged with the former, as each was found to be in "direct contempt."[233] The question at this stage, therefore, is whether Plaintiffs have met their burden of showing that the "direct contempt" label is nothing but a misnomer.

In this case, there is disagreement as to whether the "act" King accused Plaintiffs of making actually occurred at all.[234] The extent of the process due depends on whether Plaintiffs were accused of direct or constructive contempt, which as noted depends on the allegedly contemptuous act. Federal courts have given guidance in making this determination. Specifically, the "nature" of the contempt finding is to be considered, not necessarily the label.[235] If the court's determination of facts "occurred outside the court proceedings," the contempt will have been constructive, requiring all the necessary procedural safeguards. Meanwhile, if the contemptuous acts did not occur in the presence of the court or the public, the contempt will have been direct, necessitating relatively minimal safeguards.

---

233. (*See generally* Doc. 19-1). In Texas, it is well settled that direct and constructive contempt findings must accompany a written order of commitment. *In re Griffith*, 434 S.W.3d 643, 646 (Tex. App.—Houston [1st Dist.] 2014) (mem. op.). Texas judges are authorized to order the contemnor's detention "for a short and reasonable time while the judgment of contempt and order of commitment are being prepared." *In re Sheard*, 102 S.W.3d 808, 810 (Tex. App.—Beaumont 2003). Here, King produced to Plaintiffs written orders ex post, though they were allegedly pre-drafted. (*See* Doc. 18 at 13).

234. *Ex parte Krupps*, 712 S.W.2d 144, 147–48 (Tex. Crim. App. 1986).

235. *Orr v. Bowles*, No. 3:99-CV-2274-BF, 2002 WL 1033092, at *7 (N.D. Tex. May 20, 2022); *see also In re Hesse*, 552 S.W.3d 893, 899 (Tex. App.—Amarillo 2018) (mem. op.); *Goldberg v. Maloney*, No. 4:03 CV 21909, 2004 WL 2904314, at *11 (N.D. Ohio Dec. 7, 2004) ("even though the . . . court labeled the contempt as direct"); *Int'l Union v. Bagwell*, 512 U.S. 821, 838 (1994) ("[T]he label affixed to a contempt ultimately will not be allowed to defeat the applicable protections of federal constitutional law."). Some federal courts have suggested that the "nature" of the contempt determines whether it is civil or criminal, and not whether it is direct or constructive. *See Adams v. McIlhany*, 593 F. Supp. 1025, 1028 (N.D. Tex. 1984). However, more recent opinions indicate that the nature of the location of an alleged contemptuous act is the proper focus. *See Orr*, 2002 WL 1033092, at *7. Thus, the primary question is where the alleged act actually occurred.

In this case, the undersigned concludes that, viewing the facts in favor of Plaintiffs, the contempt orders were based on constructive contempt. Alternatively, the undersigned would find that the orders were not clearly based on direct contempt such that summary punishment was mandatory. At this stage, it is unknown whether King was personally aware of all essential facts to determine whether Plaintiffs would be in contempt.[236] King's alleged and undisputed statements at the qualification proceeding suggest that Plaintiffs were found in contempt because they supposedly lied to King about their residency status.[237] Contrariwise, Plaintiffs exclaim that King knew that Plaintiffs were all residents of Loving County.[238] If these facts are presumed true, Plaintiffs will have not committed any act, whether out-of- or in King's court, for contempt. Plaintiffs also allege that, as part of the plot, Defendant Jones had decided to arrest Plaintiffs for "aggravated perjury" even before the proceedings in which Plaintiffs had the opportunity to perjure themselves.[239] This would suggest that Jones and company had concluded Plaintiffs perjured themselves based on out-of-court statements. In the case of mistaken contempt, utilizing the narrow construction for summary contempt punishment would lead the undersigned to conclude that King's act-less contempt should have precipitated full due process. In other words, King's contempt finding as alleged fits more along the lines of constructive, out-of-court or mistaken contempt, instead of direct contempt. In the case of constructive contempt, therefore, full due process was warranted.

Even if it is presumed that King had reason to believe Plaintiffs were indeed lying about their residency, thereby potentially warranting a direct contempt finding, the undersigned finds that, viewing all facts in Plaintiffs' favor, summary punishment was unwarranted. Summary punishment power for contempt must be given a "narrow construction because it provides for punishment

---

236. *Spriggs v. Thomas*, No. 2:18-CV-120-Z-BR, 2021 WL 2905564, at *5–6 (N.D. Tex. June 22, 2021).
237. (Doc. 18 at 12, 14–15).
238. (*Id.* at 15).
239. (*Id.* at 16).

without affording the accused the normal safeguards surrounding criminal prosecutions."[240] Summary punishment in Texas is the result of a convergence of the court's observance of "the conduct *and* the exigency of the situation." Thus, in Texas, even a "finding of direct contempt does not automatically justify summary punishment of the contemnor."[241] Texas law constricts direct contempt summary punishment even further when there is no exigent circumstance warranting the circumvention of traditional full due process.[242] Such exigent circumstances include the immediate need to "to quell disruption, violence, disrespect or physical abuse by those in the courtroom and to maintain respect for the court."[243]

In this case, Plaintiffs allege the qualification proceeding occurred without disruption, and that they were not threatening any King court personnel or direct court orders. Though King exclaimed that Plaintiffs' alleged perjury was "disrespect" to the court, Defendants do not assert that there was an extant need to immediately suppress any such perjury.[244] Plaintiffs, according to the live complaint, had already answered the formulaic list of questions surrounding their eligibility for jury service in the affirmative. It is hardly conceivable how even obvious dishonesty in suggesting that one is a resident of Loving County when he is not would strike so severe to court decorum that it would warrant immediate summary punishment. Without an exigent circumstance, even if Plaintiffs committed direct contempt, King's authority to summarily punish for contempt would have been vanquished.[245]

Defendants implore the Court to accept the following proposition: a judge can summon individuals to her courthouse. She can "know" of disputed facts such as residency status and ask the individuals to state their beliefs as to their residency. She then finds them in direct contempt, and

---

240. *Orr*, 2002 WL 1033092, at *6 (citing *Cammer v. United States*, 350 U.S. 399, 404–05 (1956)) (quotation marks omitted).
241. *Ex parte Knable*, 818 S.W.2d 811, 812, 813 (Tex. Crim. App. 1991) (emphasis in original).
242. *In re Bell*, 894 S.W.2d 119, 129 (Tex. Spec. Ct. Rev. 1995).
243. *Knable*, 818 S.W.2d at 813 n.4.
244. *See id.*; *see also* (Doc. 18 at 15, 23).
245. *See Knable*, 818 S.W.2d at 813 ("Once the exigency ceases to exist . . . the authority of the trial court to punish without notice and an opportunity to be heard also exists.").

summarily sentences and fines them. Then the individuals, having been found in direct contempt and unable to present or defend their statements, are entirely without recourse. As explained above, this cannot be.[246]

Plaintiffs have alleged sufficient facts demonstrating a right to full procedural due process prior to being held in contempt of King's court during the qualification proceeding. As a result, Plaintiffs were at the very least entitled to prepare defenses and explain their positions. Yet they were not provided with the opportunity to do so. The right to procedural due process in cases of constructive contempt, or direct contempt outside exigent circumstances, is clearly established and beyond debate considering the plethora of case law cited by the undersigned. No reasonable law enforcement officer would believe that a constructive contempt or direct contempt not involving an exigency would permit them to arrest the accused contemnor without any meaningful way to explain their answers concerning their residency status. Therefore, Plaintiffs' allegations adequately present a due process violation under the Fourteenth Amendment.

The undersigned holds that Plaintiffs have properly alleged facts demonstrating a violation of the clearly established right to due process. Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **DENIED** as to the contempt- and arrest-based Fourteenth Amendment claims against Jones and Busse on the basis of qualified immunity.

### c. First Amendment: Speech and Association

Plaintiffs assert that the contempt orders and subsequent arrests violated their freedoms of speech and association as guaranteed by the First Amendment. The First Amendment, incorporated

---

246. But it is, where judicial immunity applies. Judicial immunity, as the undersigned concludes, protects judges for judicial acts made within their authority. This doctrine cannot be uprooted simply based on due process violations. *See Stump v. Sparkman*, 435 U.S. 349, 359 (1978) ("A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors."). Because the undersigned concludes that judicial immunity is inapplicable to any Defendant here, this consideration is irrelevant.

to the States via the Fourteenth Amendment, provides: "Congress shall make no law . . . abridging the freedom of speech, . . . or the right of the people peaceably to assemble."[247]

The First Amendment, which includes the freedom to associate politically as well as the freedom to speak and the rights to vote and support or oppose one's chosen candidate,[248] is perhaps the genesis of Plaintiffs' constitutional claims in this suit. It "protects the right of an individual to speak freely, to advocate ideas, [and] to associate with others."[249] "The Supreme Court has also recognized two types of associational rights protected by the Constitution." One is the "choice to enter into and maintain certain human relationships," while the other is the "right to associate for the purposes of engaging in other activities protected by the First Amendment, such as speech, assembly, and the exercise of religion."[250] This latter group includes the "freedom to associate with others for the common advancement of political beliefs and ideas."[251] However, there is no "generalized right of social association."[252] Nevertheless, political associations qualify as protected speech under the First Amendment.[253]

Where a First Amendment claim arises out of an allegedly unlawful arrest, the claim generally requires, much like with the Fourth Amendment, the absence of probable cause to support the arrest.[254] But in the case of "retaliatory arrests," which Plaintiffs may appear to assert, there is no such requirement to demonstrate the absence of probable cause.[255] In this case, as discussed above, Plaintiffs have sufficiently alleged facts to indicate that their arrests were conducted in the absence of probable cause. Additionally, Plaintiffs contend at various points throughout their live Complaint that Defendants only conducted these unjustified arrests to retaliate against them and impede their

---

247. *Phillips v. City of Dallas*, 781 F.3d 772, 776 (5th Cir. 2015) (quoting U.S. Const. amend. I).
248. *Soto v. La Salle County*, No. L-83-29, 1985 U.S. Dist. LEXIS 21886, at *16 (S.D. Tex. Mar. 12, 1985).
249. *Smith v. Ark. State Highway Emps.*, 441 U.S. 463, 464 (1979).
250. *Johnson v. Slaughter*, No. A-13-CV-438 LY, 2013 U.S. Dist. LEXIS 189049, at *29 (W.D. Tex. Oct. 30, 2013) (citing *City of Dallas v. Stanglin*, 490 U.S. 19, 23–24 (1989)).
251. *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973).
252. *Stanglin*, 490 U.S. at 25 (quotation marks omitted).
253. *Cox v. Kaelin*, 577 F. App'x 306, 311–12 (5th Cir. 2014) (unpublished).
254. *Buehler v. City of Austin*, No. A-13-CV-1100-ML, 2015 WL 737031, at *9 (W.D. Tex. Feb. 20, 2015).
255. *Gonzalez v. Trevino*, 60 F.4th 906, 907 (5th Cir. 2023) (Ho, J., dissenting).

political speech, which happen to be diametrically opposed to Defendants' own positions.[256] Specifically, that Jones planned to have Plaintiffs arrested for "aggravated perjury" and King herself concocted the proceeding in which Busse and Jones participated for the sole purpose of "voter suppression" illustrate the retaliatory nature of the arrests.[257] Defendants' failure to drum up sufficient probable cause further speaks to their illicit activities. Utilizing any statutory authority that allows for arrests for contempt, summons a general assembly, or otherwise for a retaliatory purpose in contravention of the First Amendment is a clearly established right, and has been so for some time.[258] Therefore, because Plaintiffs have sufficiently shown that the freedom from unjustified arrests for political speech is clearly established, Plaintiffs have also pleaded a First Amendment violation.

The undersigned concludes that Plaintiffs have demonstrated that Jones and Busse's conduct violated their clearly established right to be free from unjustified arrests for political speech. Therefore, Jones and Busse are not entitled to qualified immunity. Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **DENIED** as to the arrest-related First Amendment claims against Jones and Busse on the basis of qualified immunity.

### ii. Removal from Eligible Juror List

As to Plaintiffs' other activities claims, the undersigned begins with their alleged removal from the eligible juror list, which they claim violated their Fourteenth and First Amendment rights. Plaintiffs claim that they were deprived of the liberty to "serve on juries in Loving County" when King "caused Plaintiffs to be removed from the list of eligible jurors" by sending a post-qualification

---

256. (Doc. 18 at 7).
257. (Doc. 18 at 15–16).
258. *See Rivera v. Harris County*, No. H-19-4920, 2020 WL 2527479, at *6 (S.D. Tex. May 18, 2020) (citing *Smith v. Winter*, 782 F.2d 508 (5th Cir. 1986), in observing that "the Fifth Circuit found that the plaintiffs had stated a claim when they alleged that the defendants conspired to misuse the recall statute against the plaintiffs in retaliation for their exercise of First Amendment rights").

email to the Loving County Clerk.[259] Defendants do not substantively dispute whether King afforded Plaintiffs sufficient due process in sending the email or impeded their First Amendment rights, mostly focusing on causation, whether King had the authority to cause the result Plaintiffs allege, and whether Plaintiffs' claimed right is constitutionally recognized.

### a. Causation & Authority

As a preliminary matter, the undersigned rebuffs Defendants' argument that Plaintiffs failed to explain how King's alleged email could cause Plaintiffs to be removed from the jury wheel for future jury service.[260] In a suit alleging individual liability for a government official who violates constitutional rights, a plaintiff must assert "but-for" causation.[261] Defendants, in arguing that causation does not exist, concede that justices of the peace, like King, have no authority to compile the "list of persons eligible for jury service."[262] But this is precisely Plaintiffs' point. King, even though she had no authority to alter the juror rolls, still engaged in acts which led to such a result. If Defendants' circular argument—that an individual alleged to do an act could not have done the act because they were without authority to do so—were accepted, no *ultra vires* claim would ever be able to stand.

Speaking of *ultra vires*, Defendants also argue that causation likely does not exist because King had no authority to produce the results Plaintiffs allege she did. The *ultra vires* exception is worth considering. Where an actor engages in constitutionally violative conduct outside of his authority—an *ultra vires* action—qualified immunity does not shield him unless he had discretion to do so.[263] Defendants' concession that King lacked *any* authority to remove Plaintiffs from the Loving

---

259. (Doc. 18 at 25).
260. (Doc. 21 at 6–7).
261. *See Sims v. City of Madisonville*, 894 F.3d 632, 640 (5th Cir. 2018).
262. (Doc. 19 at 11).
263. *See Bevill v. Fletcher*, 26 F.4th 270, 275 (5th Cir. 2022) ("Defendants must first satisfy their burdens of establishing that the challenged conduct was within the scope of their discretionary authority.") (internal quotation marks and alterations omitted); *In re Ondova Ltd. Co. v. Sherman*, 914 F.3d 990, 993 (5th Cir. 2019).

County juror roll but did so regardless would seem to obviate qualified immunity.[264] Defendants'
Reply argument reflects their sentiment that King could not be held liable for allegedly committing
an act outside of her authority.[265] Defendants' only rebuttals to Plaintiffs' argument is that "Texas
law gives judges the responsibility for qualifying a jury."[266] This has been disposed of in more detail
above. But briefly, the Texas statutes on which Defendants rely concern qualification of *petit* jurors
on a panel "in a particular case," not general assembly veniremen.[267] These provisions may allocate
discretion to the judge, but apply to juror selection, not general assembly eligibility determinations.
They are inapplicable here. Thus, to the extent that King is legally unauthorized and unable to seek
Plaintiffs' removal, such is a question that is inappropriate to decide at this stage.

Turning substantively to causation, while conclusory allegations need not be taken as true,
Plaintiffs' allegations speak directly to an issue of fact which stands as the foundation for Plaintiffs'
claim. Plaintiffs assert that King sent an email to the Loving County clerk, requesting their removal
from the jury wheel. Plaintiffs also assert that they were subsequently removed from the jury wheel.
Application of simple logic bridges any causational gap: King emailed the Loving County clerk
directing Plaintiffs' removal from the juror roll, and Plaintiffs thereafter were so removed from it and
are unable to vote.[268] It can be reasonably inferred that King's email was the but-for cause of
Plaintiffs' removal from the juror roll.[269] In other words, without King's email, Plaintiffs' presence
on the juror roll would still be intact. Whether the Loving County clerk actually removed Plaintiffs
from the roll, as well as whether Plaintiffs have in fact been removed from it, are factual questions
resolved in Plaintiffs' favor at this stage. At the Federal Rule 12(b)(6) stage, it must accordingly be
taken as true the allegation that "Plaintiffs are no longer eligible to serve on juries in Loving

---

264. *See, e.g.*, *Haywood v. Hough*, 811 F. App'x 952, 957 (6th Cir. 2020) (unpublished).
265. (Doc. 21 at 6–7).
266. (Doc. 21 at 6).
267. *See* Tex. Code Crim P. art. 35.21; Tex. Gov't Code § 62.105.
268. (Doc. 18 at 18).
269. *Morris v. Dearborne*, 181 F.3d 657, 672 (5th Cir. 1999) (permitting § 1983 liability where an official "causes"
a deprivation of a citizen's constitutional rights).

County."[270] This is not a conclusory allegation, but instead a factual one, since it does not speak to a legal conclusion and instead provides a definitive answer to the question of whether Plaintiffs are on the jury list or jury wheel and are able to serve on juries in Loving County. There is no conceivably more specific way to allege this factual circumstance. Plaintiffs have therefore demonstrated sufficient causation in this case.

Causation is but one element of the First Amendment § 1983 qualified immunity analysis, however. Defendants also dispute whether the right Plaintiffs cry was violated is indeed a recognized constitutional right capable of violation and therefore § 1983 liability.[271]

### b. Jury Service as a Recognized Right

The undersigned turns to Plaintiffs' qualms about jury service. Plaintiffs allege that, following the qualification proceedings and their arrests, King's email to the Loving County clerk purportedly made them ineligible to serve on Loving County juries.[272] Plaintiffs claim that this email was an attempt to strip their right to vote and hindered their right to serve on a jury. Defendants dispute whether excluding individuals from a jury eligibility list implicates a recognized liberty or property interest.[273]

The undersigned concludes that there does not appear to be a protected interest in serving on a jury or being eligible for jury service. The courts that have addressed the issue have not concluded there is a protected interest in serving as a potential juror.[274] The undersigned detects no such precedent.

---

270. (Doc. 18 at 18).
271. (Doc. 19 at 12).
272. (Doc. 18 at 28).
273. Defendants assert that Plaintiffs allege that King sent an email "that 'directed the Loving County clerk to remove Plaintiffs from the list of eligible voters on the allegedly false grounds that they were residents of counties other than Loving County.'" (Doc. 19 at 3 (quoting Doc. 18 at 18)). This is a typographical error, as Plaintiffs' allegation states that King "directed the Loving County clerk to remove Plaintiffs from the list of eligible *jurors*." (Doc. 18 at 18 (emphasis added)).
274. *Smith v. McClendon*, No. 14-6358, 2015 WL 2079689, at *4, *7 (E.D. Pa. May 5, 2015); *Eckstein v. Kirby*, 452 F. Supp. 1235, 1241 (E.D. Ark. 1978); *Adams v. Sup. Ct. of San Diego Cnty.*, 524 P.2d 375, 379 (Cal. 1974); *Carter*

Plaintiffs cite some cases in an attempt to suggest that serving on a jury is a constitutionally protected right. They characterize the right as not necessarily one to serve on a jury itself, but as a freedom from interference with this right "based on [a] status as a member of a protected class." Plaintiffs also state that their "political affiliation" is the protected status.[275] But all the portions of the cases they cite refer to rights other than the right to serve on a jury generally. In *Eckstein v. Kirby*, for example, individuals were excluded from the jury selection process due to an inability to speak English or hear properly. The court recognized that the plaintiff was not claiming she had a "right to serve as a juror." Rather, she was arguing for a "negative right or interest," specifically "the right to not be invidiously excluded from the jury selection process." Nevertheless, under the Constitution's Equal Protection Clause, the court held that an individual's interest in serving on a jury was not a right protected by the Constitution.[276] Plaintiffs' other cases separately discuss the legality of excluding jurors based on race[277] and firing individuals based on political party affiliation.[278] In neither of these cases does the Supreme Court discuss the individual right to serve as a potential juror. Thus, the undersigned cannot conclude that such a right—the right to be eligible for jury service and be summonsed for a general assembly—exists, even if it is true that Plaintiffs are no longer eligible to serve on a jury due to King's email.

Plaintiffs have not shown that serving on a jury is a constitutional right. They subsequently cannot meet their burden of showing a violation of a non-existent right. Thus, the qualified immunity analysis for King's email conduct ends here.

---

*v. Jury Comm'n of Greene Cnty.*, 396 U.S. 320, 330 (1970) (declining to deem jury service either "a right, a privilege, or a duty").
275. (Doc. 20 at 13–14).
276. 452 F. Supp. at 1240–41.
277. *Carter*, 396 U.S. 320.
278. *Elrod v. Burns*, 427 U.S. 347 (1976).

Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **GRANTED** as to Plaintiffs' claims concerning King's email to the Loving County Clerk on the basis of qualified immunity.

### iii.    Removal from Loving County Appraisal Board

Plaintiffs present a First Amendment claim against King and Busse for their actions on the Loving County Appraisal Board. In particular, Plaintiffs argue that the pair's actions in requesting Renteria to resign from the Board on their suspicions of non-Loving County residency; voting in favor of a resolution seeking his resignation; and causing the Loving County Appraisal District to file suit against Renteria alleging he was not eligible to serve on the Appraisal Board. Defendants contend that board members are protected by qualified immunity when they vote on the board's resolutions and authorize the district to file lawsuits.[279]

In Texas, county appraisal districts are political subdivisions of the state, established in each county and governed by boards of directors.[280] Members of these boards must be residents of the district's county and are appointed by the "taxing units that participate in the district."[281] Participating and proposing board resolutions, and voting in favor of the district bringing a lawsuit are some of the statutory functions these boards serve.[282] Therefore, King and Busse's alleged actions on the Appraisal Board were official state functions, and a special standard applies. Plaintiffs must therefore demonstrate that these actions nevertheless violate their First Amendment rights, then clearly established.

The undersigned concludes that Plaintiffs have failed to meet this burden. Plaintiffs' First Amendment claims as to the Appraisal Board are most rightly construed as retaliation claims. In First Amendment retaliation claims concerning public policymakers, the Fifth Circuit requires four

---

279. (Doc. 19 at 14).
280. Tex. Tax Code §§ 6.01(a), 6.01(c), 6.03(a).
281. Tex. Tax Code § 6.03(a).
282. *See* Tex. Tax Code §§ 6.031, 43.01.

elements that the plaintiff-employee must show: "(1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action."[283] Defendants do not substantively dispute any individual element of a First Amendment retaliation claim. Instead, it appears that Defendants, citing two cases that they believe demonstrate that Plaintiffs' allegations do not state a First Amendment claim, contend that their actions do not violate a clearly established constitutional right.[284] Their emphasis is clearly on the second prong of the qualified immunity analysis, and the undersigned would be right to presume that Plaintiffs have alleged a prima facie First Amendment violation. With this in mind, the undersigned turns to the analysis of whether Plaintiffs have asserted a constitutional violation of their clearly established rights.

Addressing Defendants' first argument, the parties dispute whether Renteria, like King and Busse, is "appointed" and therefore entitled to lesser free speech retaliation protections. Appointed employees are generally provided with fewer protections than elected policymakers.[285] The Fifth Circuit affirmed this principle in *Rash-Aldridge v. Ramirez*, which Plaintiffs aver is misapplied by Defendants.[286] There, the Fifth Circuit encountered an employee suing her former council after it removed her from a planning organization for failing to represent the appointing council's decision to support a certain highway access proposal. The court, in finding the council immune to her First Amendment claim, expressed the notion that her position in the planning organization unit, to which she was appointed after getting elected to the council, was to represent the interests of the council, not of the people. Only the latter, the court implied, would receive the utmost protections afforded

---

283. *Hamilton v. City of Wilmer*, No. 3:22-CV-02103-E, 2023 WL 4921513, at *4 (N.D. Tex. Aug. 1, 2023) (internal citations and quotation marks omitted).
284. (Doc. 19 at 15).
285. *Rash-Aldridge*, 96 F.3d 117, 119 (5th Cir. 1996); *but see Bourne v. City of Middletown*, No. 3:11-cv-00309 (JAM), 2017 WL 1138125, at *8 (D. Conn. Mar. 27, 2017) (noting that in some instances, elected policymakers "may have less First Amendment protection against retaliation from other government officials" than does an appointed employee).
286. 96 F.3d 117 (5th Cir. 1996).

elected officials.[287] In other words, where the policymaker "is serving as an appointee [as opposed to an electee], the prerogatives of office are not the same."[288] The question thus becomes one of whether Renteria was an elected or appointed policymaker.

In this case, each party is partially correct. Defendants are correct in that appointed policymakers generally have fewer protections than elected policymakers. Plaintiffs, on the other hand, are also correct in that *Rash-Aldridge* does not protect Busse and King here. The council found to be immune in *Rash-Aldridge* was so found because it itself, as the defendant, had appointed the plaintiff. Because the plaintiff-employee, as *appointee* to the planning organization, in her dissension prevented "them from speaking with one voice" on the highway issue, the council had greater leeway in dismissing her from her position.[289] It is undisputed here that Renteria was also appointed.[290] However, as Defendants concede, Renteria, as with any other Appraisal District board member, was appointed by the local taxing unit, not by the Appraisal Board itself. In this scenario, the taxing unit which appointed Renteria may have been able to remove him and receive qualified immunity. But because Busse and King, who were also taxing unit appointees, are alleged to have themselves unlawfully attempted to remove Renteria, the appointee-electee distinction discussed in *Rash-Aldridge* does not apply.[291]

Defendants also maintain that members of legislative bodies "have the right to express their opinions and take action on the eligibility of other members of the body."[292] This is correct: such bodies, like the Appraisal Board here, have these rights as well as the ability to authorize certain members to sue on behalf of the organization.[293] Similarly, legislative bodies are not subject to First Amendment liability "when some members cast their votes in opposition to other members out of

---

287. *Rash-Aldridge*, 96 F.3d at 119.
288. *Id.* at 120 (quotation marks omitted).
289. *Id.* at 120.
290. (Docs. 20 at 17; 19 at 15).
291. Even if it did, it is less likely that an *attempted* improper removal would violate Plaintiffs' rights. Busse and King's attempts, after all, allegedly did not succeed.
292. (Doc. 19 at 15).
293. *See Zilich v. Longo*, 34 F.3d 359, 363 (6th Cir. 1994).

political spite or for partisan, political, or ideological reasons."[294] Improper motives, therefore, do not violate or upend legislative or policymaking council action.[295] These legal principles apply to both ordinances, resolutions, and other voting actions that an independent policymaking body such as the Appraisal Board or its members may engage in as members of the body.[296] These legal principles indicate that King and Busse, acting in their official capacities as members of the Appraisal Board, are shielded from liability pertaining to votes and resolutions that they participated in and were adverse to Plaintiffs, no matter how malicious their motives.[297] Plaintiffs have not proffered any authority to the contrary. Indeed, their Response is devoid of any argument on this point. To defeat qualified immunity, Plaintiffs must cite to precedent which places the lawfulness of an official's actions "beyond debate."[298] Plaintiffs' failure to do so is telling. Accordingly, they have not met their burden of demonstrating that King and Busse's Appraisal Board actions violated a clearly established right.

The undersigned has found that Plaintiffs have not demonstrated a First Amendment violation. Additionally, Plaintiffs' Second Amended Complaint and subsequent briefing are devoid of any authority standing for the proposition that biased or malicious board members acting otherwise within their official state authority violate the First Amendment. Given the lack of authority on the matter and Plaintiffs' failure to provide any in its absence, it cannot be concluded that any right Busse and King may have violated was clearly established. Therefore, Plaintiffs have not met their burden. Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **GRANTED** as to Busse and King's conduct on the Appraisal Board on qualified immunity grounds.

iv.   **Voter Registrar Letters**

---

294. *Id.*
295. *Id.*
296. *Houston Elec. Co. v. City of Houston*, 212 S.W. 198, 200 (Tex. Civ. App. 1919); *Zilich*, 34 F.3d at 363.
297. *See Zilich*, 34 F.3d at 363.
298. *Rogers v. Hall*, 46 F.4th 308, 314 (5th Cir. 2022) (citation omitted).

Plaintiffs also extend their First Amendment claim to Busse's action as the Voter Registrar of Loving County. Plaintiffs allege that Busse, in the midst of an election in August 2022, recently sent address confirmation notices to Plaintiffs that expressly cited SB 1111 and which demanded that Plaintiffs prove they are residents of Loving County. The letters included the "false claim that the Voter Registrar" had received information that the voter's current residence "is different from the residence on [their] information record." If the voter did not provide information "confirming their residence within thirty days of the date on the letter," the letter stated that their "registration will be canceled."[299]

Plaintiffs assert that Busse admitted that the statement that the Voter Registrar had received information about the voter's residency was a "lie." Busse further allegedly admitted that the letter's official Loving County letterhead, accompanied by signatures of the Loving County chief law enforcement and elections officer, could be "impactful" on potential Loving County voters.[300] Plaintiffs claim that these "demands" demonstrate participation in the conspiracy to impinge their First Amendment rights.

In this case, Defendants only dispute whether any violation Plaintiffs allege was clearly established.[301] Therefore, for the purposes of evaluating the Motion to Dismiss, the undersigned presumes that Busse's registrar actions violated Plaintiffs' First Amendment rights. Accordingly, the undersigned only needs to consider the second prong of qualified immunity.

The parties, however, discuss an argument pertaining to the first prong, produced in Plaintiffs' Response. Plaintiffs seem to base their First Amendment claim here on Busse's sending the allegedly intimidating letters on a violation of the Texas Elections Code, as amended by SB 1111. Specifically, Plaintiffs contend in their Response that "Texas law only permits the form letters to be

---

299. (Doc. 18 at 20).
300. (Doc. 18 at 21).
301. (Doc. 19 at 16–17).

sent to a voter if the registrar has a bona fide reason to question the voter's residency."[302] Thus, it appears to be that Plaintiffs' First Amendment claim is premised upon Busse's supposed violation of state law. It is unclear how a violation of state law can present a First Amendment claim.

Perhaps Plaintiffs' First Amendment claim is better read as follows: Busse's actions as Voter Registrar violated Plaintiffs' First Amendment rights not necessarily because the violative law was clearly established, but because Busse personally knew his actions violated the law. But then enters the ever-pending issue of whether the law known to have been violated was one on which a First Amendment claim can be based. As Defendants rightly acknowledge, a § 1983 claim cannot be substantiated by a violation of state law.[303] Because SB 1111 is a Texas state law, even if Busse had definitively and knowingly violated it, it cannot support a § 1983 action. The illicit actions must pertain to violations of federal law, and SB 1111 is not one.[304] Plaintiffs are therefore unable to maintain their § 1983 claim for the Voter Registrar conduct based on SB 1111.[305]

Turning to the second prong, in this case, the undersigned finds that Plaintiffs have not met their burden of overcoming qualified immunity for Busse's actions as Voter Registrar. Because this action, unlike Busse's conduct as part of the Appraisal Board, was taken against Plaintiffs as citizens and not as co-Board members, a different standard applies. In particular, a plaintiff asserting a First Amendment retaliation claim as a private citizen must allege that (1) the plaintiff "was engaged in constitutionally protected activity"; (2) the defendant's actions "caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) the defendant's adverse actions "were substantially motivated by the plaintiff['s] exercise of

---

302. (Doc. 20 at 17).
303. *Brown v. Williams*, 124 F. App'x 907, 909 (5th Cir. 2005) (unpublished).
304. *See Harmon v. Dallas County*, 294 F. Supp. 3d 548, 575 (N.D. Tex. 2018) (citing *Carr v. Johnson*, 51 F. App'x 928 (5th Cir. 2002) (unpublished)); *but see Colvin v. LeBlanc*, 2 F.4th 494, 500, 500 n.6 (5th Cir. 2021) (finding violation of state extradition law to allow § 1983 action where violation of state law causes a deprivation of federal constitutional rights).
305. To the extent that Plaintiffs are alleging a First Amendment claim based on a statutory violation of the Voting Rights Act, this argument would also fail. As the undersigned discusses below, Plaintiffs' Voting Rights Act claim against Busse fails as a matter of law. Therefore, the first prong of qualified immunity, a violation of constitutional or statutory law, is not met, and qualified immunity attaches.

constitutionally protected conduct."[306] In any event, a government official's "retaliation against a private citizen for [the] exercise of First Amendment rights cannot be objectively reasonable."[307]

To the extent that Plaintiffs' claim is premised on a prima facie First Amendment violation, the undersigned finds that Plaintiffs still have not met their burden. Plaintiffs simply do not cite any authority which would demonstrate that Busse's conduct violated a clearly established right to be free from receiving intimidating letters asking for confirmation of their eligibility to vote. Therefore, even if Plaintiffs' live Complaint is construed as presenting retaliation claims, it is still insufficient to allege a § 1983 First Amendment case.

Plaintiffs offer one last saving grace, relying on the general qualified immunity legal principle that "knowing violations of the law are not subject to qualified immunity."[308] It is true, as Defendants note, that the second prong of qualified immunity involves an inquiry into whether an alleged violation was of a right clearly established at the time.[309] But qualified immunity does not protect those individuals who knowingly violate *federal* law, even if it would otherwise not have been clearly established.[310] In this case, however, as noted above, a knowing violation of a state law cannot substantiate a § 1983 First Amendment claim. It would also be improper to vaguely state that Busse knowingly violated the First Amendment. Plaintiffs' argument to the contrary, without support, therefore fails.

Therefore, Plaintiffs have not met their burden of showing that Busse's conduct as Voter Registrar violated any federal law, whether clearly established or otherwise. Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **GRANTED** as to Busse conduct as Voter Registrar on qualified immunity grounds.

### v.   Conspiracy to Violate § 1983

---

306. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)
307. *Keenan v. Tejeda*, 290 F.3d 252, 261 (5th Cir. 2002).
308. (Doc. 20 at 16 (citing *Reyna v. Garza*, 569 F. Supp. 3d 567, 585 (S.D. Tex. 2021)).
309. *Felton v. Polles*, 315 F.3d 470, 477 (5th Cir. 2002).
310. *Presley v. City of Benbrook*, 4 F.3d 405, 409 (5th Cir. 1993).

Plaintiffs argue that Defendants were engaged in a conspiracy to deprive Plaintiffs of their constitutional rights under the First, Fourth, and Fourteenth Amendments. Defendants also assert qualified immunity for this claim.

Section 1983 is the "legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act."[311] In the Fifth Circuit, a "conspiracy by itself . . . is not actionable under [§] 1983." Thus, there needs to be an "actual violation" of § 1983 for a conspiracy claim to be substantiated.[312]

A plaintiff must allege that "the defendants agreed to commit an illegal act" to establish a § 1983 conspiracy claim.[313] A plaintiff must assert, in particular, "(1) the existence of a conspiracy involving state action and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." Where qualified immunity applies to actual violations, the immunity carries through to the related conspiracy charges as well.[314] Thus, "the qualified immunity analysis that applies to the underlying § 1983 claims resolves the qualified immunity analysis for the conspiracy."[315] If qualified immunity bars the underlying constitutional claim, therefore, "there is no need to reach the issue of whether a conspiracy existed to engage in those actions."[316]

The undersigned has concluded that Plaintiffs have met their burden of overcoming qualified immunity on their constitutional claims against Defendants Jones and Busse for the contempt orders and arrests. Therefore, as to these claims, the undersigned **RECOMMENDS** that the Motion to Dismiss be **DENIED**. As to their First and Fourteenth Amendment claims against King for their removal from the juror list; their First Amendment claims against Defendants King and Busse for the attempted removal from the Loving County Appraisal Board against; and their First Amendment

---

311. *Bevill v. Fletcher*, 26 F.4th 270, 283 (5th Cir. 2022) (quotation marks omitted).
312. *Pfannstiel v. Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990).
313. *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982).
314. *Id.*
315. *Morales v. Carrillo*, No. EP-19-CV-217-KC-ATB, 625 F. Supp. 3d 587, 607 (W.D. Tex. Sept. 2, 2022).
316. *Bevill*, 26 F.4th at 275 (citation and quotation marks omitted).

claim against Busse for his actions as Voter Registrar, the undersigned **RECOMMENDS** that the Motion to Dismiss be **GRANTED** on the ground of qualified immunity.

**C.       Voting Rights Act Claim**

Plaintiffs' last major cause of action seeks injunctive relief pursuant to § 11(b) of the Voting Rights Act,[317] codified at 52 U.S.C. § 10307(b). Plaintiffs allege that Defendants violated the Voting Rights Act by intimidating, threatening, and coercing Plaintiffs "from exercising their right to vote in Loving County."[318] Defendants challenge Plaintiffs' standing to seek an injunction as well as the mootness of their claim against King.

**1.   Standing**

Defendants argue that Plaintiffs lack standing to bring a § 11(b) claim against any of Defendants.

Federal courts maintain limited subject matter jurisdiction.[319] The Constitution imputes only the power to resolve disputes involving "Cases" and "Controversies."[320] An Article III case or controversy requires the plaintiff to have a "personal stake" in the case, also known as standing. In showing this, a plaintiff holds the burden of demonstrating that (1) "he suffered an injury in fact that is concrete, particularized, and actual or imminent"; (2) "the injury was likely caused by the defendant"; and (3) "the injury would likely be redressed by judicial relief." If a plaintiff "does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to decide."[321]

---

317. Section 11(b) of the Voting Rights Act reads: " No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any persons to vote or attempt to vote . . . ." 52 U.S.C. § 10307(b). Courts have found that the statute extends to private conduct and establishes a private cause of action. *See Allen v. City of Graham*, Nos. 1:20-CV-997, 1:20-CV-998, 2021 WL 2223772, at *7 (M.D.N.C. June 2, 2021) (collecting cases).
318. (Doc. 18 at 31).
319. *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 821 (5th Cir. 2022).
320. U.S. Const. art. III.
321. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (quotation marks omitted).

A plaintiff "must demonstrate standing for each claim that [he] press[es] and for each form of relief that [he] seek[s] (for example, injunctive relief and damages)."[322] Requests for injunctive relief "implicate the intersection of the redressability and injury-in-fact requirements." Because injunctive and declaratory relief "cannot conceivably remedy any past wrong," a plaintiff seeking injunctive relief satisfies the redressability requirement "only by demonstrating a continuing injury or threatened future injury. That continuing or threatened future injury, like all injuries supporting Article III standing, must be an injury in fact." An injury in fact is one "(1) potentially suffered by the plaintiff, not someone else; (2) concrete and particularized, not abstract; and (3) actual or imminent, not conjectural or hypothetical."[323]

Defendants lodge attacks concerning only the imminence element for any of Defendants' actions. "For a threatened future injury to satisfy the imminence requirement, there must be at least a 'substantial risk' that the injury will occur," meaning the injury cannot be speculative. "Standing also does not follow from the conclusion that the injunctive relief sought by a plaintiff would prevent the plaintiff from suffering the same injury in the future, which is always true when a plaintiff seeks an injunction prohibiting a defendant from repeating an action that injured the plaintiff in the past."[324] Thus, under § 11(b), "past wrongs do not themselves amount to the kind of real and immediate threat of future injury necessary to make out a case or controversy."[325] In any event, in a case involving multiple plaintiffs, "only one of the[m] needs to have standing."[326]

### i.   Non-Email Conduct Standing

In this case, the undersigned concludes that Plaintiffs have standing to bring suit under the Voting Rights Act against Busse and Jones. As a preliminary matter, Defendants argue that Plaintiffs

---

322. *Perez*, 45 F.4th at 821.
323. *Stringer v. Whitley*, 942 F.3d 715, 720–21 (5th Cir. 2019).
324. *Id.* at 721 (citations omitted).
325. *Beaumont Chapter of NAACP v. Jefferson County*, -- F. Supp. 3d -- , 2023 WL 5002453, at *5 (E.D. Tex. Aug. 4, 2023) (quotation marks omitted).
326. *Massachusetts v. Envtl. Prot. Agency*, 549 U.S. 497, 518 (2007).

do not have a live controversy regarding contempt since they are no longer in custody.[327] The undersigned agrees that Plaintiffs have not proven that the contempt arrests have a substantial risk of re-occurring. Plaintiffs were arrested here, purportedly for contempt, and were released by the end of the day. Plaintiffs only note that the threat of litigation has not dissuaded Busse, "there is reason to believe his misconduct will continue unless stopped by this Court."[328] Plaintiffs' live Complaint only alleges facts indicating that Plaintiffs were arrested on the pretext of contempt, after they were summonsed for the qualification of a general assembly. If Plaintiffs' contentions that they have been excluded from the jury eligibility list are to be taken as true, it is unclear here how Plaintiffs would be summonsed via a list from which they have been excluded, whether lawfully or not, just to be arrested and held in contempt again. Fifth Circuit and other courts' precedent denying standing for injunctive relief against specific judges for seemingly one-off incidents are legion.[329] Specifically, the Fifth Circuit has observed that, as here, no standing exists where it is "most unlikely that the plaintiff would again come into conflict with the judge in similar circumstances, and with the same results."[330] Plaintiffs' assertion that arrests will continue, all under the guise of contempt, adds no facts which could illustrate how, when, or why future arrests may occur. This is further enhanced by the undisputed fact that King no longer serves as a justice of the peace. She could, having been removed from her allegedly abused position, hardly be able to again summons Plaintiffs and order Busse and Jones to carry out their arrests. As to Busse and Jones' arresting capabilities otherwise, this is not demonstrated to be likely to re-occur, and Plaintiffs have not alleged facts indicating Defendants may produce a sequel to these actions. The single-incident arrests for contempt do not support standing.

---

327. (Doc. 19 at 18).
328. (Doc. 20 at 19).
329. *See, e.g.*, *Adams v. McIlhany*, 764 F.2d 294 (5th Cir. 1985) (finding no case or controversy where plaintiff was released from jail and was therefore unable to enjoin the contempt citation or her subsequent incarceration); *see also Herman*, 959 F.2d at 1286 (collecting cases).
330. *Herman*, 959 F.2d at 1286.

But Plaintiffs do not characterize their continuing harm as merely the risk of arrest; rather, they do so as one involving Defendants' alleged intimidation campaign.[331] Thus, Plaintiffs are arguing that Defendants' conduct, from the arrests to the Appraisal Board actions and further, in their totality create an atmosphere of intimidation which will cause Plaintiffs continued harm. The standing of this claim will be evaluated through this lens.

Even through this lens, however, the undersigned finds some difficulty in discerning what continuing harm will occur. For example, Plaintiffs request injunctive relief which would encompass in part prohibitions against Defendants "repeating their illegal actions against Plaintiffs or others in the future."

Plaintiffs explain that Defendants Busse and King attempted to remove Renteria from the Appraisal Board. Specifically, Plaintiffs assert that King and Busse's failed attempts to force Renteria's resignation as well as their effort to cause the Appraisal District to file suit against Renteria were baseless. This is because SB 1111,[332] the law on which King and Busse purportedly relied as their justification, does not prohibit Renteria's board membership even though he only lives in Loving County for a couple of weeks out of the year. Throughout their complaint, Plaintiffs characterize the Appraisal Board shenanigans as integral to the intimidation plot. Plaintiffs elsewhere assert, however, that King and Busse were recalled from their positions on the Appraisal Board.[333] If King and Busse, the troubled Defendants for Renteria's Appraisal Board membership, are no longer on the Appraisal Board, that either could move to remove Renteria from it is certainly a long shot.

---

331. (Docs. 18 at 32; 20 at 19).
332. Plaintiffs make significant noise about SB 1111, seemingly anticipating a defense by Defendants using the state bill. (Docs. 18 at 2, 7, 18-20, 25; 20 at 19). The bill, in pertinent part, amended the Texas Election Code to expressly note that persons may not "establish a residence at any place the person has not inhabited" or "designate a previous residence as a home and fixed place of habitation unless the person inhabits the place at the time of designation and intends to remain." 87th Leg., Reg. Sess. (Tex. 2021). Defendants scarcely mention the bill in their Motion to Dismiss, and do not appear to rely on it for their immunity and Article III defenses. The undersigned need not and does not address SB 1111 in issuing the recommendations on Defendants' motion.
333. (Doc. 18 at 7).

Renteria has since defeated King and Busse's attempts to remove him from the Board. Plaintiffs offer no indication or substantial risk that this harm could re-occur.[334]

The allegations pertaining to Busse's "recent actions" seem more appealing. As a reminder, Plaintiffs allege that Busse sent confirmation notices that "demanded that Plaintiffs prove they are residents of Loving County." These letters purportedly included false claims about information concerning the voter's current residence and that the statement in the letters saying the Voter Registrar had received such information was a "lie." Plaintiffs claim that these "demands" to demonstrate residency intimidate them from voting.[335]

The undersigned believes that Plaintiffs still have not met their burden of showing a continuing, substantial risk of repeated harm in the imminent future. Plaintiffs allege that Busse's actions occurred "in the midst of an election" in Loving County and exclaim that Busse would intend to send such deceit-based letters again. In the context of elections, "retrospective [injunctive] relief is not available" with regard to an election that has since passed.[336]

Defendants contend that Busse's alleged past conduct does not show "a threat of imminent future harm."[337] This is correct. Defendants offer *Michigan Welfare Rights Org. v. Trump* as a bulwark against Plaintiffs' § 11(b) claim against Busse here.[338] In *Michigan Welfare*, plaintiff organizations sued multiple defendants for supposed violations of the Voting Rights Act involving a

---

334. On these grounds, one can speculate as to the relief to be granted. Would it be an injunction reading, "Do not intimidate Plaintiffs anymore?" This can hardly be said to be a specific and imminent harm. Injunctive relief cannot be granted based on this conduct alone.

335. (Doc. 18 at 20–21).

336. *See In re Hotze*, 643 S.W.3d 413, 417 (Tex. 2022).

337. (Doc. 21 at 10). This is distinct from the mootness exception, which provides that "a dispute that would otherwise be moot is saved if it is capable of repetition, yet evades review." *Shemwell v. City of McKinney*, 63 F.4th 480, 484 (5th Cir. 2023) (citation omitted) (alterations omitted). "The capable-of-repetition-yet-evading-review doctrine applies only to claims that are moot, *i.e.* presented a case or controversy when they were filed but ceased to do so at a later time." *Stringer*, 942 F.3d at 724. However, this being said, "[t]here is no analogous exception to standing requirements: 'if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum.'" *Beaumont Chapter of NAACP v. Jefferson County*, No. 1:22-CV-00488, -- F. Supp. 3d -- , 2023 WL 5002453, at *5 n.6 (E.D. Tex. Aug. 4, 2023).

338. (Docs. 19 at 18 (citing *Mich. Welfare*, 600 F. Supp. 3d 85, 108 (D.D.C. 2022)); 21 at 10).

conspiracy to "prevent the counting of illegally cast ballots," which included the intimidation of various agents.[339] One defendant moved to dismiss the plaintiffs' § 11(b) claim based on a lack of standing. The defendant argued that the plaintiff organizations had failed to clearly allege facts supporting a real and immediate threat of future harm and argued alternatively that, even if their conduct violated § 11(b), there was no threat of imminent future harm. Like Plaintiffs here, the *Michigan Welfare* plaintiffs did not "specifically address any of [the defendant's] standing arguments as to the imminence of future harm, a requirement to show standing for equitable relief."[340] Instead, they alleged that the defendant's misconduct "has forced [one of the plaintiffs] to divert resources to monitor [the defendant's] activities and disseminate public education materials to address the conduct."[341] Some members of one of the plaintiff organizations, the plaintiffs claimed, "plan[ned] to vote in future elections." The court there found that, while those statements sufficed to establish injury, they did not establish standing.

A similar case is present before the Court. As with the *Michigan Welfare* plaintiffs, Plaintiffs here were required to show that they are "sufficiently likely to be *personally* subjected to the challenged conduct *again* in order to have standing."[342] Plaintiffs' only allegation with a tangible relation to this element is one saying that Busse has, only once since the courtroom proceedings and apparently only twice as recorded in the live Complaint, sent "intimidating" letters to Loving County voters. Plaintiffs appear to contend that this behavior will occur again at some point in the future. Even if it is true that Busse's letters could be intimidating, at no point do Plaintiffs explain how they would be intimidated or discouraged from voting as a result of them. Plaintiffs do not explain when the next election will be. Plaintiffs also fail to denote how the letters Busse originally sent intimidated them. With no explanation, it would appear that only one instance of mid-election

---

339. *Mich. Welfare*, 600 F. Supp. 3d at 93–94.
340. *Id.* at 108.
341. *Id.* (quotation marks omitted).
342. *Id.* at 108 (emphasis added) (citation omitted).

intimidation has occurred by way of Busse's letters. The undersigned is only left to surmise Busse's letter-sending strategy. A single event in the middle of an election, supplemented only by a conspiracy, may indeed overcome *mootness*. But in this case, the prospect of Busse's repeated conduct is too speculative to support standing.[343]

While Plaintiffs contend in their Response that the Court could order Busse to undertake "corrective measures, including sending new, truthful letters of correction to Loving County voters,"[344] the undersigned cannot confidently conclude that this suggestion fills the standing gap. Plaintiffs seem to imply that they have been and may continue to be intimidated by these letters. But Plaintiffs do not explain how any corrective measures, whether it be follow-up letters or otherwise, by Busse would un-intimidate them or correct the harm or injury they have suffered, if any.[345] Plaintiffs only suggest that Defendants could be ordered to "expunge[e] Plaintiffs' unlawful arrest records."[346] It is left to the imagination as to how or whether the Voting Rights Act would authorize the expunging of any arrest records in response to Busse's letters.

Plaintiffs have failed to plead sufficient conduct to suggest that they suffer continuing actual harm. Therefore, they lack standing to pursue their claim under the Voting Rights Act. Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **GRANTED** as to Plaintiffs' Voting Rights Act for want of standing concerning Defendants Busse and Jones.

###### ii.   **Email Conduct Standing**

In the event that the Court believes King is not entitled to qualified immunity for removing Plaintiffs from the eligible juror list, these allegations seem the most proper. If this allegation is to be

---

343. *See Mich. Welfare*, 600 F. Supp. 3d at 108–09 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000)).
344. (Doc. 20 at 19).
345. *See Nat'l Coal. on Black Civic Participation*, 498 F. Supp. 3d 457, 490 (S.D.N.Y. 2020) (authorizing use of "curative message" to remedy intimidating robocalls previously sent to voters).
346. (Doc. 20 at 19).

taken as true,[347] so is the allegation that they continue to be excluded from the eligible juror list. The undersigned holds that this indeed presents a continuing and actual harm. In particular, the harm suffered is that Plaintiffs are unable to be called for jury service and participate in their civic duty. Defendants themselves admit King would have no legal authority to catalyze this status by an email to a county clerk.[348] But clearly, conduct being *ultra vires* does not eliminate standing. For Plaintiffs being continuously unable to participate in juries based on a single individual's *ultra vires* action is an imminent and actual injury. This perhaps may be the only continuing injury, but it is one sufficient to supply standing against King for her email and jury list conduct here.

The Fifth Circuit has "often held that plaintiffs lack standing to seek prospective relief against judges because the likelihood of future encounters is speculative."[349] A plaintiff "suing a state-court judge and seeking . . . injunctive relief must show a significant likelihood she will encounter the same judge in the future, under similar circumstances, with a likelihood the same complained-of harm will recur."[350] However, this is not a hardline rule. A plaintiff, for example, "with a substantial risk of being called for jury duty has standing to seek an injunction against a systemic exclusionary practice but not a one-off, episodic exclusion related to a particular judge's actions."[351]

In this case, it is undisputed that King is no longer a justice of the peace, having been unsuccessful in her 2022 re-election campaign. One would therefore believe that there is not only an insignificant likelihood of re-encountering Judge King as a judge, but an impossibility of such a scenario. Thus, Plaintiffs effectively maintain that the pending election challenge King has filed

---

347. Defendants exclaim at many a point that it is practically impossible for King's email to produce such a result. (Doc. 19 at 11). This factual statement, however, must be taken as true at the Federal Rule 12(b)(6) stage. Defendants' arguments to the practical feasibility of King's alleged action attack the merits of the allegation, as to whether or not it happened or occurred as alleged, instead of whether such would substantiate a claim for relief.
348. (Doc. 19 at 11).
349. *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1286 (5th Cir. 1992).
350. *Serafine v. Crump*, 800 F. App'x 234, 237 (5th Cir. 2020) (unpublished).
351. *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 376 (5th Cir. 2021).

supplies this significant likelihood.[352] Plaintiffs' briefing, however, is devoid of any other facts than "King has filed an election challenge" which may indicate some likelihood that King could return to the bench to exact revenge, such as a successful challenge, concessions made by the election victor, or otherwise. The undersigned is not convinced that a mere challenge to the results of an election creates a significant likelihood that the challenger will be victorious.

Plaintiffs have failed to plead sufficient conduct to suggest that they suffer continuing actual harm. Therefore, they lack standing to pursue their claim under the Voting Rights Act. Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **GRANTED** as to Plaintiffs' Voting Rights Act for want of standing concerning Defendant King.

### 2. Mootness

Defendants contend that Plaintiffs' Voting Rights Act claim against King is moot because she is not a justice of the peace. King, Defendants claim, "no longer has the authority" that is susceptible to abuse or possible to enjoin.[353] Further, Defendants maintain that the claim against King, brought in her personal capacity only, does not transfer to her successor.[354]

Plaintiffs concede that King lost her re-election bid in 2022. However, Plaintiffs note, King's pending election contest in state court obviates the current mootness argument since a successful such contest will allow her to "continue her vendetta against Plaintiffs."[355]

In this case, the undersigned finds that Plaintiffs' sought-after injunctive relief against Defendant King is moot. A case becomes moot "when there is no reasonable expectation that the wrong will be repeated" and where "it becomes impossible for the court to grant any effectual relief whatever to the prevailing party."[356]

---

352. (Docs. 18 at 8; 20 at 20).
353. (Doc. 19 at 20).
354. (Doc. 18 at 3).
355. (Doc. 20 at 20).
356. *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 426 (5th Cir. 2013) (citation omitted); *Sharifullin v. Blinken*, No. 21-cv-728, 2022 WL 558191, at *2 (D.D.C. Feb. 24, 2022) (citation omitted).

As the parties agree, King is no longer a justice of the peace, or a judge in any capacity. She therefore does not have the present authority to "continue" any "vendetta" against Plaintiffs. Even if the Court were to grant Plaintiffs their requested injunctive relief, and even if King were ordered to follow through with any such order, King would lack the authority to issue any order pertaining to any matter of which Plaintiffs complain. The theoretically correct party for this injunctive relief would presumably be King's successor.[357] But this individual is not before this Court. And because Plaintiffs sue King only in her personal capacity and not her official capacity, any such injunctive relief granted or posed against King would not continue to her successor.[358]

Additionally, the undersigned concludes that the prospect of King's resurgence to the Loving County throne, should her election contest succeed, does not reasonably spell doom for Plaintiffs. Plaintiffs, as the parties asserting this Court's subject matter jurisdiction over their injunctive relief claims, possess the burden of demonstrating that their case is not moot.[359] Plaintiffs have not cited any authority or alleged any facts which would signify that King would continue her alleged campaign of political terror against Plaintiffs. Nor do they explain how an ongoing election contest would suspend mootness challenges throughout its duration. It is not a reasonable expectation here that King would, following this case's conclusion and resulting costly litigation, and regardless of the victor in this suit, re-engage any improper campaign.

While it is true that claims under § 11(b) apply to private citizens, it is not true that impossible forms of injunctive relief can be sought against them. Plaintiffs have not met their burden

---

357. *See* Fed. R. Civ. Proc. 25(d); *Barachkov v. Lucido*, Nos. 04-CV-73977, 04-CV-73957, 2015 WL 1534487, at *2–4 (E.D. Mich. Apr. 6, 2015).

358. *Harrington v. Grayson*, 764 F. Supp. 464, 475–76 (E.D. Mich. 1991) ("[U]nlike in 'personal capacity' litigation, in an 'official capacity' suit, the replacement of one public official by a successor results in an automatic substitution of parties in the suit."). Federal Rule of Civil Procedure 25(d) provides for the automatic substitution of a public officer in an action where the officer is sued in her official capacity and "dies, resigns, or otherwise ceases to hold office while the action is pending." Fed. R. Civ. Proc. 25(d); *see Barachkov*, 2015 WL 1534487, at *2–4; *but see Turngren v. Daugherty*, No. 4:09 CV 81, 2011 WL 924309, at *1, *4 (N.D. Ind. Mar. 14, 2011) (observing that successor substitution is possible where a claim is made against an official in his official capacity). Plaintiffs, having sued King only in her personal capacity, cannot seek relief under Federal Rule 25(d).

359. *Mabary v. Hometown Bank, N.A.*, 276 F.R.D. 196, 200 (S.D. Tex. 2011).

of demonstrating that their case is not moot. Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **GRANTED** as to Plaintiffs' § 11(b) claim against Defendant King.

### IV. RECOMMENDATION

The American system of jurisprudence "rests on the assumption that all individuals, whatever their position in government, are subject to federal law: 'No man [or woman] in this country is so high that he [or she] is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government from the highest to the lowest, are creatures of the law, and are bound to obey it.'"[360]

For the foregoing reasons, the undersigned **RECOMMENDS** that the Motion to Dismiss be **GRANTED IN PART** and **DENIED IN PART**. (Doc. 19).

Specifically, the undersigned **RECOMMENDS** that the Motion to Dismiss be **GRANTED** as to:

- Plaintiffs' Fourteenth and First Amendment claims against Defendant King for her alleged actions in removing Plaintiffs from the eligible juror list on qualified immunity grounds;

- Plaintiffs' First Amendment claim against Defendants King and Busse for their actions in attempting to remove Plaintiff Renteria from the Loving County Appraisal Board on qualified immunity grounds;

- Plaintiffs' First Amendment claim against Defendant Busse for his actions as Voter Registrar on qualified immunity grounds;

- Plaintiffs' conspiracy claims to the extent it relates to the above three claims on qualified immunity grounds; and

- Plaintiffs' Voting Rights Act claim against all Defendants.

---

360. *Butz v. Economou*, 438 U.S. 478, 506 (1978) (quoting *Untied States v. Lee*, 106 U.S. 196, 220 (1882)).

The undersigned further **RECOMMENDS** that the Motion to Dismiss be **DENIED** as to:

- Defendants' assertion of judicial immunity as to Defendant King;

- Defendants' assertion of quasi-judicial immunity as to Defendants Busse and Jones; and

- Defendants' assertion of qualified immunity for Plaintiffs' claims concerning the contempt orders and arrests made under the Fourth, Fourteenth, and First Amendments, for all Defendants.

SIGNED this 13th day of September, 2023.

_____
DAVID B. FANNIN
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND RIGHT TO APPEAL/OBJECT**

In the event that a party has not been served by the Clerk with this Report and Recommendation electronically, pursuant to the CM/ECF procedures of this District, the Clerk is **ORDERED** to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested. Pursuant to 28 U.S.C. § 636(b), any party who desires to object to this report must serve and file written objections within fourteen (14) days after being served with a copy unless the time period is modified by the District Judge. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made; the District Judge need not consider frivolous, conclusive, or general objections. Such party shall file the objections with the Clerk of the Court and serve the objections on the U.S. Magistrate Judge and on all other parties. A party's failure to file such objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the District Judge. Additionally, a party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996).